## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

Docket Number(s): 24-40

Caption [use short title]

Motion for: injunction pending appeal

Students for Fair Admissions

v.

U.S. Military Academy at West Point

Set forth below precise, complete statement of relief sought:

An injunction prohibiting West Point from

considering race as a factor in admissions

until further order of the Court.

MOVING PARTY: Students for Fair Admissions

OPPOSING PARTY: U.S. Military Academy at West Point, et al.

- [ ] Plaintiff
- [ ] Defendant
- [x] Appellant/Petitioner
- [ ] Appellee/Respondent

MOVING ATTORNEY: Cameron T. Norris

OPPOSING ATTORNEY: Jennifer E. Blain

[name of attorney, with firm, address, phone number and e-mail]

Consovoy McCarthy PLLC

United States Attorney's Office for the Southern District of New York

1600 Wilson Boulevard, Suite 700, Arlington, VA 22209

United States Attorney's Office, SDNY, One Saint Andrew's Plaza, New York, NY 10007

(703) 243-9423; cam@consovoymccarthy.com

(212) 637-2743; Ellen.Blain@usdoj.gov

Court- Judge/ Agency appealed from: Judge Philip M. Halpern

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
- [x] Yes
- [ ] No (explain):

Opposing counsel's position on motion:
- [ ] Unopposed
- [x] Opposed
- [ ] Don't Know

Does opposing counsel intend to file a response:
- [x] Yes
- [ ] No
- [ ] Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has this request for relief been made below?
- [x] Yes
- [ ] No

Has this relief been previously sought in this court?
- [ ] Yes
- [x] No

Requested return date and explanation of emergency: January 17, 2024

Plaintiff's members are applying to West Point this cycle. West Point's admissions deadline is January 31, 2024, after which it will begin making general admissions decisions. The loser of this motion will seek further review at the Supreme Court, and January 17 gives this Court and the Supreme Court an equal amount of time.

Is the oral argument on motion requested?
- [ ] Yes
- [x] No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?
- [ ] Yes
- [x] No  If yes, enter date:

Signature of Moving Attorney:

/s/ Cameron T. Norris    Date: 01/04/2024    Service : [x] Electronic  [ ] Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# 24-40

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

STUDENTS FOR FAIR ADMISSIONS,

*Plaintiff-Appellant*,

v.

UNITED STATES MILITARY ACADEMY AT WEST POINT; UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of Defense; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point,

*Defendants-Appellees.*

## MEMORANDUM IN SUPPORT OF <u>EMERGENCY</u> MOTION FOR INJUNCTION PENDING APPEAL (RULING REQUESTED BY <u>JANUARY 17, 2024</u>)

As the United States recently stressed, there are "times where the [Supreme] Court technically reserves a question, but the logic of the prior decision effectively answers it." *SEC v. Jarkesy*, O.A.Tr.79, perma.cc/YJA9-JD89. When *Windsor v. United States* invalidated the *federal* ban on same-sex marriage, for example, the opinion technically didn't address *state* bans. 570 U.S. 744, 774 (2013). Yet most circuits held that the logic of *Windsor* also governed the States, and the Supreme Court—just two Terms after *Windsor*—agreed. *Obergefell v. Hodges*, 576 U.S. 644, 662-63 (2015).

1

This is one of those times. *SFFA v. Harvard* bans race-based admissions at universities nationwide, but it technically "does not address" the "military academies." 600 U.S. 181, 213 n.4 (2023). The Court left that question open because the academies "may" have "potentially distinct interests." *Id.* Still, the Court never suggested that the academies would be held to any lesser scrutiny. It decried the deference that *Korematsu* gave the military, *id.* at 213 n.3, and rejected the government's argument that the military needed racial preferences at civilian universities to preserve the diversity of officers coming from ROTC, *see id.* at 379 (Sotomayor, J., dissenting). Nor did the Court suggest that, if the academies identified "distinct interests," those interests would get a pass on narrow tailoring. *Id.* at 213 n.4. *Harvard* then gave several broad reasons why race-based admissions are not narrowly tailored. *Id.* at 213-17.

West Point isn't exempt from these narrow-tailoring requirements, and it badly violates them all. West Point uses race as a negative by using it as a positive for only three races. West Point uses the same arbitrary racial categories as Harvard and UNC. It promises to use race in perpetuity, asserting the same racial-balancing goals. West Point also considers race *qua* race, illegally stereotyping applicants. And its interests are just as amorphous as Harvard's and UNC's. Contra the district court, no more facts are needed to predict that West Point will likely lose; West Point *will* lose, even accepting

2

its facts and crediting its asserted interests. The district court's refusal to make any pre-diction was an abuse of discretion.

Because West Point will likely lose this appeal, this Court should enjoin it from racially discriminating now. SFFA has members who are applying to West Point cur-rently. The application deadline is January 31, 2024. Without an injunction, SFFA's members will lose their right to compete on an equal footing for the Class of 2028. And West Point's unconstitutional discrimination cannot be remedied with damages. West Point should be enjoined, pending appeal, from considering race as a factor in admis-sions. Because the loser of this motion will likely seek relief from the Supreme Court, SFFA respectfully asks this Court to rule **by January 17, 2024**.[1]

## BACKGROUND

Admission to West Point is highly competitive. Ex.A at 4. The academy accepts less than 10% of applicants. *Id.* At the beginning, middle, and end of its admissions process, West Point considers race.

West Point first considers race when offering letters of Assurance. *Id.* at 9-10. These letters are "conditional offers" and thus "constitut[e] a firm commitment from West Point … that the candidate will be admitted" if they apply and satisfy certain minimum conditions. *Id.* When awarding these letters, West Point applies different rules

---

[1] SFFA conferred with West Point, who opposes an injunction pending appeal. West Point agrees to file its opposition within seven days, instead of the normal ten.

3

to different races. "African-American[s]" can get a letter whenever their College Entrance Examination Rank is at or above "554." Doc.53-2 at 4. A separate ranking, called a Whole Candidate Score, is required for other races but not African-Americans. *Id.* "Hispanic[s]" can get a letter of assurance if they have the same College Entrance Examination Rank as African-Americans, but only if they *also* have a Whole Candidate Score greater than "5,599." *Id.* White and Asian applicants—who can get a letter only if they are "scholars"—must have a College Entrance Examination Rank nearly 100 points higher than Hispanics and African-Americans and a Whole Candidate Score more than 1,300 points higher. *Id.* West Point instructs admissions officers to give "less than 120 [letters] per class cycle" to African-Americans, "less than 75 per class" to Hispanics, "less than 75 per class" to women, and "less than 75 per class" to scholars. *Id.*

West Point's use of race continues "throughout the admissions cycle." Ex.B ¶94. Each year, its superintendent "nominate[s] up to 50 candidates." Ex.A at 11. When selecting them, the Superintendent can consider race. Ex.B ¶94. West Point funnels these applicants through two different teams: regional offices, who "identify qualified candidates" based on traits like "leadership," "athleticism," and "scholastic aptitude"; and the Diversity Outreach Office, which merely asks if a candidate is "an African American, Hispanic, or Native American" and "qualified." *Id.*

West Point also considers race when selecting what it calls "additional appointees." *Id.* ¶93. It follows a two-step process. It first asks whether a particular race "make[s] up a greater share of West Point cadets" than its proportional share in "the

Army officer corps." Doc.47 at 18 n.3 (citing Ex.B ¶16). If a race is overrepresented, West Point "does not consider race as a plus factor" for them (as was recently the case for "Asians"). *Id.* If a race is underrepresented, West Point considers race "as a plus" for them. *Id.* West Point can also give racial preferences at this stage to African-Americans, Hispanics, and Native Americans who didn't get a letter of assurance. Ex.B ¶93. (Those who did get a letter but haven't been admitted yet are simply admitted as additional appointees. *Id.*)

West Point uses race "to foster diversity in the Army officer corps," which, it says, is necessary for cohesion, recruitment, retention, and legitimacy. Doc.47 at 1, 29-38. Despite repeating those interests over and over, West Point does not explain what level of racial diversity is needed to achieve them. Nor does it identify how diverse it would be if it stopped considering race. And despite not knowing these numbers, West Point insists that "[r]ace-neutral alternatives are not sufficient." Doc.47 at 55. The Coast Guard Academy was barred from using race for years, however, and West Point does not argue that it wasn't diverse during that time (or that the Coast Guard wasn't cohesive, legitimate, etc.). Ex.A at 23 n.14.

West Point could have stopped considering race in June after *Harvard*, like civilian universities did; but it didn't. Though *Harvard* "does not address" the military academies, 600 U.S. at 213 n.4, the government previously told the Court that the academies "rel[y] on *Grutter*" (which *Harvard* eviscerated) and "employ" the same "admissions policies" as Harvard and UNC (which *Harvard* invalidated). U.S.-*SFFA*-Br.17-24, 2022 WL

3130793. So it was unclear whether the academies would use race after *Harvard*. In August 2023, however, the academies announced that they would "use race as a factor" for the upcoming Class of 2028. Doc.1 ¶75.

SFFA filed this lawsuit and moved for a preliminary injunction in September, challenging West Point's use of race under the Fifth Amendment's equal-protection guarantee. Docs. 1, 6. SFFA has at least two members who are applying to West Point this cycle, but cannot compete on an equal footing because they are white. Member A is a high-school senior. Doc.8. He is "in excellent physical condition," "receive[s] annual physicals," and "ha[s] no medical condition that would prevent [him] from" attending. *Id.* He is "taking all necessary steps to apply." *Id.*; Doc.68. The same is true for Member C, a college freshman who has also "received a nomination from [her] congressman." Doc.69; Doc.25.[2]

The district court denied SFFA's motion. After reviewing the record—including West Point's internal guidelines, nearly a dozen declarations, and hundreds of pages of evidence—the court concluded that there weren't enough facts. Ex.A at 22. It refused to decide whether West Point's interests were "compelling." *Id.* And it refused to address any of SFFA's narrow-tailoring arguments, insisting that "[a] full factual record is vital." *Id.* The Court did rule, though, that SFFA had standing and did not delay. *Id.* at

---

[2] Member A has received a congressional nomination too. SFFA would have filed a supplemental affidavit, like it did for Member C, but the district court instructed it not to. *See* Hearing-Tr.80.

15-17, 26 n.16. And it suggested that, if SFFA were likely to succeed on its constitutional claim, the other preliminary-injunction factors would be satisfied. *Id.* at 17, 24.

SFFA immediately appealed. Doc.79. SFFA asked the district court for an injunction pending appeal, and the district court denied that motion today. Doc.83.

## ARGUMENT

An injunction pending appeal is warranted if SFFA's constitutional claim is "likely to prevail," if denying relief would cause "irreparable harm," and if granting relief would not harm the "public interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 66 (2020). All three are true here.

Though the district court thought it "largely academic," Ex.A at 15, no higher standard applies. An injunction prohibiting West Point from considering race does not "mandate" anything. *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1985). West Point can simply stop considering race, which it says is only a "plus" at certain "limited" points. Doc.47 at 16. An injunction does not become mandatory because the defendant must take steps to stop the illegal conduct—or because the defendant *chooses* to affirmatively hold meetings or rewrite materials. *Cf.* Ex.A at 13. What matters is that the *order itself* is prohibitory, not mandatory. *Mastrovincenzo v. N.Y.C.,* 435 F.3d 78, 90 (2d Cir. 2006). And if West Point ultimately prevails on appeal, it is free to consider race again in future cycles.

7

## I.    SFFA is likely to succeed on the merits.

*Harvard* identified five ways that race-based admissions violate strict scrutiny. 600 U.S. at 212-13, 218-19. They use race as a negative. They group people into incoherent racial categories. They rely on racial stereotypes. They have no firm end date. And they set goals that courts can't measure. West Point violates all five, and no special military exemption exists. These violations can be decided as a matter of law, taking West Point's interests as a given and its facts as true.

### A.    West Point violates every rule from *Harvard*.

***Negative.*** Race "may never be used as a negative." *Id.* at 218. Universities use race as a negative for some if they use it as "a plus" for others. *Id.* at 209. Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others *necessarily* advantages the former group at the expense of the latter." *Id.* at 218-19 (emphasis added). Race is obviously a negative when, without the preference, "members of some racial groups" would "be admitted in greater numbers." *Id.* & n.6.

West Point violates this rule. It "considers race and ethnicity as a plus" for only three races. Doc.47 at 55 n.30; Ex.B ¶80. It thus treats race as a negative for all others because its highly competitive admissions are zero-sum. Ex.A at 4. West Point also concedes that the composition of its class would meaningfully change—and "the number of white male cadets" would meaningfully "increase"—if it switched to race-neutral alternatives. *E.g.*, Doc.47 at 55-58. Its whole reason for using racial preferences is to increase the *proportion* of certain races. "How else but 'negative' can race be described

if, in its absence, members of some racial groups would be admitted in greater numbers than they otherwise would have been?" *Harvard*, 600 U.S. at 219. Worse than Harvard and UNC, West Point holds different races to different numerical scores, and it imposes race-based quotas on its early offers of admission. Doc.53-2 at 4. That "[m]echanical" use of race wasn't legal even under *Grutter v. Bollinger*, 539 U.S. 306, 334 (2003).

**Categories.** Admissions programs cannot rely on "incoherent" racial categories. *Harvard*, 600 U.S. at 215-16. In *Harvard*, "the universities measure[d] the racial composition of their classes" by assigning applicants to one of six categories: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.* Those categories were too "imprecise" to satisfy narrow tailoring. *Id.* (citing Justice Gorsuch's concurrence). "Asian" sweeps in "60% of the world's population." *Id.* at 291-92 (Gorsuch, J., concurring) (citing Bernstein, *The Modern American Law of Race*, 94 S. Cal. L. Rev. 171 (2021)). "White" covers people as diverse as Italians, Iranians, Norwegians, Moroccans, the Turkish, and the Welsh. *Id.* at 292. And the remaining categories are equally incoherent. *See generally* Bernstein.

West Point uses the same categories. Ex.B ¶¶112-13. It fails strict scrutiny because those categories weren't designed to achieve any compelling interest, let alone military objectives. The "federal interagency commission [that] devised this scheme of classifications … acted without any input from anthropologists, sociologists, ethnologists, or other experts." *Harvard*, 600 U.S. at 291 (Gorsuch, J., concurring). And when

the government issued them, it stressed that "'[t]hese classifications should not be interpreted as being scientific or anthropological in nature, *nor should they be viewed as determinants for eligibility for participation in any Federal program.*'" *Id.* (quoting 43 Fed. Reg. 19,269). West Point's "use of these opaque racial categories" violates strict scrutiny. *Id.* at 217 (majority).

**Endpoint.** Race-based admissions programs "must have reasonable durational limits." *Id.* at 228. "[P]eriodic review" is not enough. *Id.* at 225. Harvard and UNC violated this rule because they had no "sunset date." *Id.* And they had no "logical end point" because they wanted the racial demographics of their classes to mirror "the general population"—a constantly moving target. *Id.* at 221-23.

West Point admits that it has no sunset date on its use of race, Ex.B ¶96, and it has no logical endpoint either. Because West Point balances every class to "reflec[t] the diversity" of "the nation," Doc.47 at 43, it promises to use race in perpetuity. The nation's racial composition will always change, so West Point's racial balancing will always change with it. Indeed, West Point recently adjusted the treatment it gives Hispanic applicants precisely because their representation has fluctuated. Ex.B ¶96. "By promising to terminate their use of race only when some rough percentage of various racial groups is admitted," West Point "effectively assure[s] that race will always be relevant." *Harvard*, 600 U.S. at 223 (cleaned up). Equal protection does not tolerate that choice. *Id.* at 212-13, 223, 228.

***Stereotyping.*** University programs "may never use race as a stereotype." *Id.* at 213. Racial preferences stereotype because they award a benefit based on "race *qua* race," assuming that race is a reliable proxy for a student's views, experiences, or background. *Id.* at 220. Equal protection "forcefully reject[s] the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Id.*

West Point stereotypes. Like Harvard and UNC, it gives benefits to certain applicants based on race *qua* race. And it blatantly stereotypes. It constantly "'engages in the offensive and demeaning assumption'" that racial minorities, because of their race, see things "different[ly] from nonminority students." *Id.* at 220-21. It assumes, for example, that racial preferences will "foster trust and confidence" because minority soldiers are more likely to trust officers with "demographic similarities." Doc.47 at 27-28, 31. West Point also insists that, if officers' demographics don't precisely mirror the country's demographics, minority civilians will think the military is "illegitimate," Doc.47 at 37; minority recruits "will be discouraged from serving," *id.* at 34-35; and minority soldiers cannot "navigate diverse people … overseas," *id.* at 38 (cleaned up). This type of race essentialism, arguing that a black lieutenant from San Diego can better relate to an Afghan shepherd than his white counterpart from Houston, isn't the stuff of strict scrutiny.

***Unmeasurable Interests.*** *Harvard* holds that a university may consider race only if it has "an exceedingly persuasive justification" that "is measurable and concrete

enough to permit judicial review." 600 U.S. at 217. Courts must be able to measure not just the interest, but the difference between how that interest fares under racial preferences and how that interest would fare under racial neutrality. *Id.* at 215.

West Point's interests are impossible to measure. The academy asserted four: recruitment, retention, cohesion, and legitimacy. Doc.47 at 29-38. "It is unclear how courts are supposed to measure any," or "know when they have been reached." *Harvard*, 600 U.S. at 214. West Point never offers any reliable metric to determine whether a sufficient percentage of soldiers "'see themselves as part of an inclusive, representative force,'" Doc.47 at 30; Doc.48 ¶15, or whether units are good enough at "problem-solving" and "innovation," Doc.47 at 30, 33; Doc.49 ¶19. "There is no particular point at which there exists sufficient 'innovation and problem-solving.'" *Harvard*, 600 U.S. at 214-15. Nor can courts tell if West Point's racial preferences are causing the Army to "attract and retain top talent" or appear "more legitimate in the eyes of the nation." Doc.47 at 1, 34-36. Indeed, the government argued that all these interests were important to ROTC programs at civilian universities—which provide more than four times as many Army officers as West Point—but the *Harvard* Court was unmoved. *Harvard*-O.A.-Tr.150:8-17, perma.cc/3JEA-VMQK.

In any event, West Point doesn't divulge what it thinks its racial numbers would *be* if it stopped using race (and upped its race-neutral alternatives), let alone prove that the difference is necessary for cohesion, recruitment, retention, or legitimacy. *Individuals* are diverse, and West Point would have people of all races and backgrounds without

explicit racial preferences. *See Harvard*, 600 U.S. at 215 ("the question … is not one of *no* diversity or of *some*: it is a question of degree"). The Coast Guard Academy, for example, couldn't use race before 2010; but after ramping up its race-neutral alternatives, it admitted racial minorities on par with West Point. Doc.1 ¶105. As the district court noted, West Point has no "evidence" it even considered a world where it stopped using race, Ex.A at 23 n.14, and West Point refused to mention the Coast Guard Academy below. Those omissions are fatal under strict scrutiny. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

## B.    West Point is not exempt from *Harvard*.

*Harvard* didn't exempt West Point from its reasoning or its rules. The Supreme Court knows how to carve out certain policies from its holdings. *E.g.*, *Harvard*, 600 U.S. at 230 ("nothing in this opinion should be construed as prohibiting universities…"). But that is not what it did for the military academies. It said the academies have "potentially distinct interests," *id.* at 213 n.4—not that the academies would get a watered-down version of strict scrutiny, or that its use of race wouldn't need to be narrowly tailored to whatever distinct interests it identifies.

West Point is subject to normal strict scrutiny. As *Harvard* said, "*[a]ny* exception to the Constitution's demand for equal protection must survive … strict scrutiny," meaning all racial classifications—civilian or military—are subject to the same "daunting" test. *Id.* at 206 (emphasis added). Indeed, "*any* person … has the right to demand

13

that *any* governmental actor … justify *any* racial classification … under the strictest judicial scrutiny." *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (emphasis added). And "*all* racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed … under strict scrutiny." *Adarand Constructors v. Peña*, 515 U.S. 200, 224 (1995) (emphasis added). These any's and all's could not be clearer; the caselaw leaves no room for a bespoke military-academy exception.

Consider *Johnson v. California*. Prisons normally get the same "level of deference" as the military. *Sample v. Diecks*, 885 F.2d 1099, 1109 (3d Cir. 1989). But when they classify citizens based on race, *Johnson* tells courts to apply normal strict scrutiny. 543 U.S. 499, 505-06 (2005). Giving "deference" to "prison officials" when they use race, the Court explained, would create a "hands-off approach to racial classifications" that "is fundamentally at odds with our equal protection jurisprudence." *Id.* at 506 n.1. "[S]earching judicial review of racial classifications" is all the more "necessary" where "the government's power is at its apex." *Id.* at 511.

*Harvard*'s discussion of *Korematsu* is informative. Though *Korematsu* was right to say that the military's racial classifications must pass strict scrutiny, all agree that the Court didn't faithfully apply that standard. *Harvard*, 600 U.S. at 207 n.3. It allowed the military to intern citizens because it deferred to the "judgment" of the "military authorities" that Japanese-Americans were a threat to national security. *Korematsu*, 323 U.S. at 218-19. As it turned out, the military's policy was "'carried out without adequate security

14

reasons.'" *Adarand*, 515 U.S. at 236. *Korematsu* has since been "overruled," precisely because courts cannot tolerate "'any retreat from the most searching judicial inquiry'" when the government uses race. *Harvard*, 600 U.S. at 207 n.3.

This Court should not repeat history's mistakes. *Korematsu* deferred to actual military tactics in an active world war, and yet *still* was "'gravely wrong the day it was decided.'" *Id.* at 207 n.3. Deference is even less warranted here, where the military is discriminating against teenagers when making admissions decisions in the hopes that some of them will attend, graduate, and become officers years later. *E.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 535-36 (2004) (military policy violated "individual liberties" and didn't directly involve "the strategy or conduct of war"); *Hartmann v. Stone*, 68 F.3d 973, 985 (6th Cir. 1995) (military policy also injured "people not in the Armed Forces"). Though this Court should of course give the government's views careful consideration, that consideration cannot become abdication; and it could not overcome West Point's many violations of strict scrutiny. "Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008).

## C.    The district court's refusal to rule is reversible error.

The district court recognized that the likely merits are the "'dominant, if not dispositive, factor'" here, and that a likely equal-protection violation would "itself constitut[e] irreparable harm." Ex.A at 17, 23. And it recognized that West Point carries the burden to justify its policy under strict scrutiny. *Id.* at 16-17. Yet the district court

never ruled that West Point likely satisfies strict scrutiny, explained why West Point is exempt from *Harvard*, or made any prediction about the likely merits. *See id.* at 21-22. It refused to rule until it had a "complete factual" record, meaning after discovery and even "a full trial." *Id.* at 22-23, 25.

Respectfully, that approach was flawed. Preliminary injunctions are "customarily granted" on "evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The movant "is not required to prove his case in full." *Id.* And "disputed issues of material fact" do not "preclud[e]" the court "from granting a motion for preliminary injunction." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 85 n.10 (1981). Especially in a "constitutional case," where the likely merits and the equities largely merge, "a district court necessarily abuses its discretion when it skips analyzing the likelihood of success factor." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023); *accord Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 616-17 (D.C. Cir. 1980). And moreso here, where strict scrutiny applies and *the government* carries the burden of justifying its use of race.

The Supreme Court has "foreclosed" the argument that, even though the government has the burden, the plaintiff "should have borne the burden of disproving the asserted compelling interests at the hearing on the preliminary injunction." *Gonzales v. O Centro Espírita Beneficente Uniã do Vegetal*, 546 U.S. 418, 429 (2006). If "substantial factual disputes" make it impossible to tell whether the government has carried its burden, then the government should lose and the "injunction" should issue. *Ashcroft v. ACLU*,

542 U.S. 656, 670-71 (2004). Courts shouldn't fret over interests that the government never identifies; they shouldn't consider them. And when the government identifies interests, an "absence of evidence" on whether its policy is narrowly tailored means the government is *unlikely* to prevail. *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 183 (2d Cir. 2020).

No fact needed to rule for SFFA was missing anyway. West Point submitted evidence explaining how it uses race, which the district court recounted in detail. Ex.A at 4-11. West Point also identified its alleged interests for using race. *Id.* at 10. Even accepting that evidence and crediting those interests as compelling, West Point would still fail strict scrutiny. West Point *concedes* that it uses race as a positive for some applicants, that it uses the same racial categories that *Harvard* deemed arbitrary, that it has no fixed end date, and more. As in *Harvard*, the flaws in West Point's race-based admissions are legal defects that turn on basic facts and the very nature of race-based admissions. The district court "ha[d] no discretion to deny relief by preliminary injunction" when, even on the "undisputed evidence," SFFA proved a clear violation of "a constitutional right." *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir. 1960).

## II.  **Absent an injunction, SFFA will suffer irreparable harm.**

SFFA's members are irreparably harmed by West Point's unconstitutional racial discrimination. "In the Second Circuit, it is well settled that an alleged constitutional violation constitutes irreparable harm." *Arias v. Decker*, 459 F. Supp. 3d 561, 571 (S.D.N.Y. 2020); *e.g.*, *Johnson v. Miles*, 355 F. App'x 444, 446 (2d Cir. 2009); *Statharos v.*

*N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999); *Bery v. N.Y.C.*, 97 F.3d 689, 693-94 (2d Cir. 1996). There isn't "any justification" for carving out "an equal protection violation" from this rule, *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000), especially given "the subtle, pervasive, and essentially irremediable nature of racial discrimination," *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984). An "ongoing violation of … Equal Protection" is thus "a clear showing of irreparable harm." *Barrett v. Maciol*, 2022 WL 130878, at *5 (N.D.N.Y. Jan. 14); *accord Able v. United States*, 847 F. Supp. 1038, 1043 (E.D.N.Y. 1994) (same for Fifth Amendment and military).

SFFA's members face another irreparable harm: their inability to apply to West Point on a race-neutral playing field this cycle. SFFA's members are applying now, their applications are due on January 31, and West Point will make general admissions decisions from February to April. *See* Ex.B ¶20, ¶69. Absent an injunction pending appeal, these members will entirely miss their chance to compete on an equal footing for the Class of 2028. *See Ass'n for Fairness in Bus., Inc. v. New Jersey*, 82 F. Supp. 2d 353, 363 (D.N.J. 2000) (finding irreparable harm because a racial classification forced the plaintiffs to "compete on an unfair playing field"). "These sorts of injuries, *i.e.*, deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019). Contra the district court, these lost opportunities are irreparable regardless whether SFFA's members can get admitted to West Point or apply again next

year. *See id.* (inability to try out for high-school dance team as a junior was irreparable even though student could try out next year); *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (inability to compete in the upcoming primary was irreparable even though candidate could compete next cycle).

SFFA's injuries are irreparable, at bottom, because they cannot be calculated or recouped. An injury is irreparable whenever money damages are "unavailable," *Millennium Pipeline Co. v. Seggos*, 288 F. Supp. 3d 530, 542 (N.D.N.Y. 2017), or are "difficult to establish and measure," *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). Both are true here. An "equal protection violation" causes intangible harms that are "difficult to compensate monetarily." *Brewer*, 212 F.3d at 744. "[L]ost opportunities" are "difficult, if not impossible, to quantify" too. *MacGinnitie v. Hobbs Grp.*, 420 F.3d 1234, 1242 (11th Cir. 2005). And damages are entirely unavailable here because these federal defendants "enjo[y] [sovereign] immunity that prevents any later monetary judgment." *Pankos Diner Corp. v. Nassau Cnty. Legislature*, 321 F. Supp. 2d 520, 524 (E.D.N.Y. 2003).

## III.   An injunction will not harm the public interest.

All remaining equitable factors favor SFFA. The equities are "*always* 'best served' by ensuring [that] constitutional and civil rights are upheld." *Y.S. ex rel. Y.F. v. N.Y.C. Dep't of Educ.*, 2021 WL 1164571, at *5 (S.D.N.Y. Mar. 26) (emphasis added). The public "undoubtedly has an interest in seeing its governmental institutions follow the law,"

even when a case "involves complex, subtle, and professional decisions as to the com-position [of the] military." *Roe v. DOD*, 947 F.3d 207, 219, 230-31 (4th Cir. 2020) (cleaned up). And "[t]he government does not have an interest in the enforcement of an unconstitutional [policy]," *N.Y. Prog. & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), even "in the military" context, *Singh v. Berger*, 56 F.4th 88, 108 (D.C. Cir. 2022).

West Point will complain that an injunction would come in the middle of its admissions cycle, but that claim is greatly overstated. For a high-schooler, West Point makes no admissions decisions until September of his senior year. Doc.53-2 at 3. West Point makes almost all admissions decisions between February and April; it doesn't even require applications to be submitted until the 31st of *this* month. Ex.B ¶69, ¶20. And injunctions are prospective. As SFFA told the district court, an injunction could clarify that West Point need not revoke whatever "'LOAs'" and small number of "'of-fers'" it sent out before the injunction issued. Doc.60 at 32; *cf. Andino v. Middleton*, 141 S.Ct. 9, 10 (2020) (granting stay but exempting ballots that had been cast already). Any other burdens were invited by West Point when it decided to use race after *Harvard*, *see* 600 U.S. at 229 n.9, and are outweighed by applicants' interest in not suffering uncon-stitutional discrimination, *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006).

## CONCLUSION

By January 17, 2024, this Court should grant an injunction pending appeal prohibiting West Point from considering race as a factor in admissions.

Respectfully submitted,

Dated: January 4, 2024

*/s/ Cameron T. Norris*
Thomas R. McCarthy
Cameron T. Norris
James F. Hasson
R. Gabriel Anderson
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
tom@consovoymccarthy.com
cam@consovoymccarthy.com
james@consovoymccarthy.com
gabe@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
patrick@consovoymccarthy.com

## CERTIFICATE OF COMPLIANCE

This motion complies with Rule 27(d)(2)(A) because it contains 5,040 words, excluding the parts that can be excluded. This motion also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Garamond font.

Dated: January 4, 2024                    */s/ Cameron T. Norris*

## CERTIFICATE OF SERVICE

I filed this motion with the Court via ECF. I also served via e-mail a copy of this motion on all counsel of record.

Dated: January 4, 2024                    */s/ Cameron T. Norris*

**ATTACHMENTS**

| Exhibit | Document | D.Ct. Doc. |
|---|---|---|
| A | District Court Opinion and Order | 78 |
| B | McDonald Declaration | 53 |
|  | —Exhibit A to McDonald Dec. | 53-1 |
|  | —Exhibit B to McDonald Dec. | 53-2 |

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STUDENTS FOR FAIR ADMISSIONS,

                    Plaintiff,

      -against-

THE UNITED STATES MILITARY ACADEMY
AT WEST POINT, et al.,

                    Defendants.

**<u>OPINION AND ORDER</u>**

23-CV-08262 (PMH)

---

PHILIP M. HALPERN, United States District Judge:

Students for Fair Admissions ("Plaintiff" or "SFFA") commenced this action on September 19, 2023 against the United States Military Academy at West Point ("West Point" or the "Academy"); the United States Department of Defense; Lloyd Austin, in his official capacity as Secretary of Defense; Christine Wormuth, in her official capacity as Secretary of the Army; Lieutenant General Steven Gilland, in his official capacity as Superintendent of the United States Military Academy; and Lieutenant Colonel Rance Lee, in his official capacity as Director of Admissions for the United States Military Academy at West Point (collectively, "Defendants").[1] (Doc. 1, "Compl."). Plaintiff presses a single claim for relief alleging that West Point's admissions policy violates the Fifth Amendment. Specifically, Plaintiff alleges that West Point's reliance on racial classifications in the admissions process fails to satisfy the strict scrutiny test as considered and applied in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*Harvard*").

---

[1] At oral argument on December 21, 2023, the Court directed the parties to meet and confer in an effort to eliminate any defendants that are unnecessary to the litigation so as to limit the field to necessary and proper parties only. At this early stage in the proceedings, the Court is unable to determine, based upon the Complaint and motion papers, which of the named Defendants is actually necessary to the proper adjudication of the issues herein.

Pending before the Court is Plaintiff's motion for a preliminary injunction under Fed. R. Civ. P. 65(a), which seeks an order "enjoining the defendants during the pendency of this action from considering race as a factor when making admissions decisions." (Doc. 32). Plaintiff first filed its motion for a preliminary injunction on September 19, 2023, contemporaneous with the filing of the Complaint. (Doc. 6—Doc. 10). After service of process was completed and on October 30, 2023, pursuant to the Court's directives at a telephone conference on October 24, 2023, Plaintiff filed a proposed Order to Show Cause, which the Court subsequently entered as modified, together with a revised memorandum of law in support of its preliminary injunction motion. (Doc. 30; Doc. 31, "Pl. Br."; Doc. 32). Defendants filed a memorandum of law in opposition, together with declarations and exhibits (Doc. 47, "Def. Br."; Doc. 48—Doc. 53), and the motion was fully submitted with the filing of Plaintiff's reply brief and affidavit (Doc. 60, "Reply"; Doc. 61). On December 18, 2023, three days before appearing for oral argument on the motion, Plaintiff supplemented its motion with two additional declarations. (Doc. 68; Doc. 69).[2, 3] The Court heard oral argument on December 21, 2023 ("Dec. 21, 2023 Tr.").

For the reasons set forth below, Plaintiff's motion for preliminary injunction is DENIED.

---

[2] Defendants, when asked at oral argument whether they would move to strike the supplemental declarations served long after the motion was fully briefed, "reserved," and noted that consideration of the supplemental records would not alter the Court's analysis on the motion. (Dec. 21, 2023 Tr. at 56:17-24).

[3] On November 29, 2023, the Court received two letter-motions, one from the National Association of Black Military Women, ACLU, NYCLU, and NAACP LDF (Doc. 56), and one from 107 West Point Graduates (Doc. 57). The parties do not oppose the requests to file amicus briefs in this matter. The letter-motions are hereby GRANTED and the Court accepts the briefs annexed to the letter-motions as amici curiae in opposition to the motion for a preliminary injunction.

2

## **BACKGROUND**

On June 29, 2023, the Supreme Court ruled that the race-based admissions policies of Harvard College ("Harvard") and the University of North Carolina ("UNC") violated the equal protection clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964. The Supreme Court noted (in a footnote) in the majority opinion that "[t]he United States as *amicus curiae* contends that race-based admissions programs further compelling interests at our Nation's military academies. No military academy is a party to these cases, however, and none of the courts below addressed the propriety of race-based admissions systems in that context. This opinion also does not address the issue, in light of the potentially distinct interests that military academies may present." *Harvard*, 600 U.S. at 213 n.4. Given that carveout in *Harvard* with respect to military academies, less than three months later, Plaintiff commenced the instant action against West Point, contending that West Point's race-based admissions process violates the Fifth Amendment's equal protection principles.[4]

Plaintiff calls upon this Court to enjoin, for the pendency of this action, West Point's consideration of race in its admissions process. The Court, in order to properly frame the issue before it, summarizes below the allegations in the Complaint, and information taken from the various declarations and exhibits proffered on this motion concerning West Point and its admissions process, including its consideration of race in admissions.

---

[4] SFFA filed a similar complaint and motion for preliminary injunction against the United States Naval Academy on October 5, 2023. That court ruled from the bench on December 14, 2023, denying SFFA's motion for a preliminary injunction, and later issued a written Memorandum Opinion explaining its reasoning. *See Students for Fair Admissions v. United States Naval Academy, et al.*, No. RDB-23-2699, 2023 WL 8806668 (D. Md. Dec. 20, 2023) ("*Naval Academy*").

I.       Becoming an Officer in the Army

West Point was established in 1802 and prepares students to become leaders and officers in the United States Army. (Doc. 53, "McDonald Decl." ¶ 7). To become an officer in the Army, an individual must (1) graduate from West Point; (2) attend a civilian college or university while participating in a Reserve Officers' Training Corps ("ROTC") program; (3) attend Officer Candidate School after graduating from college; (4) receive a direct commission after earning a professional degree; or (5) advance through the enlisted ranks and then complete one of these officer training programs. (Def. Br. at 11 (citing McDonald Decl. ¶ 103 n.9)). Defendants emphasize that "West Point is a vital pipeline to the officer corps, and especially senior leadership, in the Armed Forces." (*Id*. at 12 (citing Doc. 49, "Stitt Decl." ¶¶ 38-40)). West Point is a significant source of officer commissions for the Army, historically providing approximately 20% of those commissions. (McDonald Decl. ¶ 9; Stitt Decl. ¶ 37). "West Point graduates comprise 33% of general officers in the Army" and almost 50% of the Army's current four-star generals. (McDonald Decl. ¶ 9; Stitt Decl. ¶¶ 38-39).

Admission to West Point is highly selective. In the most recent class, fewer than ten percent of applicants were given the honor of joining the Long Gray Line. (Compl. ¶ 18 (citing West Point Public Affairs, Class of 2027 to Enter West Point, (June 21, 2023), perma.cc/4QY3-5BK6)). Congress has set the size of the Corps of Cadets of the Academy at a limit of 4,400. 10 U.S.C. § 7442. As such, each incoming class currently consists of approximately 1,200 cadets before attrition. (Compl. ¶ 19 (citation omitted); Def. Br. at 11 (citing McDonald Decl. ¶ 10)). Cadets who graduate from West Point, under current law, are commissioned as active-duty officers with an obligation to serve a minimum of five years. (Def. Br. at 11 (citing McDonald Decl. ¶ 9)); 10 U.S.C. § 7448(a)(2).

4

II.    West Point's Admissions Process

West Point's admissions process is governed by, *inter alia*, federal statute (10 U.S.C. §§ 7442–46), Army regulations (Regulation 150-1, Chapter 3-4), and internal guidance. (Def. Br. at 12 (citing McDonald Decl. ¶ 11)). Plaintiff alleges that West Point's admissions process involves two stages: first, an applicant must pass medical examinations and a physical-fitness test and secure a "nomination" from a member of Congress, the Vice President, or the President; and at the second stage, applicants must be accepted by West Point's admissions office. (Compl. ¶ 17). Plaintiff alleges that at this second stage, once applicants have received a qualifying nomination, West Point unconstitutionally considers race. (*Id*. ¶¶ 17, 27-60).

Defendants, in opposition, explain in detail the West Point admissions process. To be admitted to West Point, a candidate must successfully complete (i) a candidate questionnaire, (ii) a second step kit, (iii) a candidate physical fitness assessment, (iv) a medical evaluation, and (v) an interview, and must receive (vi) a nomination. (Def. Br. at 12 (citing McDonald Decl. ¶ 19)).[5] These steps must be completed by January 31st of the year the candidate would enter West Point. (*Id*. at 12-13 (citing McDonald Decl. ¶ 29)).

As noted *supra*, candidates seeking admission to West Point must also secure a nomination. *See* 10 U.S.C. § 7442; (Compl. ¶ 17; Def. Br. at 13). There are two types of nominations: those

_____

[5] A candidate must complete a "[c]andidate [q]uestionnaire," reporting their high school GPA, standardized test scores, extra-curricular activities, athletic participation, and "basic demographic information," which includes race and gender. (Def. Br. at 12 (citing McDonald Decl. ¶ 19)). Candidates may submit the candidate questionnaire as early as February 1st of the year before they would enter West Point (their junior year for candidates applying directly from high school). (*Id*. (citing McDonald Decl. ¶ 20)). The Admissions Office reviews this questionnaire to determine if a candidate meets West Point's basic statutory eligibility requirements and is likely to be competitive for admission, and if so, an admissions officer will permit the candidate to proceed to the next step in the process. (*Id*. (citing McDonald Decl. ¶¶ 23-24)). The next step of the admissions process, known as the "second step kit," requires submission of official high school transcripts, standardized test scores, essays, and teacher evaluations. (*Id*. (citing McDonald Decl. ¶ 25)). Candidates are also asked to provide background information, including whether they are the first member of their immediate family to attend college, their combined family income, and whether they speak any foreign languages. (*Id*.).

5

from a "statutory nominating authority" and "service-connected" nominations. 10 U.S.C. § 7442; (Def. Br. at 13 (citing McDonald Decl. ¶ 31)). Statutory nominating authorities include Members of the United States House of Representatives and Senate; the Vice President; Delegates to Congress from American Samoa, the District of Columbia, Guam, the Virgin Islands, and the Commonwealth of the Northern Marianas Islands; the Governor and the Resident Commissioner of Puerto Rico; and the Superintendent of West Point. (*Id*.).

Generally, individuals who received nominations from Members of Congress, the Vice President, Delegates to Congress, and the Governor and Resident Commissioner of Puerto Rico account for 75% of West Point's Corps of Cadets. (*Id*. (citing McDonald Decl. ¶ 32)). If a candidate is appointed to West Point pursuant to nomination by a Member of Congress, that candidate is "charged" to that Member. (*Id*.). Each Member of Congress may have five "charges" at West Point at any one time. (*Id*.). When a Member has fewer than five charges at the end of the academic year, the Member is considered to have a "vacancy" for the following admissions cycle. (*Id*.). For each vacancy, Members can nominate up to ten candidates, and in a typical year, each Member of Congress will have one vacancy at West Point. (*Id*.). Like Members of Congress, the Vice President is provided with five West Point vacancies. (McDonald Decl. ¶ 39). The District of Columbia and the various U.S. territories are provided with three to six West Point vacancies. (*Id*. ¶ 40). Finally, the Superintendent may nominate up to 50 candidates per year from the country at large, so long as the cap on authorized strength of the total Corps of Cadets of the Academy is not exceeded. (*Id*. ¶ 41).

Service-connected nominations include a selection of 100 cadets per year by the President. The Secretary of the Army may nominate 85 candidates per year from enlisted members of the regular Army, 85 candidates per year from enlisted members of the reserve component of the

Army, and 20 candidates per year from members of ROTC and Junior ROTC. 65 candidates may be nominated per year who are children of members of the armed forces who were, *inter alia*, killed in action; and finally the President is authorized to appoint children of persons who have been awarded the Medal of Honor. (McDonald Decl. ¶¶ 45-48).

Congressional nominating authorities, the District of Columbia, and the various U.S. territories, may nominate their slate of candidates using one of three methods: (1) "competitive"— where the Member submits nominees to West Point without any order of preference, allowing the Admissions Office to select the best qualified candidate within that slate; (2) "principal-competing alternate"—where the Member identifies a principal nominee and a list of unranked alternates; and (3) "principal-numbered alternate"—in which the Member identifies a principal nominee and a list of ranked alternates. (Def. Br. at 13-14 (citing Army Regulation 150-1, Chapter 3-4(a); McDonald Decl. ¶¶ 34–36); McDonald Decl. ¶ 40).

Once an applicant to West Point completes the candidate questionnaire, the Admissions Office assigns the candidate an initial numerical score, known as the "Whole Candidate Score" ("WCS"), which is calculated based on academic qualifications (60%), a "community leader score" (30%), and the candidate's fitness assessment (10%). (Def Br. at 14 (citing McDonald Decl. ¶¶ 49, 51-54)). Defendants assert that neither race nor ethnicity factors into the WCS. (*Id.* (citing McDonald Decl. ¶¶ 55, 58, Ex. A)).

Once the Admissions Office assigns a WCS, it then determines whether a candidate is "qualified" or "not qualified." (*Id.* (citing McDonald Decl. ¶ 59)). Three different reviewers in the Admissions Office evaluate the candidate's file and each separately determines whether the candidate meets the academic, leadership, and physical standards as reflected in the WCS, as well as the subjective components of the application. (*Id.* at 14-15 (citing McDonald Decl. ¶¶ 59-60)).

7

If any of the three reviewers disagree as to whether the candidate is qualified, the candidate is reviewed by the Admissions Committee, whose decisions are determined by a simple majority vote. (*Id.*). Defendants assert that the Admissions Office does not consider a candidate's race or ethnicity in determining whether a candidate is qualified. (*Id.* at 15 (citing McDonald Decl. ¶ 64)).

Defendants contend that the vast majority of West Point's incoming cadet class is based on an "order of merit," as determined by the WCS, within the category of nomination obtained by the candidate. (*Id.* (citing McDonald Decl. ¶ 65)). For candidates nominated by a Member of Congress under the "competitive" method, West Point will offer an appointment to the fully qualified nominee from that Member's slate with the highest WCS. (*Id.* (citing McDonald Decl. ¶ 66)). For candidates nominated by a Member of Congress under the "principal competing" or "principal-numbered" alternate methods, West Point must consider the order specified by the Member of Congress. (*Id.* (citing McDonald Decl. ¶¶ 35-38, 68)). Where the principal nominee is either deemed unqualified or declines admission under the "principal-competing" method, West Point must offer admission to the fully qualified candidate on the Member's list with the next highest WCS; and under the "principal-numbered" method, West Point must offer admission to the fully qualified candidate who ranks next highest on the Member's list, even if that candidate has a lower WCS than others on the Member's list. (*Id.* (citing McDonald Decl. ¶¶ 35-36)). Defendants assert that in these instances, race and ethnicity also play no role in West Point's selection process. (*Id.* (citing McDonald Decl. ¶¶ 55, 68)).

If a qualified candidate is not appointed to the vacancy for which they were nominated, the candidate may be offered an appointment under two other statutory provisions. (*Id.* at 16). First, West Point may appoint up to 150 "qualified alternates"—qualified candidates who received a statutory nomination but did not win the vacancy. 10 U.S.C. § 7442(b)(5). West Point appoints

qualified alternates solely based on WCS, which does not consider race or ethnicity. (*Id.* (citing McDonald Decl. ¶¶ 55, 70(a))).

Second, if West Point has filled each nomination vacancy, admitted 150 qualified alternates, and has still not filled its class, it may offer appointment to other remaining qualified nominees, known as "Additional Appointees." (*Id.* (citing McDonald Decl. ¶ 70(b))). For at least the last 15 years, West Point has provided offers of appointment to Additional Appointees to meet its class size of around 1,200 cadets. (*Id.* (citing McDonald Decl. ¶¶ 6, 70(b))). For Additional Appointees, the Admissions Office may consider race and ethnicity as one factor in a holistic assessment in extending offers. (*Id.*).

The Admissions Office also uses a recruiting tool referred to as a Letter of Assurance ("LOA"), in light of statutory, regulatory, and policy constraints preventing West Point from providing early admission decisions. (McDonald Decl. ¶ 71). Between July and September of the year before a candidate would enter West Point (a candidate's senior year if applying directly from high school), the Admissions Office will issue LOAs to approved candidates. (*Id.* ¶ 77). An LOA constitutes a firm commitment from West Point to the candidate that the candidate will be admitted—provided that the candidate meets the conditions in the letter. (*Id.* ¶ 73). After West Point provides an LOA to a candidate, the candidate has 60 days from the date of issuance to complete their application, except for securing a nomination and the medical qualification which must be completed by April 15. (*Id.* ¶¶ 73, 79). If the candidate does not complete their application within 60 days, the LOA is revoked. (*Id.* ¶ 79).

III.    West Point's Consideration of Race in Admissions

Plaintiff notes that West Point openly states that "[t]he United States Military Academy is fully committed to affirmative action." (Compl. ¶ 27 (citing *Cadet Consumer Information/Right to Know*, United States Military Academy at West Point, perma.cc/H38P-JY3J)). Plaintiff contends that said "'commitment' plays out across all areas of the Academy's admissions policy." (*Id*. ¶ 28). West Point counters that it "considers race and ethnicity flexibly as a plus factor in an individualized, holistic assessment of African American, Hispanic, and Native American candidates at three limited stages of the admissions process." (Def. Br. at 16). The stages when West Point considers race and ethnicity are: (1) when offering LOAs; (2) when extending Superintendent nominations; and (3) when extending offers to Additional Appointees. (*Id*. at 16-18). West Point asserts that it uses race and ethnicity in these three limited circumstances "only to further the military's distinct operational interest in developing a diverse officer corps to ultimately ensure that the military can meet its critical national security mission." (*Id*. at 18 (citing McDonald Decl. ¶¶ 80, 95; Doc. 48, "Vazirani Decl." ¶¶ 8-30)). In other words, Defendants contend, "the military has concluded that a diverse officer corps is critical to the military's ability to defend our nation," in that "it (1) fosters cohesion and lethality; (2) aids in recruitment of top talent; (3) increases retention; and (4) bolsters the Army's legitimacy in the eyes of the nation and the world." (*Id*. at 29, 30).

Thus, West Point considers race in three limited circumstances as noted *supra*. First, the Admissions Office may extend an LOA to a candidate who has submitted a candidate questionnaire, official transcripts and standardized test scores, and has been interviewed, following an individualized review of the candidate's record. (*Id*. at 16 (citing McDonald Decl. ¶¶ 72, 73, 75, 77, 91)). As previously stated, LOAs are conditional offers of admission—the candidate must

10

still complete their application, pass physical fitness standards, become medically qualified, and receive a nomination. (*Id.* at 16-17 (citing McDonald Decl. ¶ 73)). If a candidate satisfies those conditions but is not selected to fill a congressional vacancy, non-congressional vacancy, or qualified alternate slot, they will receive an admissions offer as an Additional Appointee. (*Id.* at 17 n.1 (citing McDonald Decl. ¶ 93(a))). West Point's Diversity Outreach Office conducts this review for African American, Hispanic, and Native American candidates, while regional teams conduct this review for other candidates. (*Id.* (citing McDonald Decl. ¶ 78)).

Second, race or ethnicity could be one of many nondeterminative factors considered in extending Superintendent nominations. (*Id.* (citing McDonald Decl. ¶ 94)). Although the Superintendent may nominate up to 50 candidates per year, since 2008, the Superintendent has never exhausted his nominations in any given year. (*Id.* (citing McDonald Decl. ¶¶ 41-42)). Most Superintendent nominations are used for sought-after athletes, for candidates that are highly qualified and motivated to attend the Academy, and for candidates applying to other service academies. (*Id.* at 17-18 (citing McDonald Decl. ¶ 41)).

Third, at the end of the admissions cycle, if West Point has not reached its class size, in extending offers to Additional Appointees, the Admissions Office may consider race and ethnicity flexibly as a plus factor for African American, Hispanic, and Native American candidates in its holistic assessment of candidates to identify those who are expected to make valuable contributions to the cadet environment. (*Id.* at 18 (citing McDonald Decl. ¶ 93)).

## STANDARD OF REVIEW

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). A party seeking a preliminary injunction, in the Second Circuit, generally must establish: (1) irreparable harm absent injunctive relief; (2) a likelihood of success on the merits; and (3) that a preliminary injunction is in the public interest.[6] *Keil v. City of New York*, No. 21-3043, 2022 WL 619694, at *1 (2d Cir. Mar. 3, 2022); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021).

"The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). "A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act." *Id*. "This distinction is important because [the Second Circuit has] held that a mandatory injunction should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id*. In other words, the movant is held to a heightened standard and must show a "clear" or "substantial" likelihood of success on the merits, and must make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015); *see also JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) ("A heightened standard is imposed, in part, because injunctions of those sorts tend to be particularly burdensome to the defendants subject to them."). "The 'clear' or 'substantial' showing requirement—the variation in

---

[6] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Tom Doherty Assocs.*, 60 F.3d at 34.

The distinction between mandatory and prohibitory injunctions is, however, "not without ambiguities." *Id.* "Indeed, the typical method of differentiating the two—by examining whether the moving party is being ordered to act or refrain from action—is often 'more semantical than substantive.'" *Velez v. Prudential Health Care Plan of New York, Inc.*, 943 F. Supp. 332, 338 (S.D.N.Y. 1996) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)). Plaintiff attempts to frame the relief sought as prohibitory—an order to stop West Point from considering race as a factor in the admissions process (Pl. Br. at 9). The gravamen of the request, however, is not for an order "prohibiting" an act, but rather for an order directing the performance of an act, *i.e.*, for West Point to affirmatively change and remodel its admissions process. Defendants explained at oral argument that in order to cease consideration of race in the admissions process, West Point would have to convene the Academic Board; examine its current policy and decide how to untangle a complicated knot; change the policy and apply a new policy to the current applicant pool; possibly withdraw already offered appointments and LOAs; and a legion of written material would have to be changed. (Dec. 21, 2023 Tr. at 46:10-25). Simply put, granting Plaintiff's requested injunction would require myriad acts be undertaken, not prohibited.

Plaintiff also argues that it merely seeks to restore the status quo ante, and therefore commands a prohibitory injunction standard. When an injunction seeks "to require a party who has *recently disturbed* the status quo to reverse its actions," it seeks to "restore[ ], rather than disturb[ ], the status quo ante, and is thus not an exception to the rule" that is typically applied in evaluating motions for a preliminary injunction. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 275 (S.D.N.Y.) (emphasis added), *aff'd*, 788 F. App'x 85 (2d Cir.

2019). The status quo was not, however, "recently disturbed"—West Point has been utilizing a race-based admissions process for over four decades. (McDonald Decl. ¶ 81). Indeed, "[b]ecause the proposed injunction's effect on the status quo drives the standard," the Court must ascertain "the last actual, peaceable uncontested status which preceded the pending controversy." *A.H. by & through Hester v. French*, 985 F.3d 165, 177 (2d Cir. 2021). It was four decades ago, and prior to *Harvard*, when West Point's admissions regime did not include consideration of race. Plaintiff's argument that the status quo has been "recently disturbed" is therefore unavailing.

Plaintiff also argues that the mandatory injunction standard does not apply because a preliminary injunction would not give it the ultimate relief sought in the action. Although the description of the relief sought in the Complaint differs slightly from that requested on this motion, it is in effect identical. (*Compare* Compl. at 27, *with* Doc. 32). Ultimate relief is being sought by this motion. Plaintiff's reliance on choice language in *Christa McAuliffe Intermediate Sch. PTO, Inc.*, does not alter this Court's conclusion. 364 F. Supp. at 253 (the "all-relief-sought" exception does not apply because the preliminary injunction affects "this year's admissions, while if Plaintiffs win at trial, Defendants would be enjoined from using the changed Discovery procedure in future admissions cycles"). The injunction sought in *Christa McAuliffe Intermediate Sch. PTO, Inc.* would have *prohibited* the use of a new admissions process not yet implemented. Here, because the injunction would command the installation and use of a new process—it is not at all clear how the requested injunction would, as Plaintiff suggests, affect but one year of admissions at West Point. Because the admissions cycle begins on February 1st of any given year and ends on April 15th of the following year, at least several years of admissions cycles would be impacted; and if appeals, discovery, and a trial took longer than a year, multiple admissions cycles could be impacted.

14

The issue of whether to apply a heightened standard is largely academic, however, because regardless of the standard applied, for the reasons discussed herein, Plaintiff has failed to establish a likelihood of success warranting the extraordinary and drastic remedy sought.

## ANALYSIS

I.  Standing

Before considering the elements that Plaintiff must demonstrate for a preliminary injunction, the Court must first examine standing. A party invoking federal court jurisdiction must have standing to sue "for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). "Standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). "A court may only provide proposed injunctive relief, for instance, if a plaintiff can demonstrate his entitlement to that specific relief." *Doe v. Columbia Univ.*, No. 20-CV-06770, 2022 WL 4537851, at *16 (S.D.N.Y. Sept. 28, 2022). At the preliminary injunction stage, "a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021). "To establish standing for a preliminary injunction, a plaintiff cannot rest on mere allegations but must set forth by affidavit or other evidence specific facts that establish the three familiar elements of standing: injury in fact, causation, and redressability." *Id*.

To invoke organizational standing, "an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

15

requires the participation of individual members in the lawsuit." *Harvard*, 600 U.S. at 199 (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants press only one argument attacking Plaintiff's standing: that Plaintiff's use of pseudonyms for its injured members is insufficient to establish the standing of those members. (Def. Br. at 23-24). Defendants contend that Plaintiff must identify Members A and C by name in order to demonstrate "how[ ] race and ethnicity would play a role in West Point's consideration of Plaintiff's members' applications." (*Id.* at 24). The requirement that Defendants would have this Court impose upon Plaintiff appears to be based on an overreading of the Supreme Court's decision in *Summers v. Earth Island Inst.*, which instructs that a plaintiff claiming an organizational standing must identify members who have suffered the requisite harm. 555 U.S. 488, 499 (2009). The associations in *Summers* lacked standing because they failed to identify a specific member who had standing, pointing instead to their membership generally and speculating that one of those members likely had standing. *Id.* at 497-99. Here, identification of specific members with standing, supported by a verified complaint, declaration from Plaintiff's president, and those members' declarations—albeit anonymous—suffices under *Summers* to "establish[ ] that at least one identified member ha[s] suffered or would suffer harm." 555 U.S. at 498. Identification by name is not necessary where, as here, a name will not inform the pertinent inquiry of whether a person will be denied the opportunity to compete for admission at West Point on an equal basis.

Moreover, identification of these members by name as opposed to pseudonym does not comport with the Supreme Court's conclusion concerning standing in *Harvard*, which was that SFFA had standing at the commencement of those underlying litigations. 600 U.S. at 200. There, like here, the members were referred to by pseudonym. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, No. 14-CV-14176, Doc. 1 (D. Mass. Nov. 17, 2014);

*Students for Fair Admissions, Inc. v. University of North Carolina, et al.*, No. 14-CV-00954, Doc. 1 (M.D.N.C. Nov. 17, 2014). Accordingly, this Court rejects this line of Defendants' attack on Plaintiff's standing at this stage of the action.[7]

## II.   Likelihood of Success on the Merits

"Consideration of the merits is virtually indispensable" in the context of an alleged Constitutional violation, "where the likelihood of success on the merits is the dominant, if not the dispositive, factor." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Plaintiff presses a single claim against Defendants for violation of the Fifth Amendment's equal protection principles.[8]

The Court's examination of an alleged equal protection violation concerning governmental classifications based on race involves "a daunting two-step examination known in our cases as 'strict scrutiny.'" *Harvard*, 600 U.S. at 206 (quoting *Adarand Constructors, Inc.* v. *Peña*, 515 U.S.

---

[7] Defendants rely on a decision currently on appeal in the Second Circuit in which the district court, *inter alia*, denied a motion for a preliminary injunction that was supported by anonymous declarants and dismissed the action for lack of Article III standing. *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 501 (S.D.N.Y. 2022). The court in that case noted the rule that a plaintiff's burden to establish standing on a preliminary injunction motion is normally no less than that required on a motion for summary judgment. *Id.* at 500. Although this Court holds that the member-declarants identified by SFFA need not be named in order to sufficiently establish their standing, the principle that a more fulsome factual record—as would be required on a motion for summary judgment—is necessary for a motion of this ilk, rings true for the other reasons described herein forming the basis for this Court's decision.

[8] "As this case involves federal, not state, legislation, the applicable equality guarantee is not the Fourteenth Amendment's explicit Equal Protection Clause, it is the guarantee implicit in the Fifth Amendment's Due Process Clause." *Sessions v. Morales-Santana*, 582 U.S. 47, 52 (2017) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975) ("[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.")). The Supreme Court has held that the method of analyzing equal protection claims brought under the Fifth Amendment is no different than the analysis of such claims under the Fourteenth Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *see also Fullilove v. Kreps*, 584 F.2d 600, 603 n.2 (2d Cir. 1978) (same), *aff'd sub nom. Fullilove v. Klutznick*, 448 U.S. 448 (1980). The parties in this case agree. (*See* Pl. Br. at 10 (describing applicable standard as the test applied in *Harvard*); Def. Br. at 12 (same)).

200, 227 (1995)). The "strict scrutiny" standard requires the Court to determine "first, whether the racial classification is used to 'further compelling governmental interests.'" *Id.* at 206-07 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003)). If the answer to the first question is yes, the second inquiry is "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'— to achieve that interest." *Id.* at 207 (quoting *Fisher v. University of Tex. at Austin*, 570 U.S. 297, 311-312 (2013)).

A likelihood of success on the merits of its Fifth Amendment claim, therefore, requires that Plaintiff, in this procedural context, establish it is likely to prevail on its claim that Defendants *cannot* prove their consideration of race is used to further compelling governmental interests and is narrowly tailored to achieve those interests. Plaintiff, by electing to proceed with the instant motion at this early stage and without even the benefit of an answer to its Complaint,[9] has foisted an almost impossible burden on itself. That is, for Plaintiff to prove a negative now and without the benefit of a developed factual record—much less knowing and pleading the actual compelling governmental interests asserted by Defendants and how they are narrowly tailored.

The Supreme Court in *Harvard* considered whether the affirmative action admissions programs at Harvard and UNC violated the equal protection clause of the Fourteenth Amendment. "While the Court declined to overturn its 2003 decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003), which held that consideration of an applicant's race as one factor in admissions did not violate the Constitution, the Court determined the schools' programs fell short of satisfying the burden that their programs be sufficiently measurable to permit judicial review under the rubric of strict scrutiny." *Naval Academy*, 2023 WL 8806668, at *2 (quoting *Harvard*, 600 U.S. at 214).

---

[9] Defendants requested, and Plaintiff did not oppose, a stay of the time for Defendants to file an answer to the Complaint "pending decision on [the] preliminary injunction motion, including any appeals." (Doc. 37). The Court granted that request on November 2, 2023. (Doc. 40).

The Court, in a footnote, expressly declined to address "the propriety of race-based admissions systems in [the military academy] context . . . in light of the potentially distinct interests that military academies may present." *Harvard*, 600 U.S. at 213 n.4.

Thus, guided by the Supreme Court's decision in *Harvard*, Plaintiff took a patchwork of information from the Government's submissions in *Harvard*,[10] newspaper articles, press releases, websites, agency reports, reports of the West Point Board of Visitors, and studies, coupled with the declarations of two of its members, to make an educated guess at what West Point would assert are its compelling governmental interests. (Compl. ¶ 97). Plaintiff alleged in its Complaint, and moved for a preliminary injunction on the basis, that "West Point asserts compelling interests in [1] facilitating organizational cohesion, [2] forming culturally aware leaders, [3] ensuring societal 'legitimacy' (circularly defined by the Academy), and [4] safeguarding the public trust." (Compl. ¶ 97). It contends that each of the foregoing has been, in sum and substance, rejected by the Supreme Court's decision in *Harvard*. While, of course, there is nothing wrong with compiling information needed to make good faith allegations in a complaint, each of the four purported interests, when compared to those asserted by Defendants, were imprecise and clearly not what West Point alleged.

At oral argument Plaintiff reiterated its position that it did not believe it was unusual for it bring this motion without full information and noted that Defendants, in opposition to this motion, indicated what they contend are their compelling interests. (Dec. 21, 2023 Tr. at 12:15-13:16). West Point's brief contends that "[t]he Army has concluded that diversity in the officer corps is vital to national security because it (1) fosters cohesion and lethality; (2) aids in recruitment of top

---

[10] The submissions included an amicus brief from 34 top former military leaders. *See* Brief of Adm. Charles S. Abbot et al. as Amici Curiae in Support of Respondents, *Students for Fair Admissions v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181 (2023) (Nos. 20-1199, 21-707).

talent; (3) increases retention; and (4) bolsters the Army's legitimacy in the eyes of the nation and the world." (Def. Br. at 30).

Defendants also submitted six declarations with their opposition to this motion. Acting Under Secretary of Defense for Personnel and Readiness for the Department of Defense, Ashish S. Vazirani, posits that a racially diverse officer corps (1) is critical to mission readiness and efficacy (Vazirani Decl. ¶ 12); (2) provides a broader range of thoughts and innovative solutions (*id*. ¶ 19); (3) helps military recruitment and retention which is vital to national security interests (*id*. ¶¶ 22, 25); (4) helps maintain the public trust and its belief that the military serves all of the nation and its population (*id*. ¶ 26); and (5) protects the U.S. militaries' legitimacy among international partners (*id*. ¶ 28). Colonel Deborah J. McDonald, the former Director of Admissions at West Point, states that diversity at West Point (1) helps cadets lead a multicultural force and fight alongside diverse partners and allies; (2) is essential for military cohesion; (3) is critical to maintaining diversity in the officer corps; and (4) is necessary to attract top talent. (McDonald Decl. ¶¶ 101-104).

While perhaps two possible interests raised by Defendants align generally with Plaintiff's allegations in its Complaint, it is clear to this Court that the allegations offered on each side are simply different. More specificity is needed to be alleged in the Complaint and a partial analysis of the compelling governmental interests would not be sufficient for preliminary injunction purposes. An additional issue arises with respect to compelling governmental interests as well: Does the Court consider West Point's articulation, the Army's articulation, or both?

Indeed, once Defendants posited their list of allegedly compelling governmental interests supported by those six declarations and exhibits, Plaintiff countered with a reply affidavit from Lieutenant General (Ret.) Thomas W. Spoehr, for the first time reacting specifically to the interests

claimed by Defendants, and "disagree[ing] with all [of Defendants'] key conclusions supporting racial preferences in selecting candidates for West Point." (Doc. 61, "Spoehr Decl." ¶ 2). Thus, on its face, the procedural posture demands the Court to resolve this significant issue based upon, in effect, reply papers.

The problems do not end there. Plaintiff demands that "real strict scrutiny" be applied, and "not some watered-down version that gives the government special deference." (Pl. Br. at 15). But, the reality is that this Court must analyze West Point's admissions program under the strict scrutiny rubric *together with* the Supreme Court's instruction to give "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).[11] Simply put, West Point "is due more deference than were the private and public universities in *Harvard* given the explicit caveat in footnote 4 of *Harvard*." *Naval Academy*, 2023 WL 8806668, at *11.

At best, Plaintiff has highlighted an issue of fact as to the nature of the asserted reasons for considering race, whether those reasons satisfy a strict scrutiny analysis, and whose interests are

---

[11] Deference in this context is not judicial abdication, but rather simple recognition that "in the area of military affairs . . . . the Constitution itself requires such deference." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). When pressed at oral argument to explain, as a practical matter, how this Court should properly analyze strict scrutiny while granting deference, Defendants argued in sum and substance that the Court should view the deference inquiry as the weight afforded the evidence presented. Defendants argued that the Court has on the one hand six declarations proffered by Defendants, made by senior military leaders based upon their collective experience, among other things (Doc. 48—Doc. 53); and on the other hand, from Plaintiff in reply, a single declaration from a retired general who bases his opinion on his own robust experience, among other things (Doc. 61). (Dec. 21, 2023 Tr. at 36:13-37:1, 39:1-40:4). Defendants thus urge the Court to give great deference to their evidence, especially where it is the result of exhaustive inquiry. *Able v. United States*, 155 F.3d 628, 634 (2d Cir. 1998). The Court agrees that the weight of the evidence here does not suggest Defendants lack potentially compelling governmental interests; it suggests just the opposite. Plaintiff urges that the Court grant no deference at all to Defendants when considering strict scrutiny. The ultimate determination of how deference operates here remains uncertain.

actually at stake.[12] The reply does not solidify Plaintiff's conclusion—it creates questions of fact which falls far short of the clear showing required for the extraordinary and drastic remedy sought.

Plaintiff's argument at its core is that any alleged compelling interest asserted by Defendants is unconstitutional under *Harvard*.[13] The procedural posture created by Plaintiff on this application, proving a negative, makes it impossible for the Court to determine whether Plaintiff has made a clear showing entitling it to an injunction. It is possible that *Harvard*'s equal protection conclusions with respect to the civilian universities apply to West Point. Contrariwise, the reasons given by Defendants may all be compelling governmental interests which are narrowly tailored: what was not compelling to the Supreme Court as regards civilian universities may in fact be compelling when raised in the context of West Point and national security interests. Indeed, these possibilities are precisely what *Harvard* itself left open, by declining to address the issue altogether, "in light of the *potentially* distinct interests that military academies *may* present." *Harvard*, 600 U.S. at 213 n.4 (emphasis added). But to grant a motion of this importance with so much left open would be imprudent.

A full factual record is vital to answering this critical question whether the use of race in the admissions process at West Point furthers compelling governmental interests and whether the government's use of race is narrowly tailored to achieve that interest. The Court cannot enjoin West Point's use of race in admissions without a full understanding, informed by a complete

---

[12] The parties appear to agree that the Army and West Point are indistinct for purposes of this analysis. In other words, while the challenged admissions process occurs at West Point, the interests being served include what happens once those cadets leave the Academy grounds. The Court continues to question whether and to what extent the interests of the military inform the strict scrutiny analysis with respect to the military academy's use of racial classifications in its admissions process.

[13] The underlying litigations in *Harvard* were adjudicated after full trials, not at the pre-answer stage. The procedure employed here does not permit a proper consideration and development of the facts at issue; and is insufficient based on the evidence currently available.

factual predicate, as to what exactly are the compelling interests asserted, to whom those compelling interests belong, and how in this specific case they are or are not narrowly tailored to achieve those interests.[14] Accordingly, Plaintiff has not met its burden, on the present record, to show a clear, or otherwise preponderant, likelihood of success on the merits.

Although the other preliminary injunction factors need not be addressed in view of the above, the Court briefly addresses the remaining preliminary injunction requirements to complete its review.

### III. Irreparable Harm

"The burden of proof and persuasion rests squarely on the party moving for a preliminary injunction to show that irreparable harm is likely." *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 34 (2d Cir. 2015). To satisfy its burden to show irreparable harm, a plaintiff "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax*, 62 F.4th at 672.

Plaintiff argues, with respect to irreparable harm, that the alleged unconstitutional racial discrimination is itself strong irreparable harm, because it bars SFFA's members from fairly competing for a whole admissions cycle. (Pl. Br. at 9 (citing *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020)), 19-20). While the Second Circuit has held that pleading an alleged constitutional

---

[14] Plaintiff points out that the present record lacks evidence of West Point's consideration of race-neutral alternatives, necessary to establish narrow tailoring. (Pl. Br. at 18 (citing *Grutter*, 539 U.S. at 339)). It suggests that West Point could follow the example of the Coast Guard Academy and its own Merchant Marine Academy. (*Id.*). The Coast Guard Academy, until 2010, was prohibited from using racial preferences in its admissions process and, in the two years before it began considering race, launched an aggressive advertising and recruiting campaign targeting minorities which increased minority enrollment by 60%, from 15% to 24%. (*Id.*). The Merchant Marine Academy does not use race for most of admissions. (*Id.*). While Defendants' opposition discusses some of the race-neutral alternatives it has considered and implemented, it is clear that both Plaintiff and Defendants need to further develop a factual record on this issue as well.

violation itself constitutes irreparable harm, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("it is the alleged violation of a constitutional right that triggers a finding of irreparable harm"), the presumption of irreparable harm afforded constitutional claims appears to be impacted by the outcome of the Court's analysis of the likelihood of success on the merits element. *See, e.g., We The Patriots USA, Inc.*, 17 F.4th at 294 ("Although Plaintiffs are subject to meaningful burdens on their religious practice if they choose to obtain the COVID-19 vaccine, because they have failed to demonstrate a likelihood of success on their First Amendment or other constitutional claims, their asserted harm is not of a constitutional dimension. Thus, Plaintiffs fail to meet the irreparable harm element simply by alleging an impairment of their Free Exercise right."); *see also Brock v. City of New York*, No. 21-CV-11094, 2022 WL 479256, at *4 (S.D.N.Y. Jan. 28, 2022) ("[T]he favorable presumption of irreparable harm arises only after a plaintiff has shown a likelihood of success on the merits of the constitutional claim. . . . Thus, when a plaintiff seeks injunctive relief based on an alleged constitutional deprivation, 'the two prongs of the preliminary injunction threshold merge into one . . . in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.'" (quoting *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000))); *Andre-Rodney v. Hochul*, 569 F. Supp. 3d 128, 141-42 (N.D.N.Y. 2021) ("While an allegation of a constitutional violation is insufficient to automatically trigger a finding of irreparable harm, if the constitutional deprivation is convincingly shown and that violation carries noncompensable damages, a finding of irreparable harm is warranted. . . . To determine whether the constitutional deprivation is convincingly shown the Court must assess the likelihood of success on the merits."). In other words, once the Court considers and concludes that the likelihood of success element has

not been met, as it does here, the mere allegation of a constitutional violation is insufficient to establish irreparable harm.

Plaintiff also argues that "the loss of an opportunity to attend a particular school is irreparable injury in the sense that monetary damages cannot readily be fixed or, for that matter, compensate for the lost opportunity." (Reply at 22 (citing *Foulke by Foulke v. Foulke*, 896 F. Supp. 158, 161 (S.D.N.Y. 1995)). Defendants argue, persuasively, that there is no actual imminent harm as this Court is not precluded from issuing an effective remedy at the end of a final trial on the merits with the benefit of a full trial record before it.[15] Here, Member A is not yet 18 years old, and is a high-school senior who is applying to colleges now. (Doc. 8, "Member A Decl." ¶¶ 1, 2, 6). Member C is 18 years old and presently enrolled in college. (Doc. 25, "Member C Decl." ¶¶ 1, 4). To be eligible for admission to West Point, "a candidate must be at least 17 years of age and must not have passed his twenty-third birthday on July 1 of the year in which he enters the Academy." 10 U.S.C. § 7446. Because Member A and Member C are far away from their twenty-third birthdays, there is significant time to remedy the alleged constitutional injury. Because Plaintiff has not sufficiently established that Member A and member C will "lose a year" of their lives and never catch up to their peers "in terms of military seniority" (Pl. Br. at 20), and because

---

[15] Defendants also argue, effectively, that Plaintiff's "theory of irreparable harm is premised on nothing more than 'an accumulation of inferences' . . . [which] 'is simply too speculative and conjectural to supply a predicate for prospective injunctive relief." (Def. Br. at 16 (quoting *Nachshen v. E. 14 Realty, LLC*, No. 18-CV-08304, 2019 WL 5460787, at *2 (S.D.N.Y. Oct. 9, 2019)). The steps required for Member A and Member C to suffer irreparable injury, all of which must come to pass, would be: (1) to "complete their West Point applications before January 31, 2024"; (2) "be qualified"; (3) "not be selected to fill a vacancy or qualified alternate slot"; (4) "be considered for selection as Additional Appointees or Superintendent nominations"; and (5) "ultimately not be selected for appointment because of West Point's limited consideration of race." (*Id.*; *see also* Dec. 21, 2023 Tr. at 57:21-59:15). This "highly attenuated chain of possibilities," *Superb Motors Inc. v. Deo*, No. 23-CV-06188, 2023 WL 5952145, at *4 (E.D.N.Y. Aug. 25, 2023), is insufficient to establish irreparable harm under the circumstances.

it is unclear whether Plaintiff is likely to succeed on the merits, Plaintiff has not established it will be irreparably harmed absent the requested injunction.[16]

IV. Public Interest and Balancing the Equities

"Under the last injunction factor, [the Court] must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Yang*, 960 F.3d at 135-36; *We The Patriots USA, Inc.*, 17 F.4th at 295 ("When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge"). A balancing of the equities has been described as "the hardship imposed on one party outweigh[ing] the benefit to the other." *Ligon v. City of New York*, 925 F. Supp. 2d 478, 540 (S.D.N.Y. 2013).

West Point is mid-admissions cycle. As of February 1, 2024, a new admissions cycle begins at West Point. But the prior year's admissions cycle, which began on February 1, 2023, continues into April of 2024 (*see* McDonald Decl., Ex. B).  The requested injunction, to take effect on February 1, 2024, would require the entire admissions policy to be changed, and a new policy be applied to the current applicant pool midstream, as well as to applicants to the new admissions cycle beginning on February 1, 2024. This result would not only affect the students who previously applied and are currently applying, but could require West Point to withdraw already offered appointments and LOAs. (McDonald Decl. ¶ 117; Dec. 21, 2023 Tr. 46:20-24). The requested preliminary injunction does more than disrupt a single admissions cycle; it impacts the carryover admissions process from the prior admissions year which began on February 1, 2023. Because Plaintiff has not clearly demonstrated a likelihood of success on the merits or that its members will

---

[16] The Court is not persuaded by Defendants' argument that Plaintiff's alleged delay in filing this action and seeking emergency relief for the 2023-24 admissions cycle undercuts its claim of irreparable harm. Plaintiff sued and moved for a preliminary injunction only three months after the Supreme Court decided *Harvard*.

suffer irreparable harm absent injunctive relief, the balance of the equities does not tip in Plaintiff's

favor. As Plaintiff has not shown a likelihood of success on the merits of its constitutional violation

claim, it has also failed to show that a preliminary injunction serves the public interest. *We The*

*Patriots USA, Inc.*, 17 F.4th at 296.

Accordingly, Plaintiff has not met its burden of proof with respect to likelihood of success

on the merits of its claim, irreparable harm, or that the public interest weighs in favor of granting

injunctive relief.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is DENIED.

The Clerk of Court is respectfully directed to terminate the motion sequences pending at

Docs. 6, 56, and 57.

**SO ORDERED.**

Dated:   White Plains, New York
         January 3, 2024

_____

PHILIP M. HALPERN
United States District Judge

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>                              Plaintiff,<br><br>            v.<br><br>THE UNITED STATES MILITARY ACADEMY AT WEST POINT; THE UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of Defense; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point,<br><br>                              Defendants. | 23 Civ. 8262 (PMH)<br><br><br>DECLARATION OF COLONEL DEBORAH J. MCDONALD |

I, Deborah J. McDonald, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1.      I am the former Director of Admissions at the United States Military Academy at West Point and an instructor in the Department of Behavioral Sciences and Leadership.

2.      I am aware of the allegations made by the Plaintiff in this lawsuit. I submit this declaration in support of the Defendants' opposition to the Plaintiff's motion for a preliminary injunction. All statements in this declaration are based on my personal knowledge or knowledge obtained in the course of my official duties.

3.      This declaration consists of eleven parts:

1

- Part I describes my professional background, including my experience as Director of Admissions from 2008 to 2023.
- Part II provides general background on the U.S. Military Academy at West Point, its admissions policies, and its admissions committees.
- Part III explains the steps an applicant (or "candidate") must take to apply to West Point.
- Part IV describes the Admissions Office's process for "quantifying" and "qualifying" a candidate's application.
- Part V explains how West Point selects candidates for appointment.
- Part VI addresses how the Admissions Office uses "letters of assurance," i.e., conditional offers of admission, as part of its recruitment efforts.
- Part VII explains the limited ways in which West Point considers a candidate's race and ethnicity as part of the admissions process.
- Part VIII addresses how West Point's consideration of a candidate's race and ethnicity has been necessary to advance the military's interests.
- Part IX describes other race-neutral alternatives West Point has considered.
- Part X explains the reasons that West Point uses demographic data.
- Part XI explains how a preliminary injunction would impose significant harms on West Point, current applicants to West Point, and the national security interests of the United States.

## I.      Professional Background

4.      I attended West Point as a cadet from 1980 until 1985, when I commissioned into the Army on active duty as a transportation officer. I returned to West Point as an information management officer between 1995 and 1998. Since 2001, I have been stationed at West Point.

5.      In 2001, I began working in the Admissions Office as an Associate Director of Admissions. My responsibilities included overseeing the Admissions Office's budget, information technology, and marketing. From 2004 to 2008, I served as the Deputy Director of Admissions. In that role, my responsibilities included coordinating with Members of Congress, the Department of Defense, the Department of the Army, Army Cadet Command, the Department of Defense Medical Examination Review Board (DoDMERB), and other service academies in relation to West Point's accession and retention initiatives. I also led West Point's

2

recruitment efforts in areas with high numbers of potential applicants from historically
underrepresented groups.

6.      In 2008, I was nominated and presidentially confirmed as West Point's Director
of Admissions. In this role, I was responsible for enrolling high-quality classes at West Point, the
United States Military Academy Preparatory School (USMAPS), and the West Point Preparatory
Scholarship program (WPPSP). I also oversaw West Point's Admissions Directorate, which
provides support throughout the admissions process to candidates, parents, Members of
Congress, Field Force members (West Point's volunteer admissions representatives), and
educators. Finally, in my role as the Director of Admissions, I synchronized efforts with the
Army Reserve Officers' Training Corps (ROTC) to enhance the overall recruitment effort of
commissioning sources and publicize Army officer opportunities to the youth and communities
of America. I was Director of Admissions until July 1, 2023, when I stepped down in preparation
for retirement. As the Director of Admissions, I worked under the direct supervision of the
Superintendent of West Point. Currently, I serve as an Advisor to the Director of Admissions.

**II.     West Point's Admissions Policies and Committees**

7.      The United States Military Academy at West Point was established in 1802. West
Point is a four-year, federally established[1] undergraduate institution that prepares cadets to
become leaders and officers in the United States Army. Upon entry at West Point, cadets are
members of the Army. Each cadet receives an annual salary, room, board, medical, and dental
care, and is subject to the Uniform Code of Military Justice.

---

[1] *See* 10 U.S.C. § 7431(a) (establishing "a United States Military Academy, at West Point, New
York").

8.     West Point's academic program is designed to develop cadets' critical thinking and creative problem-solving skills. Upon graduation, all cadets receive a Bachelor of Science degree and are fully prepared to meet the intellectual requirements of a leader in today's Army. In addition to course offerings in science, engineering, mathematics, the humanities, and social sciences, West Point offers courses in military instruction that are not offered outside of the military service academies. (This year's course offerings include, for example, "Special Ops: Theory & Practice," "Introduction to Warfighting," and "Platoon Operations.").

9.     In addition to completing academic course work, cadets must participate in rigorous military training and mandatory athletic activities. Upon graduation, cadets are commissioned as active-duty officers with an obligation to serve a minimum of five years. West Point is a significant source of officer commissions for the Army; it historically provides approximately 20% of those commissions, and West Point graduates comprise 33% of general officers in the Army. Accordingly, West Point is a vital pipeline to senior leadership in the Armed Forces.

10.     The Academy is under the immediate supervision and control of the Department of the Army. West Point's Superintendent is the commander of the Academy and the military installation on which it is located. In a typical year, more than 13,000 men and women apply for admission (or "appointment") to West Point. West Point offers approximately 1,800 candidates per year to fill approximately 1,200 first-year seats, though the particular numbers may vary by year. Under 10 U.S.C. § 7442, the authorized strength of the total Corps of Cadets of the Academy is capped at 4,400 cadets on the day before graduation.

11.     West Point maintains a rigorous, holistic merit-based admissions process. West Point's Admissions policies are governed by federal statute (10 U.S.C. §§ 7442–46), Department

4

of the Army Regulations, West Point Regulations, relevant National Collegiate Athletic Association (NCAA) Regulations, and internal guidance, including directives from West Point's Academic Board to its Admissions Committee. The most recent directive was issued on November 5, 2020 (the "Academic Board Directive," attached as Exhibit A). It remains in effect this admissions cycle.

12.     As set forth in the Academic Board Directive, West Point seeks to select candidates who (1) express interest in a career of service to the country as active-duty Army officers; (2) demonstrate high moral and ethical behavior; (3) demonstrate strong performance in high school, college, or the Army and are predicted to graduate from West Point; (4) manifest high levels of physical and emotional stamina; (5) are medically qualified for a commission upon graduation; (6) meet the needs of the future Army in talent and diversity; and (7) are committed to all-around excellence. *See* Academic Board Directive § 2(a). West Point also seeks to admit cadets with a range of talents, such as Leaders, Scholars, Athletes, and Soldiers, as well as a range of backgrounds. *See id.* § 2(b).

13.     West Point's admissions process is overseen by its Admissions Committee, which is a standing committee of 16 members of the Academic Board. The Committee is comprised of the Director of Admissions; Heads of the Departments of Mathematical Sciences, English and Philosophy, and Behavioral Sciences and Leadership; the Master of the Sword (Head of the Department of Physical Education); the Director of the Department of Military Instruction; the West Point Surgeon; a senior representative from the Athletic Department; representatives from five additional Academic Departments identified annually by the Dean of the Academic Board; a Regimental Tactical Officer; a Company Tactical Officer; and the Commandant of USMAPS.

14.     The Admissions Committee evaluates and selects candidates for West Point, USMAPS, and WPPSP. The Admissions Committee also assists the Director of Admissions in creating recruitment strategies; recommends to the Academic Board criteria for admission and readmission of former cadets, international cadets, and cadet candidates to West Point, USMAPS, and WPPSP; and informs the Academic Board of candidates offered admission, including the profile of the new class as it develops.

15.     The Admissions Committee has a subcommittee, known as the Executive Committee, that is composed of the Director of Admissions; Department Heads of English and Philosophy, Mathematical Sciences, and Behavioral Sciences and Leadership; the Master of the Sword; the Admissions Committee representative from the athletic department; and a Regimental Tactical Officer. The Executive Committee's primary responsibilities are to make preliminary recommendations for candidates who have certain identified risk factors.

16.     The Admissions Office also houses the Diversity Outreach Office. The Diversity Outreach Office primarily conducts outreach to candidates from populations that are underrepresented at West Point. As further discussed below, the Diversity Outreach Office reviews African American, Hispanic, and Native American candidates' files to make preliminary recommendations for qualification or disqualification for admission and may also recommend these candidates for letters of assurance and Superintendent nominations (both discussed further below) after conducting a holistic review of the candidate's file. The Admissions Office does not forward applications from Asian and Pacific Islander candidates to the Diversity Outreach Office because Asian and Pacific Islander cadets typically make up a greater share of West Point cadets than Asian and Pacific Islander officers do of the Army officer corps, and, as discussed further

below, West Point has tied its talent and diversity goals to the demographics of the current officer corps in the active-duty component.

17.     West Point also has admissions teams for different geographic regions of the United States. Each regional team is led by an Admissions Regional Commander. As further discussed below, an admissions officer from the candidate's region reviews a candidate's file to make preliminary recommendations for qualification or disqualification for admission. Each Admissions Regional Commander may also recommend candidates in their regions for letters of assurance and Superintendent nominations (both discussed further below) after conducting a holistic review of the candidate's file.[2]

18.     The Director of Admissions considers recommendations for letters of assurance for all candidates and is authorized to sign such letters without committee action as outlined in Section 5(a)(2)(b) of the Academic Board Directive. The Director of Admissions also considers recommendations for Superintendent nominations for all candidates.

### III.     Steps to Apply to West Point

19.     A West Point application contains six requirements: (1) the Candidate Questionnaire; (2) the Second Step Kit; (3) a Candidate Fitness Assessment; (4) a medical evaluation; (5) an interview; and (6) a nomination.

20.     Candidates can begin the application process no earlier than February 1st of the year before the candidate would enter West Point (their junior year for candidates applying

---

[2] Certain candidates are reviewed by specialized admissions officers rather than regional admissions officers.  For example, athlete candidates are reviewed by athlete admissions officers, soldier candidates by soldier admissions officers, international candidates by international admissions officers, and former cadet candidates by former cadet admissions officers.  For ease of reference, my use of "regional team" and "regional admissions officer" encompasses these specialized admissions officers.

directly from high school) by submitting the Candidate Questionnaire. Upon opening an application, and after around June 1st, candidates may complete the remaining steps, and must finish the process by January 31st of the year the candidate would enter West Point. However, if a candidate seeks a medical waiver, West Point provides until April 15th of the year the candidate would enter West Point to complete the medical qualification process. In addition, while West Point requests that Members of Congress submit their nominations no later than January 31st of the year the candidate would enter West Point, some Members might submit nominations thereafter.

21.     Using criteria explained below, West Point evaluates (or "qualifies or disqualifies") completed applications on a rolling basis and tenders most offers of admission between October and April of the year the candidate would enter West Point. A candidate must accept or decline an offer of appointment by May 1st of the year they would enter West Point. Each of the six requirements is discussed further below. West Point may tender offers of admission past May 1st depending on the acceptance rate at that time.

### 1. Step One: Candidate Questionnaire

22.     Unlike civilian universities, West Point admissions are governed by federal statutes and regulations that set forth specific eligibility criteria. For example, for appointment to West Point, a candidate must be at least 17 years old and not yet 23 years old by July 1st of the year they would enter West Point; be a U.S. citizen;[3] not be married, pregnant, or legally

---

[3] Up to 60 international cadets may study at West Point at any given time. Eligible countries are selected on an annual basis by the U.S. State Department and the U.S. Department of Defense. While international cadets are fully assimilated into the Corps of Cadets, they do not commission into the U.S. Army upon graduation, and their admissions process is different from the process for U.S. candidates. The class of 2026 admitted 16 international cadets, and the class of 2027 admitted 16 international cadets.

responsible for dependents; not have past felony convictions or drug abuse; not be a conscientious objector; and otherwise be of good moral character.

23.     The Candidate Questionnaire asks for candidates to self-report information, including their date of birth, citizenship, high school Grade Point Average (GPA), standardized test scores, extra-curricular activities, athletic participation, race and ethnicity, and gender, among other basic demographic information. The Candidate Questionnaire is used as an eligibility screening tool to determine if a candidate (1) meets the basic statutory eligibility requirements to receive an appointment to West Point, and (2) is likely to be competitive for admission. Candidate Questionnaires are reviewed by the candidate's assigned West Point admissions officer.

## 2.  **Step Two: Second Step Kit**

24.     If the West Point admissions officer concludes that a candidate meets the eligibility requirements to attend West Point after a preliminary screening of the Candidate Questionnaire, the West Point admissions officer directs his or her regional team to open the Second Step Kit for that candidate. Typically, 80% of candidates screened with the Candidate Questionnaire move on to this phase.

25.     The Second Step Kit requires candidates to submit official school transcripts; official Scholastic Assessment Test (SAT), American College Testing (ACT), or Preliminary SAT (PSAT) results; short answer essay question responses; and four teacher evaluations. The Second Step Kit also asks candidates for additional basic demographic information, including whether the candidate is the first member of their immediate family (to include grandparents) to attend college, the candidate's combined family income, and language fluency. The Second Step

Kit must be completed no later than January 31st of the year the candidate would enter West Point.

### 3.  Steps Three to Five: Candidate Fitness Assessment, Medical Evaluation, and Interview

26.     At the same time that the Second Step Kit is opened to eligible candidates, candidates are directed to take a Candidate Fitness Assessment. The Candidate Fitness Assessment is a test of strength, agility, speed, and endurance. It consists of six events: 1) basketball throw; 2) cadence pull-ups or flexed-arm hang; 3) 40-yard shuttle run; 4) modified sit-ups; 5) push-ups; and 6) one mile run.

27.     Candidates must also undergo a medical evaluation by the DoDMERB.

28.     Finally, candidates must interview with a Field Force or Military Liaison Officer, a coach (if a recruited athlete), or their commander (if a soldier).

29.     These steps must be completed no later than January 31st of the year the candidate would enter West Point.

### 4.  Step Six: Nomination

30.     As required by 10 U.S.C. § 7442, and unlike civilian universities, every candidate appointed to West Point must be nominated.

31.     There are two types of nominations. First, a candidate can receive a nomination from a member of the United States House of Representatives and Senate; the Vice President; Delegates to Congress from American Samoa, the District of Columbia, Guam, the Virgin Islands, and the Commonwealth of the Northern Marianas Islands; the Governor and Resident Commissioner of Puerto Rico; and the Superintendent of West Point (a "statutory nominating authority"). *See* 10 U.S.C. § 7442(a)(2)-(10), (d). Second, a candidate can receive a "service-connected" nomination. *See* 10 U.S.C. § 7442(a)(1), (b)(1)-(4), (c).

(i)      Statutory Nominating Authority

32.     Generally, nominations from Members of Congress, the Vice President, Delegates to Congress, and the Governor and Resident Commissioner of Puerto Rico make up 75% of West Point's cadet corps. The top fully qualified candidate appointed to West Point pursuant to nomination by a Member of Congress is "charged" to that member. When a Member of Congress has fewer than five charges at West Point at the end of an academic year, the Member is considered to have a vacancy for the following admissions cycle. For each vacancy, a Member of Congress can nominate up to ten individuals domiciled in his or her district or state. 10 U.S.C. § 7442(a). Typically, each year one vacancy per military service academy becomes available per Member of Congress. Members of Congress have virtually unlimited discretion to determine who they nominate and how their offices process and consider applications. West Point has no authority or control over which candidates Members of Congress nominate.

33.     Members of Congress are required to nominate their slate of candidates using one of three methods, as provided by 10 U.S.C. § 7442(a) and Department of Army Regulation 150-1, Chapter 3-4.

34.     First, Members can make nominations using the "competitive method," in which they submit nominees to the West Point Director of Admissions without any order of preference, leaving it to the Admissions Office to select one of the up to ten candidates within the nomination slate. *See* Army regulation 150-1, Chapter 3-4(a)(1). In this case, West Point ranks candidates within the slate (establishing "an order of merit") based on the candidates' Whole Candidate Score (explained below), a metric that does not incorporate or otherwise consider race or ethnicity. The fully qualified candidate with the highest Whole Candidate Score within a nomination slate will be offered an appointment.

11

35.     Second, Members can use the "principal-competing alternate method," in which the Member indicates a principal nominee, and in the event that the principal nominee is not deemed fully qualified by West Point or declines an offer of appointment, the member defers to the Admissions Office to select among the remaining candidates on the nomination slate based on the candidates' Whole Candidate Score. *Id.* Chapter 3-4(a)(2).

36.     Third, Members can use the "principal-numbered alternate method," in which the Member identifies a principal, or first choice nominee, and provides a ranked list of alternates. *Id.* Chapter 3-4(a)(3). In this case, West Point must offer an appointment to the fully qualified candidate who is ranked highest on the Member's list, even if that candidate has a lower Whole Candidate Score than other individuals on the Member's list.

37.     While it varies by year, approximately 85% of Members use the competitive method.

38.     Regardless of the nominating method used by a Member of Congress, West Point must appoint one nominee for each congressional vacancy so long as at least one of the candidates included on the slate for that vacancy is fully qualified.

39.     Section 7442(a)(2) also provides the Vice President, like Members of Congress, with five West Point vacancies; typically, one vacancy opens per year that he or she will nominate to fill. The Vice President provides nominations to candidates from the country at large.

40.     Section 7442(a)(5)-(10) provides the District of Columbia and the various U.S. territories with three to six West Point vacancies. For each vacancy, they can nominate up to ten individuals using one of the three methods discussed above.

12

41.     Finally, Section 7442(d) authorizes the West Point Superintendent to nominate up to 50 candidates per year from the country at large, so long as the cap on authorized strength of the total Corps of Cadets of the Academy is not exceeded. Superintendent nominations can be provided at any point in the admissions cycle once a candidate has successfully completed all other applications steps, is found to be qualified, and is missing only a nomination. Superintendent nominations are used for qualified candidates who West Point highly desires but who lack nominations from other sources. There are no statutory restrictions on the Superintendent's discretion to nominate candidates. Superintendent nominations are most often used to provide nominations for athletes early in the admissions cycle in order to compete with other Division 1 athletic programs. Because non-military schools do not require applicants to secure nominations, those schools can typically offer admission to applicants earlier in the admissions process than West Point; accordingly, the Superintendent can use this statutory authority to compete for highly sought-after athletes.

42.     Since 2008, the Superintendent has never exhausted his nominations for any given year. For example, for the class of 2027, the Superintendent provided only 17 nominations; for the class of 2026, he provided only 21 nominations.

43.     As a result of the nomination requirement, the statutory nominating authorities play a large, and often determinative, role in the selection process. That is because candidates typically compete against the other candidates in their nomination pool, rather than against the entirety of candidates applying to West Point.

(ii)     Service-Connected Nominations

44.     Title 10 also authorizes military service-connected nominations.

13

45.     First, Section 7442(b)(1) provides for a presidential competitive category, in which the President may select 100 cadets per year who are children of certain members of the armed forces.

46.     Second, Section 7442(b)(2)-(4) provides that the Secretary of the Army may nominate 85 candidates per year from enlisted members of the Regular Army; 85 candidates per year from enlisted members of the reserve component of the Army; and 20 candidates per year from members of ROTC & Junior ROTC.

47.     Third, Section 7442(a)(1) provides that 65 West Point slots may be filled with "children of members of the armed forces who were killed in action or died of, or have a service-connected disability rated at not less than 100[%] resulting from, wounds or injuries received . . . [in] active service," as well as children of military or civilian personnel in a "missing status."

48.     Fourth, Section 7442(c) provides that the President is authorized to appoint children of persons who have been awarded the Medal of Honor.

## IV.     Quantification and Qualification of Candidate Files

### 1.     File Quantification and the Whole Candidate Score

49.     After a candidate completes the Candidate Questionnaire, the Admissions Office assigns a numerical score to the candidate's file as part of a process known as file "quantification."  *See* Academic Board Directive § 4(a). This numerical score—known as the Whole Candidate Score—is initially based on self-reported data provided by the candidate in the Candidate Questionnaire and is one of the most important indicators for initial screening of a candidate's file.

50.     The formula for calculating the Whole Candidate Score is set forth in Annex A to the Academic Board Directive.

14

51.     Sixty percent of the Whole Candidate Score derives from a candidate's academic qualifications, calculated from their standardized test scores and high school GPA.

52.     Thirty percent of the Whole Candidate Score derives from the candidate's Community Leader Score, which is based on extracurricular activities, sports participation, and evaluations from school officials.

53.     The final ten percent of the Whole Candidate Score comes from the Candidate Fitness Assessment.

54.     The Whole Candidate Score fluctuates during the application window and can increase or decrease until the candidate completes their application. For example, a Whole Candidate Score generated from the candidate's self-reported information contained in the Candidate Questionnaire may increase if the candidate submits higher verified standardized test scores or a higher official GPA. The Whole Candidate Score may decrease if the candidate does poorly on the Candidate Fitness Assessment or receives unfavorable school official evaluations.

55.     Race or ethnicity are not factors in the Whole Candidate Score.

56.     The Admissions Committee can adjust a Whole Candidate Score by plus or minus 10% of the candidate's Whole Candidate Score to allow for the special nature of school programs, significant work experience during the school year, special accomplishments, personal achievements of a significant nature, international studies, foreign language expertise, or information of a negative nature not strong enough to disqualify a candidate. For example, the Whole Candidate Score does not consider a candidate's performance in college if the candidate has taken university courses. If the candidate performed well in the candidate's college courses, a positive Whole Candidate Score adjustment may be warranted. Conversely, if a candidate

performed poorly in the candidate's college courses, a negative Whole Candidate Score adjustment may be warranted.

57.     When a candidate is considered for a Whole Candidate Score adjustment, the appropriate Regional Commander will present the case and the extenuating circumstances to the department responsible for consideration and approval of a Whole Candidate Score adjustment. These adjustments will be identified on the admission slate for each candidate so that the entire Admissions Committee can identify the candidates receiving a Whole Candidate Score adjustment.

58.     Race and ethnicity are not considered when making a Whole Candidate Score adjustment.

## 2.  **File Qualification**

59.     After the Admissions Office assigns a Whole Candidate Score to a candidate, West Point undertakes a three-step review process to determine whether a candidate is "qualified" or "not qualified." *See* Academic Board Directive § 4(b). First, the admissions officer assigned to the candidate conducts a first review.  If a candidate indicates that they are African American, Hispanic, or Native American in their Candidate Questionnaire, this first review is conducted by the Diversity Outreach Office. Other candidates' first reviews are conducted by a regional admissions officer. Regardless of who a candidate is first reviewed by, admissions officers apply the same qualification standards and review processes (described further below) to all candidates. After the first review, for all candidates, a member of the admissions committee (non-admissions staff or faculty) conducts a second review, and another admissions officer conducts a third review.

60.     The reviewing officials confirm that candidates meet the academic, leadership, and physical standards as reflected in the Whole Candidate Score. The reviewing officials also provide an individualized, holistic evaluation considering the subjective components of the application, including essay answers, interview results, writing samples, and comments from school officials. The admissions officers determine if the candidate is academically and physically qualified. If any of the three reviewers disagree, the candidate's status is reviewed by the Admissions Committee, whose decisions are determined by a simple majority.

61.     Standards for academic qualification are determined by the Director of Admissions, with approval by the Academic Board. By law, a candidate admitted to West Point "must show, by an examination held under regulations prescribed by the Secretary of the Army, that he is qualified in the subjects prescribed by the Secretary." 10 U.S.C. § 7446(b). Using the statute's guidance, West Point uses indicators of success typical in post-secondary education subjects such as math, engineering, and English and also incorporates indicators of candidate leadership potential. Physical qualification thresholds are established by the Director of Admissions in consultation with the Master of the Sword, and then approved by the Academic Board. DoDMERB determines minimum medical qualification.

62.     For the current admissions cycle, preliminary academic indicators for qualification include a GPA in the top 81% of the candidate's high school class, an SAT Math score at or above 570, and an SAT Evidence-Based Reading and Writing Score at or above 550. (The Academic Board Directive sets out similar indicators for ACT scores). *See* Academic Board Directive § 4(b).

63.     Candidates who pass the preliminary academic review process are considered to be academically qualified candidates. The academic assessment is only one attribute of the

qualification process. As noted, candidates must also be reviewed for medical qualification, and the physical and leadership components of the Whole Candidate Score. Any candidate who is deemed to be at risk in any of these areas will be presented to the Admissions Committee or the Executive Committee for qualification or disqualification. Being "at risk" in any of these components does not automatically disqualify a candidate.

64.     Race and ethnicity are not factors in determining the qualification of a candidate.

## V.     Selection of Candidates

65.     West Point evaluates completed applications for admission on a rolling basis each year between August of the year before the candidate would enter West Point and April or May of the year of entry (candidates' senior year of high school for those applying directly from high school). When a candidate is deemed qualified, the file returns to the Director of Admissions, who works to build a class of cadets. Selection is based on order of merit (or order specified by Member of Congress, where applicable) within the types of nominations obtained by candidates. *See* Academic Board Directive § 5(a). Out of order of merit selection will only be made for Additional Appointees (described further below) and Superintendent nominations. *Id.*

66.     Specifically, all candidates receiving a nomination using the competitive method (i.e., the statutory nominating authority gives West Point the discretion to choose among nominees) are selected for appointment based on order of merit by their Whole Candidate Score. For example, if a Member of Congress nominated ten candidates via the competitive method for one vacancy, West Point would offer admission to the fully qualified candidate with the highest Whole Candidate Score among the ten nominated within that district or state. Because candidates are ranked by Whole Candidate Score within each congressional district or state, the highest Whole Candidate Score among congressional vacancy winners can vary significantly under the

18

competitive method. Candidates in highly competitive congressional districts may not win the congressional vacancy despite having significantly higher Whole Candidate Scores than similarly situated candidates from less competitive districts.

67.     West Point uses the same process for candidates with service-connected nominations, such as a Presidential nomination—i.e., West Point ranks the candidates in order of merit based on the candidates' Whole Candidate Score. Race and ethnicity play no role in this process.

68.     For congressional slates where Members of Congress have chosen other nomination methods, designating nominees as a principal nominee or numbered alternate, the Admissions Office must consider selection in the sequence specified by the Member of Congress. In other words, a qualified candidate with a lower Whole Candidate Score relative to other candidates from that district may receive an offer of appointment simply because the Member of Congress designated that candidate as a principal nominee or numbered alternate. Again, West Point does not consider race or ethnicity in this selection process.

69.     When a qualified candidate will clearly win a vacancy, he or she will be placed on an admissions slate, which is voted on by a quorum of the Admissions Committee. Most appointment offers will be tendered from January through April of the year the candidate would enter West Point once West Point receives congressional nominations from the various Members of Congress and as candidates complete the medical evaluation. Appointment offers made before January are usually for candidates with a non-congressional nominating source, as those nominations are generally received before the congressional nominations.

70.     If a qualified candidate is not selected for appointment for the vacancy for which he or she was nominated, that candidate may still be offered an appointment under two other statutory provisions.

    a.  First, a candidate may receive an appointment as a qualified alternate. Specifically, Title 10 authorizes West Point to appoint 150 qualified alternates to the incoming class from among the pool of qualified candidates who received nominations from a Member of Congress, Delegate in Congress, the Resident Commissioner from Puerto Rico, or the Governor of Puerto Rico but did not win the vacancy. 10 U.S.C. § 7442(b)(5). These nominees compete against each other in a nationwide pool of qualified alternates, with the 150 highest-ranked candidates selected by "order of merit," defined as the 150 candidates with the highest Whole Candidate Score. *See* Academic Board Directive § 5(a). Race and ethnicity are not factors in determining the order of merit of qualified alternates.

    b.  Second, if vacancies in the incoming class of cadets remain following all the appointments otherwise authorized by law, 10 U.S.C. § 7443 provides that the Secretary of the Army may fill vacancies "[i]f it is determined that, upon the admission of a new class to the Academy, the number of cadets at the Academy will be below the authorized number." As such, Section 7443 provides for the appointment of additional cadets from among the remaining qualified nominees, with a nomination from any nominating source. These appointment offers are labeled "Additional

20

Appointees." Section 7443 does not require Additional Appointees to be selected by order of merit. During every year that I was Director of Admissions, it was necessary to make offers of appointment to Additional Appointees to meet the entering class size of around 1,200 cadets. For the class of 2026, 284 candidates were provided offers of appointment as Additional Appointees; for the class of 2027, 364 candidates were provided offers of appointment as Additional Appointees. As explained below, race and ethnicity are one of many factors that the Admissions Committee may consider as part of a holistic assessment in extending offers to Additional Appointees.

## VI.    Letters of Assurance

71.    Due to statutory, regulatory, and policy constraints not applicable to civilian universities, West Point cannot provide early admission decisions. In consideration of this limitation, the Admissions Office uses a recruiting tool referred to as a Letter of Assurance (LOA) to encourage competitive candidates to quickly complete their application process.

72.    To be considered for an LOA, a candidate must have completed the Candidate Questionnaire (Step One in the admissions process); submitted their 6th semester high school transcript and a verifiable PSAT, ACT, or SAT score; and completed an interview. A candidate need not have completed the Second Step Kit, Candidate Fitness Assessment, or medical evaluation, or have received a nomination to be considered for an LOA.

73.    An LOA constitutes a firm commitment from West Point to the candidate that the candidate will be admitted—provided that the candidate meets the conditions in the letter. *See* Academic Board Directive § 2(a). If a candidate receives an LOA, he or she must complete the

21

application and pass physical fitness standards within 60 days of the issuance of the LOA; become medically qualified by April 15; and receive a nomination. If a candidate fails to meet any one of these conditions, the candidate will not receive an appointment.

74.     The Director of Admissions provides guidance on how many LOAs are available in each admissions cycle, as West Point must be careful to balance incentives to candidates to complete the rigorous and time-consuming application with the countervailing statutory cap on the total number of cadets. There is no quota system or other numerical requirement in issuing LOAs. The guidance for the class of 2028 is attached as Exhibit B.

75.     To determine who should be offered an LOA, admissions officers and their supervisors review Candidate Questionnaires, 6th semester high school transcripts, verifiable standardized test scores, and interviews and identify promising candidates within several categories, including those with particular talents (Soldier, Athlete, Scholar) and/or those who are diverse (African American, Hispanic, Native American, Women).[4]

76.     A Soldier is an enlisted member of the Regular Army (i.e., active duty) or Reserve Component who has completed Advanced Individual Training and has an assessment from their commander in their file. An Athlete is a candidate who has been "chipped," a special designation by a West Point coach that a recruited athlete should receive an LOA. A Scholar is a candidate whose academic performance predictor, as known as the College Entrance Examination Rank (CEER) score, is greater than or equal to a specified value. A CEER score is calculated using a candidate's standardized test scores and high school GPA. These categories are reviewed yearly and may change depending on the admissions landscape.

---

[4] Soldiers and Native American candidates are included in these categories though they do not appear in Exhibit B.

77. The Admissions Office conducts an individualized, holistic review of candidates before offering an LOA. Specifically, an admissions officer screens the application based on Candidate Questionnaire, high school transcript, verifiable standardized test scores, and interview. The admissions officer also identifies risk areas, such as substandard test scores in either math or reading, a low Community Leader Score, or issues concerning moral turpitude. Based on that review, the Director of Admissions issues LOAs to approved candidates in accordance with the Academic Board Directive. LOAs are typically issued between July and September of the year before a candidate would enter West Point (a candidate's senior year if applying directly from high school).

78. If a candidate indicates that they are African American, Hispanic, or Native American in their Candidate Questionnaire, the LOA screening process described above is performed by the Diversity Outreach Office. Other candidates are screened by regional teams. Both the Diversity Outreach Office and the regional teams make their LOA recommendations to the Director of Admissions, who considers recommendations for LOAs for all candidates and is authorized to sign such letters without committee action as outlined in Section 5(a)(2)(b) of the Academic Board Directive

79. After West Point provides an LOA to a candidate, the candidate has 60 days from the date of issuance to complete the application, except for the medical qualification and securing a nomination, which can occur after the 60-day deadline has ended. If the candidate does not complete their application within 60 days, the LOA is revoked. Likewise, if the candidate does not receive the required medical qualification and nomination, the LOA is revoked.

VII.    **West Point's Limited Consideration of Race and Ethnicity in the Admissions Process**

80.     West Point considers race and ethnicity flexibly as a plus factor in its individualized, holistic assessment of African American, Hispanic, and Native American candidates at three limited stages of the admissions process. West Point adopted its current policies after decades of experience led the Armed Forces to recognize that building a cohesive fighting force that is highly qualified and broadly diverse is "integral to overall readiness and mission accomplishment."[5]

81.     Until the late 1960s, African American cadets did not enter West Point in substantial numbers. By 1968, West Point had graduated 27,969 cadets, of which very few were African American. In 1978, the Admissions Office first established class composition goals and created a Diversity Outreach Office to work on increasing cadet corps diversity. During the 1990s, the Admissions Office considered race and ethnicity in admissions and worked to advance diversity initiatives to bring in geographically, experientially, and racially and ethnically diverse classes.

82.     While the numbers of cadets from underrepresented demographics increased in the 1980s and 1990s, the gains were not significant. For example, in the entering class of 2000, the number of African American cadets was approximately 65 (6% of the men entering the class and 9% of the women entering the class). The number of women cadets entering that same year was 188, comprising 15.9% of the entering class. Given these relatively low numbers, the Admissions Office intensified its efforts to offer admission to candidates from underrepresented demographics.

---

[5] *See* Department of Defense, Department of Defense Board on Diversity and Inclusion Report: Recommendations to Improve Racial and Ethnic Diversity and Inclusion in the U.S. Military 3 (2020).

83.     In 2013, based on the continued underrepresentation of previously excluded groups in the Army's officer corps, the Chief of Staff of the Army, General Raymond T. Odierno, directed West Point to increase diversity among its cadets, and specifically to increase the number of African American and women cadets.

84.     As the Director of Admissions, I worked to implement this directive, in conjunction with broader Department of Defense (DoD) diversity goals. Specifically, my aspirational goal was to try to at least mirror the demographics of the Army officer corps in each graduating West Point class. At the time, the Army officer corps was far more diverse than the West Point cadet corps—for example, African Americans constituted 14% of the officer corps but only 8% of West Point cadets. Because of the military's closed personnel system, it was vital that West Point provide the Army with a pipeline of officers who would keep pace with the progress towards diversity that the Army had achieved elsewhere.

85.     As a result, since General Odierno's direction, West Point has tied its talent and diversity goals to the demographics of the current officer corps in the active-duty component. For example, the current percentage of African Americans in the active-duty officer corps is 11%. The Admissions Office set an aspirational diversity goal of 14% African American cadets for the class of 2027. This goal was set higher than the current percentage of African Americans in the active-duty officer corps to account for attrition between entrance to West Point and graduation. For the class of 2027, the Admissions Office also had aspirational diversity goals of 11% for Hispanic cadets, 5% for Asian cadets, and 20% for women cadets, as well as talent goals of 23% Athletes, 30% Scholars, 15% Leaders, and 5% Soldiers. The Admissions Office did not include Native American and Pacific Islander cadets in its diversity goals because these

candidates make up a very small percentage of the applicant pool and cadet corps. These diversity and talent goals do not operate as ceilings or floors. Nor do the goals operate as quotas.

86.     West Point offers appointment by merit and will not offer appointment to unqualified candidates regardless of its diversity and talent goals. In other words, an otherwise unqualified candidate will not be offered an appointment based on his or her race or ethnicity. Indeed, during many application cycles, West Point does not meet its talent and diversity goals. For example, for the class of 2027, West Point did not meet its aspirational goals for Women, Athletes, African Americans, or Hispanic cadets. Despite not achieving its talent and diversity goals, West Point did not offer appointments to additional candidates based on their race or ethnicity to achieve a numerical goal.

87.     Similarly, these aspirational goals do not act as a ceiling. For example, for the class of 2027, West Point provided more offers of appointment to Asian cadets, Leaders, Scholars, and Soldiers than set out in its 2027 talent and diversity goals but did not stop offering admission to highly qualified candidates simply because the goal was met. West Point seeks to admit the highest quality candidates based solely on merit. (Annex B of the Academic Board Directive provides West Point's class composition goals.).

88.     Since 2013, West Point has seen a gradual increase in the percentage of cadets from underrepresented racial or ethnic demographics. For the class of 2013, West Point had 6.9% African American cadets, 6.3% Asian cadets, 0.8% Native American cadets, and 9.4% Hispanic cadets; for the class of 2027, West Point has 10% African American cadets, 13.5% Asian cadets, 0.9% Native American cadets, and 11.4% Hispanic cadets.

89.     Although West Point holistically considers race and ethnicity among many other factors at three limited points in the application process, it does not affect most West Point

appointments. As discussed above, a candidate's race or ethnicity plays no role in West Point's selection of candidates to fill congressional vacancies, non-congressional vacancies, or qualified alternate slots, all of which are filled in order of merit based on Whole Candidate Score (or as specified by Member of Congress, where applicable). Thus, for the class of 2027, consideration of race or ethnicity did not impact any of the 906 appointments (71% of total appointments) made under those nominating sources. Nor did it impact the 935 similar appointments made in 2026 (77% of total appointments).

90.     Race and ethnicity, among other criteria, may affect the admissions process at only the following three stages.

91.     First, early in the admissions cycle, the Admissions Office may consider race and ethnicity flexibly as a plus factor in deciding to offer an LOA to an African American, Hispanic, or Native American candidate after reviewing the Candidate Questionnaire, 6th semester high school transcript, verifiable standardized test scores, and interview. As noted, the Director of Admissions provides guidance each year on how many LOAs are available. *See* Exhibit B, 2028 Admissions Guidance § 6. That guidance also addresses when LOAs may be appropriate depending on a candidate's CEER score and Whole Candidate Score. *Id.* For example, the 2028 guidance notes that LOAs may be appropriate for African American candidates with a CEER score at or above 554. *Id.* Even if an African American candidate exceeds this CEER score, however, the Admissions Office may decide not to offer the candidate an LOA. As noted, the Office's review of each candidate is holistic, and the guidelines set forth in the Admissions Director's guidance are advisory only. The Director retains discretion not to offer an LOA to a candidate for any reason. And if a candidate receives an LOA, that is not a guarantee of

admission—a candidate must still satisfactorily complete the remaining steps of the admissions process; if the candidate does not do so, West Point will not offer admission.

92.    For the class of 2027, West Point offered 675 LOAs. White candidates received 480 (71%) based on, among other things, their demonstrated talents as Soldiers, Athletes, or Scholars. For the class of 2026, West Point offered 484 LOAs. White candidates received 315 (65.1%), again based on, among other things, their demonstrated talents as Soldiers, Athletes, or Scholars.

93.    Second, at the end of the admissions cycle, if West Point has not reached its class size, West Point may make offers to "Additional Appointees." The class of 2026 had 284 Additional Appointees. The class of 2027 had 364 Additional Appointees. Race and ethnicity may affect offers of admission to Additional Appointees at this final stage of admissions in two ways.

   a.   First, a qualified candidate who is not selected to fill a congressional vacancy, non-congressional vacancy, or qualified alternate slot but has an LOA—which, as discussed above, may (or may not) be based in part on race and ethnicity as one factor in an individualized, holistic assessment—will receive an offer of appointment as an Additional Appointee. For the class of 2027, 170 Additional Appointees had LOAs. Of those, 142 were white. For the class of 2026, 168 Additional Appointees had LOAs. Of those, 113 were white.

   b.   The Admissions Committee may also make offers of appointment as Additional Appointees to candidates who competed for nomination and were found qualified but did not receive LOAs. In doing so, the

Admissions Committee may consider race and ethnicity flexibly as a plus factor for African American, Hispanic, and Native American candidates in its holistic assessment of candidates to identify those who are expected to make valuable contributions based on their demonstrated leadership, athleticism, scholastic aptitude, past experience as a solider, and diverse background. For the Class of 2027, West Point had 99[6] Additional Appointees admitted to the class who did not have an LOA. Of these 99 Additional Appointees, 86 were white. For the Class of 2026, West Point had 55 Additional Appointees who were admitted to the class who did not have an LOA. Of these 55 Additional Appointees, 45 were white.

c. Not including Additional Appointees appointed to West Point from USMAPS, 61% of Additional Appointees in the class of 2026 and 72% in the class of 2027 respectively were white.

d. For all Additional Appointees who are extended offers of appointment, race and ethnicity are only one factor among many other qualities and experiences that West Point considers valuable contributions to the cadet environment. For both 2026 and 2027, West Point made offers of appointment to white candidates whose Whole Candidate Scores were lower than qualified non-white candidates who were not offered appointment.

94. Third, throughout the admissions cycle, admissions officers conduct a holistic review of all candidates to identify qualified candidates who are highly desired for the valuable

---

[6] Not including Additional Appointees appointed to West Point from USMAPS.

contributions they are expected to make (based on their demonstrated leadership, athleticism,

scholastic aptitude, past experience as a soldier, and diverse background) but who lack a

nomination and may warrant a Superintendent nomination. If the Diversity Outreach Office

determines that an African American, Hispanic, or Native American candidate is otherwise

qualified for admission but has not received a nomination, the Office may recommend that the

Director of Admissions recommend the candidate for a Superintendent nomination. Both the

Diversity Outreach Office and the regional teams make their Superintendent nomination

recommendations to the Director of Admissions, who considers recommendations for all

candidates and then makes recommendations to the Superintendent as to which candidates

should receive Superintendent nominations. As noted, the Superintendent may nominate up to 50

candidates per year, and most of those nominations go to athletes. Since 2008, the

Superintendent has never exhausted his nominations in any given year. For the class of 2027, he

provided only 16 nominations, of which all 16 were provided because the candidates were

athletes.  For the class of 2026, the Superintendent provided 19 nominations, of which 15 were

provided because the candidates were athletes.  Of the four non-athlete Superintendent

nominations provided for the class of 2027, all four were to white candidates.[7]

95.     To the extent West Point considers race and ethnicity in the admissions process, it

does so to further the military's unique interests in developing a diverse officer corps. It does not

consider race and ethnicity based on a belief that minority cadets always express a characteristic

---

[7] In prior years, a candidate's race or ethnicity could also potentially play a role in whether the Admissions Office opened the "second step kit" for a candidate. As explained above, however, most candidates (around 80%) make it to this phase of the application process. Thus, as a practical matter, it is highly unlikely that any consideration of race or ethnicity at this stage affected whether a candidate was ultimately selected for an appointment. In any event, West Point does not intend to continue considering race and ethnicity at this stage in future admissions cycles.

minority viewpoint on an issue. And because West Point has made substantial progress toward

its goal of a fully integrated, highly qualified, and diverse Corps of Cadets, its use of race and

ethnicity in the admissions process has become more limited in recent years.

96.      West Point also does not intend to use race and ethnicity as a factor in admissions

indefinitely. The Admissions Office reviews its talent and diversity goals bi-annually in

conjunction with its review of demographic information provided by DoD. During my tenure as

Director of Admissions, I adapted our policies when appropriate. For example, around 2014, the

Admissions Office stopped its practice of forwarding Hispanic candidates to the Diversity

Outreach Office because our qualified candidate pool of Hispanic candidates had grown

considerably, and so I concluded that we could manage their admissions files within the regional

teams. I understand that the Admissions Office has recently started referring Hispanic candidates

to the Diversity Outreach Office again due to a drop in the acceptance rate of such candidates,

but this example underscores that West Point will adapt (and has adapted) its policies when

continued consideration of race and ethnicity becomes unnecessary.

**VIII.   West Point's Limited Consideration of Race and Ethnicity Has Been Necessary to Achieve the Army's Compelling Interests**

97.      DoD, the Army, and West Point have each concluded that it is critical to the

Nation's military strength and readiness to maintain a pipeline of military officers who are highly

qualified, diverse, and trained to succeed in an increasingly diverse environment. As West

Point's Superintendent, Lieutenant General Steven W. Gilland, explained in a recent statement to

Congress, West Point's mission is "[t]o educate, train, and inspire the Corps of Cadets so that

each graduate is a commissioned leader of character committed to the values of Duty, Honor,

Country and prepared for a career of professional excellence and service to the Nation as an

officer in the United States Army." *Admissions, Curriculum, and Diversity of Thought at the*

*Military Service Academies: Hearing Before the H. Armed Servs. Comm., Subcomm. on Mil. Personnel*, 118th Cong. (2023) (statement of Lieutenant General Gilland, Superintendent of West Point).[8] As part of its mission, West Point seeks to commission leaders with foundational professional knowledge, skills, and the moral character required to support and defend the Constitution and serve as Army officers. The Nation places special trust and confidence in West Point graduates who accept commissions to serve as Army officers. The Nation expects its officers to wield lethal force in an ethical manner, to care for the Soldiers in their units, and to exercise stewardship over the Army Profession, while seizing the initiative to accomplish missions in a complex, decentralized operating environment.

98.     As Lieutenant General Gilland has explained, to complete its mission, West Point focuses on three lines of effort. First, West Point builds diverse and effective winning teams through an inclusive cadet corps, staff, and faculty to develop more effective leaders who faithfully represent the Army and the Nation. Second, West Point develops leaders of character to generate leaders prepared to fight and win wars. Finally, West Point cultivates a culture of character growth that includes creating and sustaining a safe and secure environment built on trust, dignity, and respect.

99.     As part of the development of leaders, character development ranks as the most important. West Point's leadership model is designed to produce leaders capable of mastering the challenges of modern warfare. West Point begins the process by creating trust and serving as the foundation for building cohesive teams and sustaining readiness. As part of its curriculum, West Point promotes an academic environment where debate is encouraged, ideas are challenged, and

---

[8] Lieutenant General Gilland's full statement is available at https://perma.cc/6YXQ-A8WJ.

honest feedback is expected. West Point does not advocate for one perspective; instead, it teaches cadets how to think effectively and analytically.

100.    A common principle within the Army is to "train how you fight." West Point cannot effectively train future officers to lead a diverse force without training the cadets to operate in a diverse environment. West Point has concluded, based on its assessment of its candidate pool and educational needs, that limited consideration of race and ethnicity in admissions is necessary to West Point's mission of training future military leaders of character.

101.    West Point's purpose is to produce leaders of character who are prepared to provide selfless service to our Army and our nation. The West Point admissions process aims to create a diverse corps of cadets, which is essential to West Point's educational mission and to the larger mission of the Army, for several reasons. First, West Point has determined that diversity helps prepare cadets to lead a multicultural force and fight alongside the U.S.'s diverse partners and allies. Army officers must be comfortable leading individuals notwithstanding racial, cultural, linguistic, or other differences, and officers must be prepared to critically evaluate competing perspectives as they make life and death decisions under the stress of combat. As a result, West Point persists in drawing upon the widest possible set of backgrounds, talents, and skills to maximize the Army's warfighting capability.

102.    Second, a diverse cadet corps enhances appreciation, respect, and empathy, which are essential for military cohesion. Officers are expected to display integrity and honor, have empathy, and positively influence others. Cultural competency facilitates trust, which is key to achieving common goals in disciplined, cohesive teams. A diverse and inclusive environment pushes cadets beyond their comfort level so they can develop as agile and resilient critical

thinkers who can successfully lead Soldiers in complex and uncertain environments across the world.

103. Third, diversity at West Point is critical to maintaining diversity in the officer corps—diversity that the Army has worked for years to achieve. Unlike other institutions in the United States, the military is a closed personnel system. Officers are developed internally; the military does not hire its officer corps laterally, as a corporation might. The military's future leadership will necessarily be drawn from those who join the military today. Current senior Army leadership accessed into the Army in the 1980s and 1990s. For example, General Randy George, the current Chief of Staff of the United States Army, graduated and accessed into the Army's officer corps from West Point in 1984. As a result of the nature of the closed loop system of the military career lifecycle, it is of critical importance to ensure diversity in initial officer accessions, especially accessions through West Point, since approximately 20% of new Army officers each year are West Point graduates, and a disproportionate percentage (33%) of Army general officers are West Point graduates.[9]

104. Fourth, a diverse Corps of Cadets ensures an inclusive multifaceted environment for all cadets, thus ensuring that West Point can attract top talent in the nation from all backgrounds. Eliminating tailored consideration of race and ethnicity in admissions would lower acceptance and enrollment rates of diverse candidates, thus shrinking the pool of qualified officer candidates from diverse racial and ethnic backgrounds. Maintaining diversity in the corps of cadets is key to spurring a sense of belonging; it helps cadets feel like an integrated part of the

---

[9] To become an officer in the Army, an individual must either graduate from West Point, attend a civilian college or university while participating in an ROTC program, attend Officer Candidate School after graduating from college, receive a direct commission after earning a professional degree, or advance through the enlisted ranks and then complete one of these officer training programs.

academic community and encourages cadets to engage freely with each other. Prohibiting

consideration of race in admissions at West Point would reduce the number of officers of all

backgrounds exposed to a diverse educational experience.

## IX.  West Point's Consideration of Race-Neutral Alternatives

105.    West Point uses several alternative methods to increase racial diversity. However,

these alternative methods alone have failed to produce the level of diversity in the Corps of

Cadets that is necessary to achieve the Army's compelling interests. First, West Point has

marketed to specific underrepresented demographics through an enrollment management

company with the goal of increasing the pool of diverse candidates. However, when West Point

increased marketing to diverse populations, the number of completed applications declined and

the acceptance rates for Hispanic and African American candidates declined. This decline may

have been the result of the broader declining interest of young people to attend college and the

decreasing propensity overall for military service in today's youth.

106.    Second, West Point representatives frequently visit Army posts, camps, and

stations to market to Soldiers and increase West Point applications from servicemembers.

Because certain non-white racial demographics are overrepresented in the enlisted population,

increasing the number of candidates who are Soldiers could increase the number of diverse

candidates. However, the impact of increasing Soldier candidates would still have a minimal

impact on overall diversity at West Point because approximately 8-9% of candidates applying in

a given year are current Soldiers, and Soldiers make up only approximately 8% of a given class.

107.    West Point has also considered other race-neutral measures, in addition to

outreach efforts, to increase the level of diversity in the Corps of Cadets. For example, around

2016, West Point considered increasing diversity using socio-economic status criterion; however,

based on a review of several years' worth of qualified candidates, West Point discovered that lower socio-economic status would not be effective at increasing racial diversity at West Point from its candidate pool. Rather, West Point determined that consideration of lower socio-economic status as a factor would actually increase the number of white males in a given class.

108.    Additionally, West Point considered prioritizing first-generation college candidates. However, West Point reviewed its admissions data and determined that the number of first-generation college candidates applying to West Point was so small that this alternative would not significantly impact diversity of the Corps of Cadets.

109.    West Point has also considered changing its use of standardized tests, such as the SAT, which could increase racial diversity. However, West Point values a standardized measure of academic potential, especially considering the variance in academic rigor between high schools, to ensure that admitted cadets can succeed while at West Point. Further, the version of the Fiscal Year 2024 National Defense Authorization Act, as proposed by the United States Senate, would mandate that service academies require the submission and consideration of standardized test scores as part of the application process, thereby limiting the flexibility of West Point to restructure its admissions criteria.

110.    Finally, West Point has encouraged nominating sources, specifically Members of Congress, through training and outreach, to consider providing nominations that include a diverse slate of candidates that are representative of their districts or states. However, West Point has not observed a significant shift in diversity based on nominations. A recent study found that Members of Congress "have nominated disproportionately more white students than Black,

Hispanic, or Asian and Pacific Islander students."[10] The study showed that white students received approximately 74% of congressional nominations despite comprising 54% of the U.S. population aged 18 to 24.[11] The study concluded that this disproportionality in the nominating process "contributed to significant racial and ethnic disparities in the student bodies of the [military] academies."[12] This is another reason why West Point's limited consideration of race and ethnicity is necessary to ensuring a diverse class of cadets.

## X. West Point is Required to Monitor Demographic Data

111.    Under federal law and DoD directives, West Point is required to collect and report military personnel data elements, including race and ethnicity, on its cadets.

112.    The Office of Management and Budget (OMB) oversees and coordinates the implementation of Federal regulations across the Executive Branch. In October 1997, OMB published a notice in the Federal Register, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," that replaced and superseded prior OMB guidance from 1977. In its 1997 revision, OMB modified and separated race and ethnicity categories. The following five categories of race are listed in the Federal Register Notice: "American Indian or Alaska Native," "Asian," "Black or African American," "Native Hawaiian or Other Pacific Islander," and "White." Similarly, OMB directed the use of ethnicity categories of "Hispanic or Latino" and "Not Hispanic or Latino." While the United States government has long collected statistics on race and ethnicity, until OMB issued its 1977 "Race and Ethnic Standards for Federal Statistics and Administrative Reporting," federal data collection lacked uniformity on

---

[10] Connecticut Veterans Legal Center, *Gatekeepers to Opportunity: Racial Disparities in Congressional Nominations to the Military Service Academies* at 3 (2021), https://perma.cc/85X7-TQ2F.

[11] *Id.* at 5.
[12] *Id.* at 3.

race and ethnicity reporting categories. OMB mandates the use of these race and ethnicity

categories by federal agencies, including DoD.

113.    DoD issued mandatory guidance for all DoD entities, including West Point, on the

reporting of military personnel data elements, first in DoD instruction 1336.05, and subsequently

in DoD Manual 7730.69, Volume I, Uniformed Services Human Resources Information System:

Main Reporting Requirements. DoD Manual 7730.69, Volume I, provides the master person file

coding format, which requires DoD entities to identify the race code and ethnicity code of an

individual "in accordance with the 1997 OMB standards on race and ethnicity . . . [in the]

Federal Register" as described above. Collection and reporting of the required military personnel

data elements enables the DoD to create mandatory information reports, statistical tabulations,

and demographic information of the uniformed services.  Federal law and DoD directives thus

mandate West Point's use of specific race and ethnicity categories.

## XI.    A Preliminary Injunction Requiring West Point to Change Its Admissions Policies Would Impose Significant Harms

114.    I understand that the Plaintiff has requested that the Court preliminarily enjoin

West Point from considering race as a factor by December 1 of this admissions cycle. If the

Court were to enter such an injunction, it would impose significant harms on West Point.

115.    As explained above, the current admissions cycle began in February 2023, when

candidates who were then as young as juniors in high school could first submit the Candidate

Questionnaire. The Admissions Office has been reviewing candidate applications since August

2023 under admissions policies that have been in place at West Point for years and that include

the limited consideration of race and ethnicity for some candidates. Applying those longstanding

policies, the Admissions Office has already extended LOAs and offers of appointment to

hundreds of candidates for this admissions cycle.

116.    If the Court were to preliminarily enjoin West Point from applying its longstanding admissions policies, the Admissions Office would need to consider how to change those policies to comply with the Court's order. The Admissions Office would need to consider, among other things, how it uses LOAs and how it might advance the military's interest in diversity without considering a candidate's race or ethnicity. That process would take time and require consultation with the Academic Board and possibly other stakeholders.

117.    West Point might also have to consider whether and how to withdraw previously provided LOAs or offers of appointment, harming those candidates in the middle of their college application processes.

118.    Preliminarily enjoining West Point from applying its longstanding admissions policies mid-cycle would also mean that certain candidates could be evaluated under a different set of criteria depending on when in the cycle they submitted their application. For example, a candidate who has already submitted his application and received an LOA could be evaluated under a different set of criteria than a candidate who has not yet applied. This would be inherently unfair both to those who already have received an LOA and those whose applications are still under consideration. To my knowledge, West Point has never changed its admissions policies mid-cycle in this way or applied different criteria depending on when a candidate applied.

119.    Finally, preliminarily enjoining West Point from applying its longstanding admissions policies would harm the important national security interests that those polices are designed to further. I understand that the Army has made a military judgment that a diverse officer corps is necessary for mission and combat readiness. If West Point were prohibited from considering a candidate's race in the limited manner described above, I expect that West Point's

39

class of admitted cadets would become less diverse, as it was before West Point began applying its current policies. This would result in an officer corps that would also become less diverse over time.

Dated: West Point, New York

      November 21, 2023

MCDONALD.DEBOR
AH.JO.1180341524

Digitally signed by
MCDONALD.DEBORAH.JO.118034
1524
Date: 2023.11.21 20:44:24 -05'00'

DEBORAH MCDONALD

# EXHIBIT A

MAAR                                                              5 November 2020

MEMORANDUM FOR THE ACADEMIC BOARD

SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022-2023

1.      PURPOSE: This directive prescribes the policies, procedures, and
guidelines for use in determining the quantification, qualification, and selection of
candidates for the United States Military Academy (USMA) Classes of 2025 and
2026, the United States Military Academy Preparatory School (USMAPS) Classes
of 2021 and 2022, and the West Point Preparatory Scholarship Program (WPPSP)
Classes of 2021 and 2022.

2.      ADMISSIONS OBJECTIVES:

        a.      Within the limits established by law, the Department of the Army, and
the procedures authorized below, select candidates who:
        (1)  Express interest in a career of service to the country as active-duty
Army officers;
        (2)  Demonstrate high moral and ethical character;
        (3)  Demonstrate strong performance in high school, college or the Army
and who are predicted to graduate from USMA;
        (4)  Manifest high levels of physical and emotional stamina;
        (5)  Are medically qualified for a commission upon graduation;
        (6)  Meet the needs of the future Army in talent and diversity;
        (7)  Are committed to all-around excellence.

        b.      Seek to achieve a class balance in terms of talent in leaders,
scholars, athletes, and soldiers and diversity in minorities and women. The
Academic Board will review the balance of talent and diversity recruitment bi-
annually to ensure the recruitment meets the needs of the USMA and the Army.
The review methodology will be forward-looking in the validation or revision of
diversity recruitment in future years.

3.      COMPOSITION AND RESPONSIBILITIES OF THE ADMISSIONS
COMMITTEE AND ADMISSIONS EXECUTIVE COMMITTEE:

a.              The Admissions Committee is a standing committee of the Academic
Board.  It is composed of the Director of Admissions; Heads of the Departments
of Mathematical Sciences, English and Philosophy, and Behavioral Sciences and

MAAR                                          5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

Leadership; the Master of the Sword; the Director of the Department of Military
Instruction; the USMA Surgeon; a senior representative from the Athletic
Department; representatives from five additional Academic Departments
identified annually by the Dean of the Academic Board; a Regimental Tactical
Officer; a Company Tactical Officer; and the Commandant of USMAPS. Each
will have designated alternates. Each department has one vote on matters
presented to the Admissions Committee. A quorum of 9 principals (and 7
alternates) must be present to adjudicate the actions at the Admissions
Committee. In the event of a tie vote of 8-8, the file will be presented at the
next scheduled Academic Board. Any voting member could ask that any
candidate file be adjudicated at the Academic Board. The Admissions
Committee qualifies and selects candidates for USMA, USMAPS, and
WPPSP in accordance with Academic Board guidance, appropriate sections
of Title 1O US Code, Department of the Army Regulations, and USMA
Regulations. Additionally, admissions policies will adhere to NCAA
Regulations. The Admissions Committee assists the Director of Admissions in
the formulation of policy recommendation for recruiting candidates;
recommends to the Academic Board criteria for admission and readmission of
former cadets and cadet candidates from USMAPS, USNAPS, and
USAFAPS; and informs the Academic Board of candidates offered admission,
including the profile of the new class as it develops. The Admissions
Committee will report to the Academic Board a retention report in January for
the last graduating class. Included in this report will be the Army retention
data for the five, ten, fifteen and twenty- year classes. This data will be
compiled by OEMA and OIR.

b.  The Executive Committee (EXCOM) is a subcommittee of the
Admissions Committee composed of the Department Heads of English and
Philosophy, Mathematical Sciences, and Behavioral Sciences and Leadership;
the Master of the Sword; the Director of Admissions; the Admissions
Committee representative from the athletic department; and a Regimental
Tactical Officer.  Six members must be available to convene a session, at least
four of whom must be primary members. If there is a tie vote, or an objection to
the outcome of the vote, on any issue before the EXCOM, the matter will be
presented and discussed before the entire Admissions Committee and the
outcome determined by a majority vote of that body. The EXCOM can conduct
electronic votes as needed. The EXCOM's primary responsibilities are:

(1) to consider Letters of Assurance and contingent offers of admission
for USMA candidates who do not meet preliminary indicators for academic
qualification discussed below:

MAAR                                                 5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

(2)  to consider Letters of Assurance or offers of admission for
candidates to USMAPS and WPPSP who exceed risk levels for those
programs, also discussed below.

(3)  to decide whether a candidate will be accepted with risk in one or
more events constituting the Candidate Fitness Assessment (CFA). When a
candidate is identified by the Director of Admissions with risk in one or more of
the six events on the CFA, appropriate information will be provided to the
Master of the Sword for review. The Master of the Sword will recommend to
the EXCOM that the candidate be qualified with risk or take a retest on the
entire CFA. The EXCOM will vote on that recommendation.

(4)  a majority vote rules unless any member of the EXCOM requests
that the entire Admissions Committee should consider the case.


4.  CANDIDATE FILE QUANTIFICATION AND QUALIFICATION:

a.   File Quantification: Candidate files for USMA, USMAPS, and
WPPSP will be quantified with Whole Candidate Score (WCS) and subscores
as indicated in Annex A. No untimed, special-assistance administrations of
either the SAT or ACT are authorized for use in quantifying candidates for
USMA qualification consideration.

b. File Qualification:

(1)  The qualifications of all USMA, USMAPS, and WPPSP candidates
will be judged by the Admissions Committee or the EXCOM unless a case is
forwarded to the Academic Board for resolution with a recommendation from
the Admissions Committee.

(2)  Preliminary indicators for qualification for USMA will be:

(a) Academic: Academic GPA in the top 81% of high school class.
Adequate college prep program with acceptable grades.

(b) The ability to communicate in writing. Evaluation of writing skills for our
candidates is an integral part of the admissions qualification process.  A standard
writing submission concerning three topics selected by the Admissions Committee
must be submitted prior to qualification.

(c) Each candidate must take the SAT or the ACT writing exams for review

MAAR                                             5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

by the Admissions Committee.  **If due to COVID restrictions** a candidate is
unable to submit a writing portion of a test with **his or her Pre-COVID testing**, the
candidate must have a candidate statement, English School Official Evaluation and
have no risks in corresponding English components of the SAT or ACT.

(d) Preliminary qualifying SAT scores are:

SAT Math$\geq$ 570
SAT EB R/W $\geq$ 550
Essay Reading and Writing subscores $\geq$ 5
Essay Analysis $\geq$ 3.
Essay subscores must be evaluated within the same test and cannot be
supermaxed from multiple tests.

(e) Preliminary qualifying ACT scores are:

ACT English $\geq$24;
ACT Math $\geq$ 25;
ACT Reading $\geq$25:
ACT Science Reasoning$\geq$ 24
Essay Score 5.

(f) Preliminary academic predictor score (CEER/ACEER)$\geq$ 466.

(g) Leadership: Community Leadership Score (CLS)$\geq$ 520.

(h) CFA: The procedures and risk levels approved by the Academic
Board on 4 October 2006 will be used in addition to an overall passing score for
CFA 450.  With the implementation of the Army Combat Fitness Test, we will
gather ACFT results from USMAPS CCs and Active and Reserve Component
Soldiers.  However, until further guidance is provided from Department of the
Army with respect to ACFT full implementation, the results of the ACFT will not
be used to disqualify any candidate for admission consideration to West Point or
to USMAPS.  Excluding USMAPS, all cadet candidates will submit a CFA score
during their admissions cycle.  USMAPS CCs will only submit an ACFT score for
the current cycle, however the previous year's CFA score will be used for WCS
calculations.

(f) Whole Candidate Score (WCS)$\geq$ 5200.

(g) Medical -- Medical qualification will initially be determined by the
Department of Defense Medical Examination Review Board (DODMERB).

MAAR                                                        5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

Candidates disqualified by DODMERB may be forwarded to the Surgeon, USMA
for waiver consideration. When a waiver is recommended by the
Surgeon, USMA, the Admissions Committee may grant it if it is in the best interests
of the candidate, USMA, and the Army.

        If the USMA Surgeon determines that the candidate meets
accession standards of Department of Defense Instruction (DODI)
6130.03 Medical Standards for Appointment, Enlistment, or Induction in
the Military Services, then a waiver is not necessary.

        If candidates do not meet Chapter 2 standards, but do meet Chapter 3
retention standards, the Admissions Committee may vote to authorize a medical
waiver. The Committee will discuss these cases and a vote will be taken on
whether to approve the cases on a Medical Waiver Memorandum. Any
candidate approved for a waiver will be identified with the indication of MWM#
on the final slate for the candidate's offer of admission. Although the
Superintendent is the waiver authority for these candidates, he has delegated
that authority to the Admissions Committee as long as the vote is unanimous in
favor of the considered candidates. Any split vote on a candidate will cause the
Director of Admissions to prepare a decision paper with the recommendation of
the Admissions Committee for the Superintendent to make a final decision for
medical qualification. A candidate approved for a Superintendent's Medical
Waiver will be identified with the indication of SMW on the final slate for the
candidate's offer of admission.

        If candidate does not meet AR 40-501 Standards of Medical Fitness,
CH 3 retention standards a waiver may not be considered nor forwarded to the
Admissions Committee for vote.

        (h)  Admissions Committee adjustment  of the  WCS  is authorized to
the extent of plus or minus 10% of the WCS to allow for special nature of school
programs, significant work experience during the school year, special
accomplishments, personal achievements of a significant nature, international
studies, foreign language expertise, or information of a negative nature not strong
enough to disqualify a file. When a candidate is considered for a WCS
adjustment, the appropriate Directorate of Admissions Regional Commander will
present the case and all extenuating circumstances to the department responsible
for consideration and approval of a WCS adjustment. These adjustments will be
identified on the admission slate for each candidate so that the entire Admissions
Committee can identify the candidates receiving a WCS adjustment.

MAAR                                                    5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

(i)   Candidates who have been convicted of a crime or are
currently pending legal resolutions must be addressed at the Admissions
Committee. Candidates who receive minor traffic violations with fines less
than $200 are not required to be reviewed by the SJA. The Director of
Admissions can review and waive this level of offense. The USMA SJA will
review all other issues of arrest or legal fines and make recommendations to
the Admissions Committee for consideration when appropriate.

(j)  Any issues concerning moral turpitude which might not rise to
the level of a legal conviction will be evaluated by the Admissions Committee.
These instances include but are not limited to racism, sexism, harassment,
bullying, etc.

c.  Special Guidance:

(1)  The Admissions Committee will review all files for final qualification
to assure fairness within the candidate pool as work progresses toward
achieving admissions objectives. The EXCOM is part of the Admissions
Committee and can qualify candidate files. Candidates falling into any of the
risk categories listed below require special review by specific Admissions
Committee members prior to a determination of qualification:

(a)  Mathematics- SATM < 570 / ACTM< 25.

(b)  English and Philosophy –

SAT EB Reading < 550 or any Essay Reading and Writing subscore <
5  or Essay Analysis subscore < 3.
ACTE < 24;
ACTR <25 or essay subscore < 5.

(c)  Physics and Nuclear Engineering- ACTS< 24.

(d)  DPE - CFA with any event below the 20-point standard or CFA
score below 450 total.

(e)  USCC - CLS< 520 / FAS< 525.

(f)  Director of Admissions - WCS < 5200.

(g)  Any CEER below 554 must be approved by the EXCOM prior to
the granting of an LOA for admission to USMA.

MAAR                                                5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

   (2) **COVID Related Test Considerations:**
**For those candidates who were unable to take a standardized test either
during their junior or senior year due to the COVID conditions, a separate
review process will be used to determine qualification.  This review
process will only be implemented for students who can show they were
unable to sit for the SAT or ACT in either their junior or senior year in high
school due to COVID restrictions.  Using a test flexible plan, students will
also be able to submit PSAT scores in the event they have not been able to
take an ACT or SAT due to COVID restrictions.**

   (3)  In judging qualification of candidates, the Admissions Committee is
encouraged to use all relevant performance and retention data from past
USMA classes. The Directorate of Admissions and OEMA will grant
members of the Admissions Committee Access to this data at their
request.

   (4)  The Admissions Directorate is encouraged identify candidates who
are clearly admissible and those who are not competitive for admission so that
the earliest status notifications can be  dispatched.

   (5)  Considerations for disqualification of candidates may include, but
are not limited to, the following items:

      (a)  Academic:

         - Transcript showing poor performance, to include failing or
conditional work.

         - Transcript that lacks breadth of subject matter essential for
success in the USMA  program.

          -Transcript that suggests low ambition as reflected by only 2-3
serious academic courses in the 7th and 8th semesters.

          - Transcript that shows poor personal character traits
associated with academic work such as excessive tardiness, absences, and
noted behavior  problems.

          -Standardized testing record of significant risk. While the best
combination of scores from either the SAT or ACT is used for each candidate,
the entire testing record should be considered during the academic evaluation
of the candidate. While at-risk SAT/ACT scores are not used as a single factor

MAAR                                                    5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022-2023

in disqualification, it must be remembered that low scores almost always indicate
a lack of mastery in the tested area.

      - Faculty appraisals that report substandard academic
performance or signal inappropriate behavior in the classroom or as a
school citizen.

      (b) Physical Qualification:

      - Substandard performance on the Candidate Fitness
Assessment (CFA) with an aggregate score below 450 or not meeting
minimum in each subevent.

      - Permanent physical impairment.

      - Information from the school that reports substandard
physical/athletic performance and signals limited potential for success in the
physical program at USMA or as an Army Officer.

      (c) Motivations and Communication:

      - Candidate statements (essays) that display a lack of ability to
communicate in writing, display a lack of appropriate motivation to attend USMA,
and/or display the potential presence of character flaws such as the inability to
work with and value other demographic groups or genders.

      (d) Overall Record:

      - Leadership, character, conduct, maturity, and discipline
problems documented in the record or referenced by members of the
candidate's faculty or community.

      - Evidence of ineptitude, apathy, personality disorder, defective
attitudes, or inability to expend effort constructively. This may include medical
evaluation of ADD, ADHD, or classroom assistance as evidenced by an
Individual Education Plan (IEP).

      - Records of poor performance additional to that of high school, to
include college or preparatory work, service record, employment, etc.

      - Records of Former Cadets (USMA, USNA, USAFA, USCGA,

MAAR                                          5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

USMMA and their respective military preparatory schools) that include
assessments of poor leadership, character, conduct, and potential.

      -   Arrest and conviction record.

      - Incidents of discreditable nature short of arrest and conviction,
but such that the frequency, pattern, style, and proximity to
qualification/enrollment cause concern.

      (e) Other negative attributes not falling specifically into the above
categories.

    (6)  All disqualified USMA candidates will be reviewed for USMAPS
attendance.

    (7)  The Admissions Office, without informing the Admissions
Committee, may disqualify candidate files having a CEER/ACEER < 400 or
a WCS < 5000.

    (8)  The Academic Board encourages the use of all relevant
information in the determination of qualification/disqualification decisions and
expects that subjective committee judgments will take into account all
candidate characteristics and qualities, special accomplishments, special
talent, biographical data, experiences, and third-party appraisals, however
the Admissions Committee should remember not to disadvantage those
candidates without third party appraisals.

5.  SELECTION FOR USMA, USMAPS AND WPPSP:

a.     USMA: Once candidate files are qualified, selection is based on order of
merit within the types of nominations obtained by candidates. Out of order of merit
selection will only be made for Additional Appointees and Superintendent
Nominations to help achieve the Army's needs in talent and diversity in the class.
When a fully qualified candidate will clearly win a congressional or service-
connected vacancy to USMA, he or she will be placed on an admissions slate.
The slate must be voted on by a quorum of the Admissions Committee. A
candidate's name can be withdrawn from the slate by any voting Committee
member for further discussion or referral to the Academic Board for a decision. In
the event of electronic voting of slates, the Director of Admissions will establish a
"not later than" time, normally two duty days, to receive votes. Once a quorum has
voted electronically to support the slate, no objections are received, and the "not
later than time" is past, the slate will be authorized and processed for

MAAR                                                    5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

appropriate action.

(1)   Methods of Selection.

(a)  All qualified candidates in the nomination categories listed below will
be selected for an appointment based on rank-ordering by Whole Candidate
Score in order of merit:

Congressional Competitive nomination slates
All Service-connected nominations, to include:
- Presidential
- Children of Deceased & Disabled Veterans, Missing in Action, and
Children of Medal of Honor Recipients
- ROTC (Senior, Junior Honor Schools)
- Regular Army and Reserve Component Soldiers.

(b)  For Congressional slates where nominees are designated as a
principal candidate or ranked alternate, selection must be considered in
the sequence specified.

(c)  International Cadets must be nominated by their respective countries.
They are required to complete their files with the same information as United
States citizens with the exception of the U.S. Army medical examination for
commissioning. A sub-committee that includes the Directorate of Admissions
International Cadet Admissions Officer, the Departments of Foreign Languages,
Mathematical Sciences, and English and Philosophy will review each file for
qualification. All files recommended for qualification will be approved by a vote of
the entire Admissions Committee. Admission of nominated, qualified
International Cadets will be governed by the needs of the United States as stated
in appropriate regulations and agreements.

(d)  The Superintendent is authorized to nominate up to 50 candidates
annually for appointment to the incoming class. These nominations are
typically reserved for candidates who help meet talent and diversity
recruitment. They are approved for the Superintendent by the Chief of Staff,
USMA and may be selected out of order of merit.

(e)  A "Qualified Alternate" (QA) is a candidate selected in accordance
with the provisions of subsection (b) (5) of Section 4342 of Title 10 U.S.C., which
prescribes that 150 candidates, selected in order of merit from the qualified
alternates of US Senators and Representatives, may be appointed each year.
Qualified Alternates will be selected by rank ordering qualified candidates who

MAAR                                                       5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

do not win designated vacancies by Whole Candidate Score (WCS) on the
National Waiting List (NWL}. Fully qualified Congressional nominees on the
NWL will be offered admission in WCS order from highest to the lowest until 150
have accepted the offer. They will be designated as QAs.

   (f) An "Additional Appointee" (AA) is a candidate selected in accordance
with Section 4343 of Title 10 U.S.C., which authorizes the filling of vacancies
"If it is determined that, upon the admission of a new class to the Academy, the
number of cadets at the Academy will be below the authorized number." The
section further prescribes that at least three-fourths  of these  candidates  must
be qualified candidates nominated by the Vice President,  US Senators,
Members of the US House of Representatives, Delegate from the District of
Columbia, Delegate from the Virgin Islands, Governor of Puerto Rico,
Commissioner from Puerto Rico, the Delegate from Guam, and the Delegate
from American Samoa. Additional Appointees needed to reach the Military
Academy's authorized class strength will be selected in the legal ratio of three
Congressional nominees to one Service-connected nominee from fully qualified
candidates. These selections are made from the qualified candidates on the
National Waiting List. The law does not require that they be selected in order of
merit.

   (g)  Soldiers will be considered for a Regular Army or Reserve Component
nomination from the Commander's Endorsement from that unit. Any soldier who
does not receive a Commander's Endorsement, but is nominated by another
authorized nomination source, will not be considered for an appointment until the
file is fully discussed at Executive Committee or full Admissions Committee.

   (h)  The Director of Admissions will furnish to the Admissions Committee
for special selection consideration: the files of all qualified candidates whose
talents are so outstanding that they should be offered admission immediately; the
files of those qualified candidates whose overall potential is not adequately
reflected by their formal academic and secondary school records, such
inadequate reflection being due either to the special nature of the candidate's
socio-economic background  or the special nature of the schooling  received; and
the files of other qualified candidates for whom admission is suggested as
reasonable in efforts to achieve diversity in the  class.

   (i) The Admissions Committee will keep the Academic Board informed of
the selections made under this provision. Additional Appointees selected to help
achieve talent and diversity may be selected out of Whole Candidate Score
order, leaving candidates with higher Whole Candidate Scores on the National
Waiting List. When the Director of Admissions presents candidates to the
Admissions Committee out of WCS order, the Director will notify the

MAAR                                                     5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

Admissions Committee prior to a vote how many fully-qualified candidates
not offered admission the previous year had a higher WCS than the current
proposed AA candidate.

(2)   Conditional Offers of Admission.

(a)  Letters of Assurance (LOA):  In order to compete for the most talented
candidates while attempting to achieve diversity, the Admissions Committee is
authorized to provide Letters of Assurance (LOA) based on preliminary file
qualification data. These letters constitute a firm commitment from USMA to the
candidate if the candidate meets the conditions of the letter. In order to be eligible
for an LOA, candidate files must contain at least a completed Candidate
Questionnaire, and a sixth-semester transcript with the appropriate data to
compute a CEER and verifiable standardized test scores. Depending on the
timing of the letter and the file completion status of individual candidates, the LOA
conditions will be:

(1)   File completion, including a qualifying CFA.

(2)   Determination of qualification by the Admissions Committee.

(3)   A time limit to meet the contingencies of the LOA will be  imposed.

(4)   Medical  qualification.

(5)   Receipt of a nomination.

(b)  The Director of Admissions is authorized to sign LOAs without
committee action for the following candidates:

(1)   All candidates who exhibit no risk in preliminary qualification
areas and whose WCS is equal to or greater than the lowest for the Qualified
Alternates in the last class enrolled. Based on class-size considerations, the
Director of Admissions, in conjunction with the Chairman of the Admissions
Committee, may set the WCS at a lower (or higher) level, if necessary after
informing the Admissions Committee.

(2)   All other candidates who support talent and diversity goals
whose CEER/ACEER >554 and no indicated risk in preliminary qualification
areas.

(c)  LOAs for any candidate who exhibits risk in any area
and/or a CEER < 555 must be approved by a majority vote of the

MAAR                                                    5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

Executive Committee.

     (d) Expedited Offers of Admission. These offers are reserved for
exceptionally qualified candidates as well as all 1-rated athletes in any USMA
Athletic Department sport authorized to recruit. For non-risk candidates, an
expedited offer of admission requires a minimum of the sixth- semester
transcript, a Candidate Questionnaire, and verified standardized testing scores
(ACT, SAT or PSAT). Especially in the case of risk candidates, the Executive
Committee may require more information before an Admissions Committee
vote is allowed for slating of individuals for expedited offers. These candidates
may have Superintendent nominations because they are of such quality that
an immediate offer is desired in order to remain competitive with other
colleges competing for that candidate. The athletic department and the athlete
admissions officer must ensure that all follow-up for file completion, CFA
testing, medical qualification and nomination assistance is accomplished for
these candidates in a timely manner. All candidates receiving an Expedited
Offer of Admission must complete all requirements for qualification prior to
being admitted.

     (e) Admissions of former cadets and cadet candidates from
USMAPS, USNAPS, and USAFAPS require special actions. These candidates
must complete the entire admissions process, to include receipt of a nomination
from an authorized source. Their cases will be reviewed by the DAD, Dean,
USCC, the Athletic Department, the Superintendent, and a subcommittee
member of the Admissions Committee. Each of these offices will make a
recommendation on the suitability of the candidate for admission as a former
cadet. These recommendations and the candidate's file must be considered by
the entire Admissions Committee. Candidates in this category who are
determined qualified by the Admissions Committee must be referred to the
Academic Board for a vote on final qualification and appointment to USMA. The
names of those who are unanimously disqualified by the Admissions Committee
will be provided to the Academic Board for information only.

b.     Selection for USMAPS and WPPSP: Preparatory programs are
designed to help achieve diversity at USMA. While ODIA recruits for both
preparatory programs, NCAA guidance must be followed for WPPSP.
Candidates with recognized athletic ability assisted each year as the result of
selection for WPPSP shall be in equal ratio to the number of student-athletes
on the regular intercollegiate squads of the academy compared to the total
enrollment of the academy. This rule does not apply to USMAPS.

(1) USMAPS:

MAAR                                              5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

(a)   These candidates may be selected by a USMAPS sub- committee consisting of one academic department representative and the Director of Admissions.

(b)   Candidates who are not academically qualified to attend USMA will be considered for USMAPS.

(c)   SAT Math and Reading scores greater than 500 or an ACT component scores greater than or equal to 20 with a CEER/ACEER greater than 431 should be considered for appointment to USMAPS.

(d)   Scores falling below these levels must be approved by a majority vote of the Executive Committee. If the CEER is below 373, the EXCOM will make a recommendation to the entire Admissions Committee before an LOA will be approved.

(2)   WPPSP:

(a)   Selection will be accomplished by a sub-committee consisting of one academic department and the Director of Admissions. Upon selection for the program, candidate names are provided to the Association of Graduates, the program sponsor.

(b)   Fully qualified candidates who are not recruited athletes will be considered for WPPSP. These candidates should exhibit no risk in qualification areas. Candidates selected for this program should demonstrate high motivation and strong leadership potential as determined by the Community Leadership Score (CLS). Regional Commanders will provide the EXCOM an overview of the candidates recommended for WPPSP prior to the actual offer being tendered.

(c)   SAT Math and Reading scores greater than 500 or an ACT component scores greater than or equal to 20 with a CEER/ACEER greater than 431 should be considered for appointment to Civil Prep.

(d)   Risk scores must be approved by a majority vote of the Executive Committee. If the CEER is below 373, the EXCOM will make a recommendation to the entire Admissions Committee before an LOA will be approved.

6.   CANDIDATE QUALIFICATION AND SELECTION:

MAAR                                                              5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

Candidate qualification and selection by the Admissions Committee covers a
wide range of candidates by WCS and CEER/ACEER. Qualified WCS scores
in a typical class range from 7000+ at the high end to around 4800 at the low
end. Since Admissions has transitioned to a completely paperless application
process, it is imperative that the synergy produced by the discussion of cases
and issues at the Admissions Committee not be lost. The Committee will
continue to meet on a weekly basis to engage in such discussions, as
required, and also to vote on medical waiver memoranda and slates. The
movement to digital files now enables members of the Admissions Committee
to qualify or disqualify candidates remotely in their offices and elsewhere.
Members of the Committee serving in the first year are encouraged to consult
as required with veteran colleagues or members of the Admissions staff. It is
finally imperative as well that in the decentralized dynamic of work-station
review, Committee members engage files promptly once they are posted to
the AMS admissions site.

7. ACADEMIC BOARD SPECIFIC GUIDANCE:

   a. The Academic Board directs the Admissions Committee to continue to
consider the Whole Candidate Score (WCS) and its various sub-scores in the
process of determining qualified candidates. Be attentive to the possible need
for changes over time, especially with respect to impacts not only with
standardized tests but leadership and athletic components of the WCS as a
result of COVID restrictions in the students' local school districts.

   b. The Academic Board further directs the Admissions Committee to
accomplish the following specified tasks during the period covered by this
directive:

  (1) Continue policy of restricting less than 10% of an incoming class
with CEER scores below 466. This cap is for US students only.

  (2) Continue the 10% cap on the aggregate number of candidates entering
USMAPS or Civil Prep below 340 CEER. These low CEERs can include any
candidates from any class composition category. Any exceptions to the cap or
candidate cohort requires a full admissions committee discussion for approval.
This cap is for US students only.

  (3) Establish a goal of no more than 25% of each Class Composition Goal
cohort entering with CEER scores below 466. The actual entry percentages will be
briefed to the Academic Board each admissions cycle in August. There is a non-
binding goal but an intent to minimize CEER risks by cohorts where possible. This

MAAR                                                    5 November 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022 -2023

cap is for US students only.


8.   REVIEW OF THE ACADEMIC BOARD DIRECTIVE:

The Academic Board will review and vote on this directive every other year. If
there is a need for any change to the document's content during the two-year
cycle, a minimal memorandum of change will be prepared by the Admissions
Committee Chair and the Director of Admissions for Discussion and Approval by
the Academic  Board.

APPROVED BY THE ACADEMIC BOARD ON 5 NOVEMBER 2020.

HARPER.DAVID.ANDREW.1007253806
Digitally signed by HARPER.DAVID.ANDREW.1007253806
Date: 2021.06.09 14:17:25 -04'00'

DAVID HARPER
COL, US Army
Professor and Head
Department of English and Philosophy
Chairman of the Admissions Committee

MCDONALD.DEBORAH.JO.1180341524
Digitally signed by MCDONALD.DEBORAH.JO.1180341524
Date: 2021.06.09 12:27:28 -04'00'

DEBORAH J. McDONALD
COL, US Army
Director of Admissions

MAAR                                                              30 October 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022-2023

ANNEX A: Quantification of Candidate File Components Calculation

$\underline{WCS}$ = 6 (CEER/ACEER) + 3 (CLS) + 1 (CFA)

$\underline{CEER}$ = 316.935*HS$_{PCT}$ + 0.333*SAT$_{EB}$ + 0.981*SAT$_{M}$ - 572.502

$\underline{ACEER}$ = (391.437*HS$_{PCT}$) + (14.398*ACT$_{M}$) + (5.853*ACT$_{E}$) + (3.588*ACT$_{SR}$) + (2.427*ACT$_{R}$)- 532.388

$\underline{PSATCEER\ Math\ Proxy}$ = SAT$_{M}$ = 2.62.0781 + 0.6692XPSAT$_{M}$

$\underline{PSATCEER\ English\ Proxy}$ = SAT$_{EB}$ = 271.9788 + 0.6471 X PSAT$_{Verbal}$

HS$_{PCT}$ = Converted HS GPA from table of data for a 4.0 scale

$\underline{COMMUNITY\ LEADER\ SCORE\ (CLS)}$ =$\dfrac{EX+ AT+ FAS}{3}$

CANDIDATE FITNESS ASSESSMENT (CFA) – six event physical fitness test including pullups/ flexed arm hang, shuttle run, modified basketball throw, crunches, pushups and mile run.

- **COMMUNITY LEADER SCORE (CLS):** The arithmetical mean (with a range of 147 to 740 inclusive) of the Faculty Appraisal, Athletic Activity, and Extracurricular Activity scores.

- FACULTY APPRAISAL SCORE (FAS): The average of the candidate's scores on the school evaluation from Math, Science, English and Physical Education Teachers.

- SCHOOL OFFICIAL EVALUATION (SOE) of Candidate Forms (DD Form 1869) on a scale of 40-740.

- ATHLETIC ACTIVITIES SCORE (AT): A score reflecting a candidate's athletic participation awarded in accordance with the following guidelines.

MAAR                                                    30 October 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022-2023

## ATHLETIC GUIDELINES

800: An outstanding athlete (All-American, 1st team All-Area selection) and either
Athletic rating of 1 in the sport in which honors are received or CFA score> 650.

700:
(1)  First-team All-Area selection in a single sport;
(2)  Team captain in two or more sports for class size over 100);
(3)  Ranger or Special Forces tab [Soldiers].


600:
(1)  Captain of team;
(2)  Varsity letter in two or more sports.
(3)  Martial Arts Black Belt or equivalent within past three years

500:
(1)   Varsity letter in a single sport;
(2)   Expert Infantryman Badge, Expert Field Medical Badge, Jumpmaster, or
Presidential Fitness award [Soldiers]

400:
(1)  Participation in a varsity sport (no letter);
(2)  Graduate of Airborne, Air Assault, Pathfinder, or comparable other Army
school [Soldiers];
(3)  Maximum score on Army Physical Fitness Test [Soldiers].

300:
(1) Participation in junior-varsity and other team sports (not
intramurals); (2) Soldier status.

200: No participation and no evidence of interest in sports.

MAAR                                                    30 October 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022-2023

- EXTRACURRICULAR ACTIVITIES SCORE (EX): A score reflecting a candidate's participation in activities outside of required school curricula awarded in accordance with the following guidelines.

  800: An outstanding young person with quadruple participation or honors and awards on selected extracurricular activities (each worth 600 or more points).

  700:

  (1) Student Council President;
  (2) Triple participation or honors and awards in selected extracurricular activities (each worth 600 (points)
  (3) Participation in Boys/Girls Nation;
  (4) JROTC Regt/Bde Cmdr or Civil Air Patrol Spaatz Award winner;
  (5) Decoration for valor [Soldiers];
  (6) Ranger or Special Forces tab [Soldiers];
  (7) Soldier's Medal [Soldiers].

  600:
  (1) High-school Class President;
  (2) Editor-in-chief of a school publication;
  (3) Participation in Boys/Girls State, President of National Honor Society, or recipient of a National or State award;
  (4) Eagle Scout (Boy Scouts) or Gold Award (Girl Scouts);
  (5) Triple participation or honors and awards in selected extracurricular activities (each worth 500 points)
  (6) Earhart/Mitchell Award;
  (7) Combat Infantryman Badge; Combat Action Badge; Combat Medical Badge [Soldiers];
  (8) Soldier of the Year-brigade-level or higher [Soldiers];
  (9) Division-level In-Service Recruiting Program [Soldiers].

  500:

  (1) Holder of one or more elective offices in moderately selective organizations;
  (2) Participation in activities or recipient of awards in moderately selective organizations
  (3) Holder of a private pilot's license;
  (4) EMT/EMS or Volunteer Firefighter;
  (5) National Honor Society VP/Treasurer or Secretary;

A-3

MAAR                                                                30 October 2020
SUBJECT: Academic Board Directive for the Admissions Committee,
Academic Years 2021-2022 and 2022-2023

(6)  Civil Air Patrol  Officer/1SG;
(7)  Combat veteran of three or more months in theater  [Soldiers];
(8)  Expert Infantryman Badge or Expert Field Medical Badge
     [Soldiers];
(9)  Meritorious Service Medal [Soldiers];
(10) Distinguished Honor Graduate of Army school  [Soldier];
(11) Soldier of the Quarter-brigade-level or higher [Soldiers].

400:

(1)  Participation in activities or recipient of awards in organizations with
     limited selectivity;
(2)  Non-commissioned Officer  [Soldiers];
(3)  Squad Leader or Platoon Guide [Soldiers];
(4)  90-day-plus OCONUS tour [Soldiers];
(5)  Army Commendation Medal [Soldiers];
(6)  Master Fitness Trainer [Soldiers];
(7)  Honor Graduate of an Army school [Soldiers];
(8)  PLDC graduate [Soldiers];
(9)  BOSS Representative  [Soldiers].

300:
(1)  Some participation in organized activities;
(2)  Army Achievement Medal or Good Conduct Medal [Soldiers].

200: No participation in organized  activities.


NOTE: The information above contains general guidance on the components
used to compute a Community Leader Score (CLS).  In a process as imprecise
as leadership assessment, subjective judgment must  be applied  to the
evaluation process in order to take into consideration special situations: e.g., an
unusually high or low Faculty Appraisal Score (FAS) that is inconsistent  with
other elements of the candidate record; athletic achievement in an extremely
large or small school or an excellent or marginal program; an activity record that
may not fit the categorizations of the Candidate Activities Record. The
Admissions Office and the Admissions Committee are expected to make
adjustments in the components of the CLS to take into account such situations.

MAAR                                                              30 October 2020
SUBJECT: Academic Board Directive for the Admissions Committee, Academic
Years 2021-2022 and 2022-2023

ANNEX B: Class Composition Goals for Classes of 2025 and 2026

1. Each year, USMA enrolls approximately 1,220 future leaders to serve in our officer corps with a goal to graduate approximately 1000 cadets after 47 months. Although USMA receives guidance and direction in training requirements and branching allocations, USMA does not receive guidance regarding diversity composition of an incoming class. Without guidance, USMA has shaped the composition of the incoming classes to be nested with the Department of Defense Diversity and Inclusion Strategic Plan in order to continue to attract and retain "a force that not only comes from diverse backgrounds, but also reflects the face of the nation".

2. USMA shapes the incoming class through established Class Composition Goals (CCGs). CCGs drive the allocation of available resources to generate awareness and inspire underrepresented cohorts. USMA narrowly tailors the use of CCGs to achieve diversity that upon graduation will be commensurate with or slightly above the current officer percentage in each demographic (Women, African Americans, Hispanics, and Asians).

3. USMA also shapes an incoming class through established CCGs based on talent. These talent goals include those attributes associated with experiential skills to include soldier, athlete, scholar, and leader and have been in use for admissions criteria for the past 75 years.

   **Scholar:** candidate whose CEER $\geq$ 650
   **Leader:** candidate whose CLS $\geq$ 645
   **Athlete:** candidate designated by ODIA as a 1 rate athlete in an intercollegiate sport
   **Soldier:** candidate who has completed Basic Training and has time in service$\geq$180 days. Can be Regular Army (RA), Reserve Component (RC) or National Guard (NG). USMAPS CCs who did not enter USMAPS as a RA or RC soldier will be considered an Invitational Reservist upon entry to USMAPS.

4. CCGs for USMA Classes 2025/2026 is based on FY2019 reported active officer corps demographics and the historical talent skills from previous class cohorts. These goals consider estimated attrition over the 47-month time at USMA.

**RA Officer Population as a Benchmark of Diversity**
*Women  > 20% (Officer Population – 18%)*
*Minorities > 37% (Officer Population 29%)*
   *African American  > 14% (Officer Population 11%)*
   *Hispanic          > 11% (Officer Population 8%)*
   *Asian             > 7% (Officer Population 7%)*
   *Other             > 5% (Officer Population 3%)*

**Cadet Population as a Benchmark for Talent Goals**
*Scholars > 30% (West Point Cadet Population – 39%)*
*Leaders  > 25% (West Point Cadet Population - 19%)*
*Athletes  > 23% (West Point Cadet Population – 22%)*
*Soldiers  >  7% (West Point Cadet Population – 5%)*

B-1

# EXHIBIT B

MEMORANDUM FOR THE DIRECTORATE OF ADMISSIONS          5 July 2023

SUBJECT: Initial Guidance for USMA Class of 2028

1. **General:**


a.   Team, let me start of by saying what an exceptional job by all on competing the 2027 class cycle! The cycle was especially difficult given the challenges presented by the failure of the DODMERB systems and the time it took for them to reestablish regular operations.  We are well into 2028 now with the opening of the SSK on 15 May.  We brought in the in another incredibly competitive and diverse admissions class with 2027 and met or exceeded our class composition goals for Asians, Leaders, Scholars, and Soldiers; while falling just a little short in Women, Athletes, African Americans, and Hispanics. We extended more Offers of Admission but saw a continued downturn in applicants who accepted offers of admission this past year and anticipate we will continue to see this play out in the next several class cycles.

b.   Our final target class for 2027 was 1230 US admits and we exceeded that on RDay with 1245 first time US admits and fourteen internationals for a CBT entering size of 1259.  This is a significant increase over the last class cycle.  We will begin to focus on a steady state of 1220 first time US admits over the next few years but will be ready for any adjustments should the corps size dictate any increase or decrease in accessions. This class guidance is initial guidance and may shift throughout the class cycle.

c.   Class of 2028 guidance: We will continue the policies we had in place for 2027, **but any use of the PSAT alone to calculate WCS/CEER will require the approval of the Director of Admissions.** We will still require the ACT essay. For those who only submit SAT test scores and are deemed to be an English risk, we will require a timed writing sample. I will keep all other current policies in effect - specifically in the timing of offers, the number of LOAs tendered and the medical scheduling process.

d.   Medical deadlines: We will strictly adhere to a 15 April 2024 medical waiver approval deadline for the class of 2028 – with any exceptions requiring approval from the Director only. We continue to be challenged with meeting this deadline and strongly encourage all regional commanders and admissions officers to emphasize this deadline.  Highly encourage our regional commanders to work closely with your candidates to schedule medicals early to help facilitate a rapid medical review process.  Any LOA or LOE applicant automatically should be medically scheduled at the time of the LOA.

2. **Class Size:** We are targeting a class size of approximately 1220 US cadets.  For planning purposes, anticipate the following vacancy distribution for USMA 2028 based on recent distributions with previous classes. Internationals cadets will add beyond the 1220 to bring the number to 1235.  The breakout of anticipated nominations by class based on recent classes is included in the table.

|  | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | *2027* | *2028* |
|---|---|---|---|---|---|---|---|---|
| Congressional | 553 | 581 | 539 | 558 | 571 | 521 | *512* | *552* |
| Presidential | 45 | 68 | 100 | 60 | 48 | 77 | *69* | *100* |
| Reserve | 85 | 85 | 85 | 85 | 85 | 85 | *84* | 85 |
| RA | 47 | 55 | 48 | 49 | 40 | 52 | *31* | *50* |
| ROTC | 9 | 12 | 20 | 20 | 16 | 20 | *20* | *20* |
| Supt | 38 | 36 | 30 | 33 | 31 | 19 | *17* | *25* |
| SDVET | 3 | 9 | 6 | 5 | 6 | 11 | *22* | *20* |
| V President | 1 | 0 | 2 | 0 | 3 | 0 | *1* | *1* |
| QA | 150 | 150 | 150 | 150 | 150 | 150 | *150* | *150* |
| SubTotal | 935 | 990 | 976 | 961 | 950 | 935 | *906* | *958* |
| Additional Appointees | 323 | 219 | 233 | 284 | 270 | 284 | *364* | *262* |
|  |  |  |  |  |  |  |  |  |
| Total | 1255* | 1215* | 1209* | 1247* | 1220* | 1219* | *1270** | *1220** |
|  |  |  |  |  |  |  |  |  |
| From USMAPS* | 201 | 202 | 190 | 201 | 194 | 171 | *169* | *200* |
| International* | 13 | 15 | 16 | 12 | 16 | 16 | *16* | *15* |
| X-Cadets* | 14 | 15 | 10 | 14 | 6 | 10 | *10* | *10* |

3. **Additional Appointees:** Planning factors for additional appointees not to exceed (note they may fall into more than one category):

    a. Athletes – 180 additional appointees (183 selected for 2027 cycle)
    b. African Americans – 100 additional appointees (76 selected for 2027 cycle)
    c. Women – 75 additional appointees (74 selected for 2027 cycle)
    d. Hispanic Americans – 75 additional appointees (54 selected for the 2027 cycle)

4. **Offers of Admission**: We will begin rolling admissions with those fully qualified candidates with an LOA and a nomination who will be able to receive an offer of admission as early as September or October. The majority of the of the offers will still be tendered at the end of January through April. All candidates regardless of date tendered will have until 1 May 2023 to accept or decline their offer. USMAPS offers of Admission will be tendered together on or about the first week of May after all files have been evaluated and approved through the Admissions Committee. Civil Prep Files will be offered as they complete their files, submit first semester transcripts, and are fully qualified for admission. International and former cadet files will go through the admissions review and committee review before final adjudication at the Academic Board in the Spring of 2024. Only exceptions will be former cadets considered for readmission for the Spring Term – those files will be completed and adjudicated before December 2023.

5. **Talent and Diversity:** Within major talent and diversity categories we will be authorized the following vacancies based on the 2027 goals.

| 2027 Talent and Diversity (%) Class size 1259 | Ath >23% | AfAM >14% | Hisp>11% | Asian>5% | Women>20% | Ldr>15% | Sch>30% | Soldiers>5% |
|---|---|---|---|---|---|---|---|---|
| USMA 2027 Goal | >280 | >171 | >138 | >61 | >244 | >183 | >366 | >61 |
| USMA27Actual 1259 | 270 (21.4%) | 131 (10.4%) | 137 (10.8%) | 174 (13.8%) | 249 (19.8%) | 199 (15.8%) | 486 (38.6%) | 92 (7.3%) |
| USMA 2027 Goal Achieved | Not achieved | Not achieved | Not Achieved | Exceeded | Not Achieved | Exceeded | Exceeded | Exceeded |
| 2028 Talent and Diversity (%) Class size 1220 | >23% >290 | >14% >177 | >11% >139 | >5% >63 | >20% >252 | >15% >189 | >30% >360 | >5% > 61 |

6. **Letters of Assurance**. Effective 1 July 2023 we will open Letters of Assurance (LOA) consideration for candidates listed below in sub paragraph 6(a-e). They must have at least sixth semester transcript and verifiable ACT or SAT scores and have **an interview** in their file. **Anyone wishing to pursue a LOA for a candidate with just PSAT scores must gain the approval of the Deputy Director of Admissions prior to pushing through the workflow**. Interviews can be either FFORCE interviews, USMA interviews while visiting USMA, ROTC interviews, SLE interviews, or modified CHIP sheet from the head coach for a recruited athlete which addresses character. **If their CEER is below 554, they must be brought to EXCOM**. These guidelines may shift during the class cycle. Be prepared to execute changes rapidly should the guidelines shift due to class size changes.

   a. 1-rated chipped Recruited Athletes: CEER/ACEER ≥ 554 with no risk. For CEER/ACEER < 554 or indicated risk, must be approved by the Admissions Executive Committee (EXCOM) or the Admissions Committee as required. **(less than 160 per class cycle)**

   b. African-American: CEER/ACEER ≥ 554 with no risk. For CEER/ACEER < 554 or indicated risk, must be approved by the admissions Executive Committee (EXCOM) or the Admissions Committee as required. **(less than 120 per class cycle)**

   c. Hispanic- American: CEER/ACEER ≥ 554 with no risk and WCS >5599. For CEER/ACEER < 554 or indicated risk, must be approved by the Admissions Executive Committee (EXCOM) or the Admissions Committee as required. **(less than 75 per class cycle)**

   d. Scholars: CEER/ACEER ≥ 650 with no risk and WCS >6800. **(less than 75 per class cycle)**

   e. Women: CEER/ACEER ≥ 554 with no risk and WCS >6499. For CEER/ACEER < 554 or indicated risk, must be approved by the Admissions Executive Committee (EXCOM) or the Admissions Committee as required. **(less than 75 per class cycle)**

7. **USMAPS:** Entering USMAPS class size is slightly larger than the 2022 cohort, however we are continuing to monitor the risk entering USMAPS. We expect 239 students to enroll into USMAPS this year, still smaller than the 246-seat capacity. We will continue to follow the restriction of less than 10% of an incoming class with a CEER below 466 but will exclude those Prepsters from CEER risk calculations, instead using PCEER for USMAPS CEER risk assessments. For the class of 2028 enrolling into USMAPS, Regional Commanders should establish a standing list of ten candidates for each region for USMAPS with at least one candidate of Native Hawaiian/Pacific Islander decent (when possible). These candidates should be very strong leaders and have a **single risk** in the academic area. We should be able to make a USMAPS decision on this RC group by early March 2024. All candidates for consideration to go into USMAPS will be reviewed by the USMAPS member of the Admissions Committee Team. We will not use USMAPS as a medical holding facility, so all USMAPS offers will be for medically qualified applicants only, unless specifically approved by the DAD.

8. **WPPSP:** Plan for a West Point Preparatory Class size of forty candidates. This will allow Athletic Department to place ten recruited athletes in the program if needed. All other candidates for this program will be fully qualified with **no risks and WCS > 5900**. We should move aggressively with high quality regional candidates. Regional Commanders also need to establish a standing list of fifteen candidates to be considered for this program. I want to make all non-recruited athlete offers before 1 April 2024 if possible.

9. **Other guidance for the year**:

   a. VAS / VAC  and QNS Drills:
      i. Regional Commanders can conduct internal VAS drills in the summer. We will conduct a VAS drill in early October for any candidate who falls below the 5000 WCS or below 400 CEER.  Regional Commanders and Admissions Officers can make exceptions based on other aspects of the file, but for the standing rule of thumb we will adhere to this VAS criteria.
      ii. We will conduct a VAC drill in early November for any candidate with an open file greater than 90 days and no action on the file.  A second VAC drill may be conducted in February for lack of seventh semester transcripts or college transcripts.  File completion deadline is 31 January 2023 – and incomplete file at that time will be closed.  Exceptions will be granted only by me on a case-by-case basis.
      iii. Part of the file completion will be an interview form.  Ideally, we will have the interview in the file prior to tendering an offer of admission.  We will use both the USMA interview form and the ROTC PMS interview form this candidate cycle.  An amended chip sheet for 1 rate athletes can also be used as long as it addresses character.

10.  Congratulations on a great class of 2027 as we maneuvered through the various DODMERB
challenges. All travel will still be approved by LTC Tolman or me, and nested in an integrated
plan to reach as many candidates and their influencers as possible.  We will continue to market
aggressively in many areas to continue our efforts to inspire quality students to open and
complete an application to West Point.  Well done by each and every one of the DAD team.
Your dedication and diligence made this past year an exceptionally smooth one. The Corps
Starts Here!

LEE.RANCE.ALL
EN.1037455780

Digitally signed by
LEE.RANCE.ALLEN.1037455780
Date: 2023.07.12 21:37:47
-04'00'

RANCE A. LEE
LIEUTENANT COLONEL, US ARMY
Director of Admissions