UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>Plaintiff-Appellant,<br><br>v.<br><br>UNITED STATES MILITARY<br>ACADEMY AT WEST POINT, *et al.*,<br><br>Defendants-Appellees. | Docket No. 24-40 |

**Defendants-Appellees' Opposition to Plaintiff-Appellant's
Motion for Injunction Pending Appeal**

Defendants-appellees (the "government") respectfully submit this memorandum opposing the "Emergency Motion for Injunction Pending Appeal" ("Mot.") by Students for Fair Admissions ("SFFA").

As the most senior leaders of the U.S. Armed Forces have concluded for decades, the U.S. Army has a compelling national-security interest in a diverse officer corps. Diversity, including racial and ethnic diversity, makes a more effective fighting force—more cohesive and lethal, better able to attract and retain top talent, and more legitimate in the eyes of the nation and the world. The Army's interest in preserving national security is "an urgent objective of the highest order," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010), and is fundamentally

different from the educational interest at issue in *SFFA v. Harvard College*, 600 U.S. 181 (2023). To further this compelling interest, the U.S. Military Academy ("West Point") narrowly considers race and ethnicity at three limited stages of its admissions process to ensure the Army continues to produce the officer corps that military leadership has determined is necessary for success.

SFFA sought a preliminary injunction from the district court, which was denied on January 3, 2024. SFFA now seeks what it failed to obtain below: an order directing West Point to immediately change its admissions policies during the middle of the current admissions cycle. In doing so, it misconstrues facts cherrypicked from an underdeveloped factual record and asks this Court to apply *Harvard* wholesale to West Point, without full briefing and factual development regarding the entirely distinct military interests presented here. In sharp contrast, by expressly leaving open the issue of *Harvard*'s application to military academies, the Supreme Court took a cautious approach, which SFFA's insistence on emergency intervention would jettison. Ordering West Point to rewrite its longstanding admissions policies mid-cycle—before facts can be developed by the parties and tested by the fact-finder—would

2

harm West Point, the Army, and national security in ways that cannot easily be undone if the government prevails on the merits. SFFA's extraordinary request should therefore be denied.

## BACKGROUND

West Point prepares cadets to become leaders and officers in the Army and is a vital pipeline to senior leadership in the Armed Forces. ECF 53 ¶¶ 7, 38-40.[1] To be admitted to West Point, a candidate must complete a candidate questionnaire, a "second step kit," a physical fitness assessment, a medical evaluation, and an interview, and must receive either a service-connected nomination or a nomination from a statutory nominating authority. *Id.* ¶¶ 19, 31, 45-48. The admissions process begins in February of the year before candidates would enter West Point, and candidates must complete their applications by January 31 of the year they would enter West Point. *Id.* ¶¶ 20, 29.

The Admissions Office assigns each candidate a "Whole Candidate Score," which is based on academic qualifications, a "Community Leader Score," and a fitness assessment, and also determines whether each

---

[1] "ECF" refers to the district court docket.

candidate is "qualified"; neither determination considers race or ethnicity. *Id.* ¶¶ 49, 51-54, 55, 58, 59-60, 64.

The vast majority of the incoming class is selected based entirely on Whole Candidate Score. *Id.* ¶ 65. Only a small share of each cadet class—including candidates selected as "Additional Appointees" or for "Superintendent nominations"—may be selected by different means. *Id.* ¶¶ 10, 41-42, 65, 70(b). The Admissions Office *may* consider race and ethnicity as one factor in a holistic assessment in extending offers to Additional Appointees or recommending candidates for Superintendent nominations, but in practice it rarely does so for Superintendent nominations, most of which go to athletes. *Id.* ¶¶ 41, 70(b), 94. The Admissions Office may also consider race and ethnicity as one factor in a holistic assessment in extending letters of assurance ("LOAs"). *Id.* ¶¶ 72-73, 75, 91.[2] West Point considers race and ethnicity narrowly as one

---

[2] LOAs are early-notification conditional offers of admission, not separate pathways to admission; their recipients may ultimately be admitted through a race-neutral pathway.

SFFA misconstrues the admissions process and its use of race and ethnicity. *Compare* ECF 53 ¶¶ 7-96, *with* Mot. 3-5. For example, SFFA highlights guidance regarding how many LOAs are available and scores warranting issuance of LOAs (Mot. 3-4, 9), without acknowledging that all candidates can compete for LOAs, and this guidance does not mandate

factor at these three stages of the admissions process only to further the Army's distinct interest in developing a diverse officer corps to meet its critical national-security mission. *Id.* ¶¶ 80, 95; ECF 48 ¶¶ 8-30.

## LEGAL STANDARD

A preliminary injunction is "extraordinary and drastic" relief, "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 679-80 (2008) (quotation marks omitted). Movants must "bear the burden of showing that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *Agudath Israel v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020). "[M]ore is required" where a movant seeks the "still more drastic" relief of "an injunction issued in the first instance by an appellate court," "including a strong showing" of likelihood of success on the merits. *Id.* (quotation marks omitted).[3]

---

numerical requirements for LOAs because it is advisory only, ECF 53 ¶¶ 72, 74-75, 77, 78, 91. Thus, the LOA review process does not establish a quota as that term is "properly understood." *Grutter v. Bollinger*, 539 U.S. 306, 335 (2003).

[3] Because SFFA's request is already subject to a "significantly higher" standard, *Agudath*, 980 F.3d at 226, the Court need not determine

5

## ARGUMENT

### A. SFFA Has Not Demonstrated Likelihood of Success on the Merits

As the district court concluded, SFFA has not shown it is likely to succeed on the merits. Governmental classifications based on race must satisfy strict scrutiny: the use of race must "further compelling governmental interests," *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003), and be " 'narrowly tailored,' " or " 'necessary,' " to achieve those interests, *Harvard*, 600 U.S. at 207. SFFA's motion accepts that the Army has compelling national-security interests in the cohesion and lethality, recruiting and retention, and legitimacy benefits that flow from a diverse officer corps, but argues West Point's use of race and ethnicity in admissions is not narrowly tailored to achieve those interests. (Mot. 2-3). SFFA is wrong.

---

whether the heightened standard for mandatory injunctions also applies. Nonetheless, it does. This Court "focus[es] on the status quo rather than the 'mandatory' and 'prohibitory' terminology"—"[p]rohibitory injunctions maintain the status quo pending resolution of the case," while "mandatory injunctions alter it." *North American Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 36 & n.4 (2d Cir. 2018). The injunction SFFA seeks would undoubtedly alter the status quo, requiring West Point to "affirmatively change and remodel its admissions process." (ECF 78 ("Op.") 13); ECF 53 ¶ 81.

### 1. The Army's Professional Judgments Warrant Deference, and the Army's Interests Distinguish This Case from *Harvard*

SFFA's narrow-tailoring analysis suffers from two fundamental flaws: its insistence that this Court should disregard the Army's professional judgments about its military needs, and that *Harvard* forecloses West Point's use of race and ethnicity when the Army's compelling interest is altogether different from that of civilian universities, as *Harvard* itself contemplated.

"Deference by the courts to military-related judgments by Congress and the Executive" is required because "courts are ill-suited to second-guess military judgments that bear upon military capability or readiness." *Able v. United States*, 155 F.3d 628, 633-34 (2d Cir. 1998) (collecting Supreme Court cases). This is particularly true where, as here, "complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force" are at issue, as it is "difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

Deference to military judgments is not inconsistent with strict scrutiny (*contra* Mot. 13-15). The Supreme Court has consistently

deferred to military judgments even where strict or heightened scrutiny would apply. *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986) (First Amendment free-exercise challenge); *Rostker v. Goldberg*, 453 U.S. 57, 64-72 (1981) (equal-protection challenge); *see Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring). As the district court recognized, a court "must analyze West Point's admissions program under the strict scrutiny rubric *together with* the Supreme Court's instruction to give 'great deference to the professional judgment of military authorities.'" (ECF 78 ("Op.") 21).

Military authorities here have set out their considered and examined judgment: based on the repercussions that flow in its absence and the benefits it confers, a diverse officer corps is necessary for an effective fighting force. ECF 48-53 (explaining historical context, repeated conclusions by senior military leadership, battlefield experience, and research). At its most stark, a lack of diversity in leadership can jeopardize the Army's ability to win wars. The Army learned this lesson the hard way, after decades of unaddressed internal racial tension eventually erupted during the Vietnam War. Plagued by accusations that white officers were using minority servicemembers as

"cannon fodder," the Army confronted violent internal riots from fire bases in Vietnam to Army posts within the U.S. to installations and warships in West Germany, Korea, Thailand, and Okinawa. ECF 50 ¶¶ 38-51. The violence and resulting mission disruption posed such danger to the Armed Forces that senior leadership concluded it fundamentally threatened the Army's ability to fulfill its national-defense mission. *Id.* ¶¶ 56-74; ECF 48 ¶ 14; ECF 49 ¶ 32. Presidentially appointed committees comprising the most senior military leaders have repeatedly concluded, from at least 1963 to today, that the Army's strength and readiness depend on a pipeline of officers who are both highly qualified and racially and ethnically diverse, and who have been educated in environments that prepare them to lead increasingly diverse forces. ECF 51 ¶¶ 9-33; ECF 48 ¶¶ 11-16; ECF 49 ¶ 14; ECF 50 ¶ 9.

And it is West Point's considered and examined judgment that, without considering race and ethnicity in its admissions, its cadet corps, and therefore the future officer corps, would be meaningfully less diverse. *E.g.,* ECF 53 ¶ 104. The Army knows well what the officer corps could look like without diversity initiatives, and what it does look like with them. (*Contra* Mot. 12-13). In 1968, at the height of a racial crisis within

9

the military, the Army had 520 white general officers and only one Black general officer (0.002% of the total). ECF 50 ¶ 67. Today, individuals identified as Black, individuals of Hispanic origin, and individuals of Asian or Pacific Islander origin make up approximately 11%, 9%, and 8% of the officer corps, respectively, while white individuals make up 68%. ECF 49 ¶¶ 9-10. The West Point cadet corps is consistent with this trend: as of 1968, in its entire history, West Point had graduated almost 30,000 cadets but only 68 Black cadets. ECF 50 ¶ 76; ECF 53 ¶¶ 81-88. The West Point class of 2027, however, includes 10% Black cadets, 13.5% Asian cadets, 0.9% Native American cadets, and 11.4% Hispanic cadets. ECF 53 ¶ 88.

SFFA disregards these military judgments and these distinct interests in contending (Mot. 1) that the "logic" of *Harvard* compels its success here. *Harvard* addressed whether civilian universities' interest in "obtaining the educational benefits" of diversity, 600 U.S. at 209, and their means for doing so, survived strict scrutiny. But a different analysis applies where a different compelling interest is at issue—especially where, as here, that interest is preparing our nation's military for war. *See Grutter*, 539 U.S. at 327. The Supreme Court specifically

10

recognized as much, declining to address whether consideration of race and ethnicity in admissions policies "at our Nation's military academies" survives strict scrutiny "in light of the potentially distinct interests that military academies may present." *Harvard*, 600 U.S. at 213 n.4.

SFFA's suggestion that the *Harvard* Court already considered and rejected the military interests at issue here (Mot. 12) misreads that decision. While the government argued in *Harvard* that the military has an interest in fostering diversity through civilian universities' Reserve Officer Training Corps programs, the Supreme Court did not address that argument—indeed, the majority did not mention ROTC, and it expressly carved out the military academies from its decision. 600 U.S. at 213 n.4. Thus, the Court explicitly distinguished the interests in the civilian context from those in the military context, indicating that a judgment regarding one may not apply to the other.

The cases SFFA cites do not suggest otherwise. *Johnson v. California* applied strict scrutiny to racial classifications in a prison context, but made clear that in light of "the special circumstances" that prisons present, racial classifications may be deemed valid under strict scrutiny, "which is designed to take relevant differences into account."

11

543 U.S. 499, 509-15 (2005). And this case bears no resemblance to *Korematsu v. United States*, 323 U.S. 214 (1944)—considering race and ethnicity narrowly as a plus factor in a holistic, individualized admissions process is a far cry from military internment of Americans based on race.

### 2. West Point's Use of Race and Ethnicity Is Narrowly Tailored

Deferring to the professional judgment of the Army and calibrating the inquiry to the Army's distinct national-security interest requires the conclusion that West Point's use of race and ethnicity is sufficiently narrowly tailored.

The Supreme Court has held (in the civilian context) that an admissions program that considers race and ethnicity must treat "each applicant" "as an individual." *University of California v. Bakke*, 438 U.S. 265, 318 & n.52 (1978); *accord Grutter*, 539 U.S. at 337. "[T]ruly individualized consideration demands that race be used in a flexible,

12

nonmechanical way . . . as a 'plus' factor in the context of individualized consideration." *Grutter*, 539 U.S. at 334.[4]

West Point conducts that individualized consideration. At the three limited points in its admissions process where race and ethnicity may come into play, West Point "engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute" to the cadet corps and ultimately to the Army as a commissioned officer, *id.* at 337; at each of these points, individualized consideration is afforded equally to candidates of all races and ethnicities, and race and ethnicity do not function as "defining feature[s]," but rather are considered alongside many other factors—such as demonstrated leadership, athleticism, scholastic aptitude, and soldier experience—that may contribute to cadet corps diversity, *id.* ECF 53 ¶¶ 72, 75, 77-78, 91-92 (LOA); *id.* ¶¶ 41, 94 (Superintendent nomination); *id.* ¶¶ 70(b), 93 (Additional Appointee).

---

[4] SFFA argues *Harvard* "eviscerated" *Grutter* (Mot. 5), but the Supreme Court relied on *Grutter* and other precedent addressing the use of race in admissions at civilian universities extensively in *Harvard*, 600 U.S. at 214-25, making clear that those cases continue to apply.

SFFA argues that West Point's individualized admissions process fails strict scrutiny because it "violates" five "rule[s]" from *Harvard*. (Mot. 8). These arguments misconstrue *Harvard* and fail to take account of the altogether different interests asserted here.

First, West Point's admissions process does not rely on impermissible racial stereotypes. (Mot. 11). "Context matters." *Grutter*, 539 U.S. at 327. *Harvard*'s discussion of stereotyping was focused on guarding against assumptions that students of particular races express "characteristic minority viewpoint[s]" and, therefore, that their admission would further classroom diversity. 600 U.S. at 219-21. West Point does not seek to admit diverse candidates on the assumption they express a particular viewpoint shared by others of the same background, ECF 53 ¶ 95, nor does it do so in pursuit of educational benefits of diversity. Rather, West Point seeks to admit diverse candidates so the Army can achieve its interests in cohesion and lethality, recruiting and retention, and legitimacy through a diverse officer corps.[5] And West

---

[5] SFFA misstates the interest at issue by referring to "West Point's" interests. The *Army*, which includes West Point, has a national-security interest in a diverse officer corps; West Point's admissions process serves that interest.

Point's admissions process is grounded not in stereotyped assumptions about how cadets—and ultimately officers—of particular races and ethnicities might contribute to those military interests; it is grounded in professional Army judgments—supported by extensive experience and research, ECF 48-53—that those interests cannot be realized without a diverse officer corps. Thus, West Point does not rely on any *assumption* that there is inherent benefit in diversity for diversity's sake; it embraces the empirical military judgment (which warrants judicial deference) that there are strategic, operational, and tactical benefits in the diversity of the officer corps.

Second, there is a meaningful connection between West Point's use of certain racial and ethnic categories and the interests it pursues. (Mot. 9).[6] Again, "[c]ontext matters." *Grutter*, 539 U.S. at 327. *Harvard* concluded the "racial categories" those universities used did not further the "educational benefits of diversity" they claimed to pursue. 600 U.S. at 215-16. Here, however, there is no similar "mismatch." *Id.* at 217.

---

[6] *Harvard* discusses racial categories in the context of whether means are connected to goals. 600 U.S. at 215-17. It does not establish a "rule" that admissions programs "cannot rely on 'incoherent' racial categories." (Mot. 9).

15

The Army has concluded that to achieve its national-security interests, it is mission-critical that the officer corps reflect the diversity of the enlisted corps and the nation as a whole. ECF 48-53. To achieve that goal, West Point uses the same race and ethnicity categories mandated by the Office of Management and Budget to measure the demographics of the Army and the U.S. population. ECF 53 ¶¶ 112-13. Thus, it is "evident" how use of these categories furthers the interests the Army pursues. 600 U.S. at 216.

Third, West Point does not intend to use race and ethnicity indefinitely, and periodically reviews and adjusts its admissions process, ECF 53 ¶ 96, to "ensur[e] that race [and ethnicity] play[] no greater role than is necessary to meet its compelling interest," *Fisher v. University of Texas*, 579 U.S. 365, 380 (2016). Countermanding military judgments that a diverse officer corps is necessary to achieve the Army's national security interests by further imposing an arbitrary end point on West Point would pose risks of a kind that the Supreme Court had no occasion to consider in *Harvard*.

Fourth, West Point does not use race and ethnicity as "negative[s]." (Mot. 8-9). Race is used as a negative where it "'unduly harm[s]

nonminority applicants.'" *Harvard*, 600 U.S. at 212, 218 (quoting *Grutter*, 539 U.S. at 341). *Harvard* cited evidence of such undue harm, *id.* at 218, but here, there is none. Indeed, for the vast majority of cadets, race and ethnicity play *no role* in their evaluation by and appointment to West Point. ECF 53 ¶¶ 42, 65, 70(b), 89. It is therefore likely that, on a full trial record, West Point will be able to demonstrate its admissions process does not unduly harm any racial or ethnic group—and thus does not use race or ethnicity as negatives.[7]

Finally, in positing the Army's national-security interests in fostering a diverse officer corps are not sufficiently measurable, SFFA misunderstands those interests. While the Supreme Court held that Harvard's and UNC's interest in educational diversity was not sufficiently measurable because, among other things, a court could not determine whether the exchange of ideas is "robust," or whether "new knowledge" is being developed, 600 U.S. at 214, the Army's interests in diversity are different. They are intended to address a concrete problem

---

[7] As SFFA acknowledges (Mot. 2, 17), its characterization of *Harvard*'s admonition that race not be used as a negative would foreclose all uses of race and ethnicity in admissions everywhere (Mot. 8-9). But if that is what the Supreme Court had meant, it would have had no reason to carve out military academies. 600 U.S. at 213 n.4.

civilian universities do not face: creating and maintaining a lethal fighting force to defend our nation, against a specific historical backdrop of racial tensions between officer and enlisted corps that have threatened to undermine that mission.

But even if such measurement were required, the Army has identified several ways a court could determine whether the Army is meeting its goals. A court can examine the same data the Army does, such as feedback from current servicemembers. The "Army measures unit cohesion through Army-wide surveys and annual command climate surveys," including the congressionally mandated annual Defense Organizational Climate Survey ("DEOCS"), which collects information on unit cohesion, harassment, discrimination, and mission readiness. ECF 49 ¶ 16. DEOCS has consistently found that individuals who report higher levels of unit cohesion are more likely to remain in service, *id.*, and that "long-standing challenges in retention and advancement of . . . minority members and racial/ethnic harassment and discrimination . . . degrade unit 'Cohesion' and ultimately degrade the readiness and lethality of the all-volunteer force," Department of Defense, Office of People Analytics, DEOCS Redesign: Phase 1 Overview Report, at 335

(2021); *cf. id.* at 153 ("Research finds that inclusive work environments are linked to reduced risk of racial/ethnic harassment/discrimination and turnover intentions as well as increased readiness.").

As in the prison context, a court can "careful[ly] consider[]" the views of senior military leadership, *cf. Washington v. Lee*, 263 F. Supp. 327, 332 (M.D. Ala. 1966) (Frank Johnson, J.), *aff'd*, 390 U.S. 333 (1968), which has consistently concluded officer diversity is a national-security imperative. ECF 49 ¶ 42; ECF 48 ¶ 19; ECF 51 ¶¶ 17-28. That conclusion is a strategic military judgment, amply supported by military history, real-world battlefield experience, and qualitative and quantitative studies. ECF 48-53. Because the Army has concluded the officer corps must reflect the diversity of the enlisted corps and the nation as a whole, a court can examine demographic data to determine whether the Army is meeting those goals. ECF 49.[8]

---

[8] In SFFA's case against the U.S. Naval Academy, asserting the same claim as here, the district court denied SFFA's motion for a preliminary injunction. *SFFA v. U.S. Naval Academy*, No. 23 Civ. 2699, 2023 WL 8806668 (D. Md. Dec. 20, 2023). The district court agreed "a court could examine demographic data to determine whether the government is meeting its goals." *Id.* at *13.

19

Also as in the prison context, a court can examine whether major violent racial conflicts in the Army have occurred since the Army made an effort to diversify its officer corps. None have. ECF 50 ¶ 81. Just as the Supreme Court found measurable whether "temporary racial segregation of inmates will prevent harm to those in prison," such as a "race riot," *Harvard*, 600 U.S. at 207, 215, the fact that similar harm to servicemembers has not recurred demonstrates measurable success.

To determine whether diversity in the officer corps successfully increases recruitment and retention, a court can also examine the numbers: the number of minority officers is increasing, the number of minority cadets at West Point is increasing, and retention within the Army is at an all-time high. ECF 49 ¶ 10; ECF 53 ¶¶ 81-88; ECF 48 ¶ 24.

To determine whether diversity in the officer corps bolsters the Army's legitimacy in the eyes of the nation and the world, a court can evaluate national surveys and determine whether there have been international incidents similar to those that plagued the military when the lack of diversity among the officer corps and enlisted corps was at its most stark. ECF 49 ¶ 32; ECF 50 ¶ 81.

20

At bottom, SFFA asks the Army to prove a negative—if its officer corps were not diverse, national security would not be harmed. But that not only ignores history, but also would require the Army to conduct a real-world, real-time experiment, potentially endangering servicemembers and undermining national security. The Constitution does not require such an unethical test, and it would fly in the face of decades of military judgment.

SFFA's last-ditch attempt to compare West Point to the Coast Guard Academy is factually flawed. SFFA claims—without citation—that before the Coast Guard Academy considered race in admissions, it conducted an "aggressive advertising and recruiting campaign" and "increased minority enrollment by 60%—from 15% to 24%," ECF 1 ¶ 105, and contends West Point has failed to consider such race-neutral alternatives (Mot. 13). But West Point has offered evidence that it already uses race-neutral alternatives and has considered others, and none used or considered would be sufficient. ECF 53 ¶¶ 105-10. Moreover, the Coast Guard Academy's policies are not in the record, and in any event the Coast Guard, unlike the Army, is not a component of the Department of Defense.

21

### 3. The District Court Properly Exercised Its Discretion

SFFA argues the district court committed "reversible error" in denying its motion. (Mot. 15-17). But the issue now is whether SFFA is entitled to an injunction pending appeal, not whether it can succeed on its appeal of the district court's refusal to grant a preliminary injunction. *Agudath*, 980 F.3d at 228.

Regardless, the district court acted well within its discretion in denying a preliminary injunction. The district court ruled that granting "extraordinary and drastic" relief on such an important issue would require a fuller evidentiary record and presentation of arguments regarding strict scrutiny. (Op. 19-23). That was within the court's wide discretion. *Munaf*, 553 U.S. at 679-80 (injunctions "never awarded as of right"); *Ashcroft v. ACLU*, 542 U.S. 656, 664 (2004) (preliminary injunction rulings reviewed for abuse of discretion). While SFFA points to cases holding that injunctions were *permissible* even on an incomplete record (Mot. 16-17 (citing, e.g., *Ashcroft*, 542 U.S. at 670-71)), none of those cases hold an injunction *must* issue even if a court holds it would be imprudent to decide. *See Trump v. International Refugee Assistance Project*, 582 U.S. 571, 579-80 (2017).

22

### B. SFFA Has Not Shown Irreparable Harm

SFFA has not shown its members will face irreparable harm absent injunctive relief pending appeal. An alleged constitutional violation, standing alone, does not always constitute irreparable harm. Rather, "[i]n cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in noncompensable damages ordinarily warrants a finding of irreparable harm." *A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021). The injury must be "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quotation marks omitted).

As the district court concluded (Op. 25 n.15), the irreparable harm SFFA claims its members will face—the denial of the ability to compete on an equal footing, resulting in a loss of opportunity to join the West Point class of 2028—is remote and speculative. Such harm would result only if those members (1) complete their West Point applications before January 31, 2024; (2) are qualified; (3) are not selected to fill a vacancy or qualified alternate slot, ECF 53 ¶ 70; (4) are considered for selection

as Additional Appointees or Superintendent nominations; and (5) ultimately are not selected for appointment because of West Point's limited consideration of race and ethnicity.

But the sparse declarations from Members A and C neither state that those members will actually apply by West Point's application deadline nor provide information regarding their qualifications in any detail, which is necessary to determine whether they could even be affected by the policy they challenge.  SFFA thus has not supported this "speculative and attenuated injur[y]" with the evidence necessary to demonstrate likely irreparable harm to its members.  *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995).

The cases SFFA cites underscore that the harm claimed is not "so imminent as to be irreparable if [the] court waits until the end of trial to resolve" it.  *Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999). Those cases involve situations where the opportunity would be lost forever, *D.M. v. Minnesota State High School League*, 917 F.3d 994, 1003 (8th Cir. 2019) (high school juniors would lose opportunity to dance on school team senior year), or for a significant time, *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (presidential candidate would lose

24

opportunity to compete in primary held every four years), such that the court could not provide an effective remedy at the end of the litigation. Here, however, "[t]he threatened harm would [not] impair the court's ability to grant an effective remedy" to Members A and C were SFFA to succeed on its claim at trial, and thus there is no "need for preliminary relief." *Rodriguez*, 175 F.3d at 235. Given that Members A and C are both 18 years old or younger, ECF 8 ¶ 1, ECF 25 ¶ 1, and cadets may enter West Point if they are not yet 23 years old by July 1 of the year of entry, ECF 53 ¶ 22, a trial could be completed, and all appeals concluded, with ample time for Members A and C to apply and compete for appointment to West Point in several future admissions cycles. As the district court concluded (Op. 25-26), these members' alleged irreparable harm thus cannot "be deemed 'imminent,' " *Rodriguez*, 175 F.3d at 235.

## C. The Public Interest and Balance of Equities Weigh Against an Injunction Pending Appeal

Finally, as the district court concluded, the public interest and balance of equities weigh heavily in the government's favor. A court "must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary

remedy of injunction.'" *Yang*, 960 F.3d at 135-36 (citation and footnotes omitted).

West Point is mid-admissions cycle. Applications for the class of 2028 opened in February 2023 and are due by January 31, 2024, with most offers extended through April 2024; corresponding dates apply to the class of 2029. (Op. 26). The district court concluded the "requested injunction, to take effect on February 1, 2024, would require the entire admissions policy to be changed, and a new policy be applied to the current applicant pool midstream, as well as to applicants to the new admissions cycle beginning on February 1, 2024." *Id.*[9]

This impact on the admissions cycle outweighs Members A and C's individualized interests in changing West Point's policy mid-admissions cycle. *See Christa McAuliffe Intermediate School PTO v. de Blasio*, 364 F. Supp. 3d 253, 276 (S.D.N.Y. 2019) ("balance of hardships" favored

---

[9] SFFA argues such disruption is "greatly overstated" because West Point makes "almost all admissions decisions between February and April," and an injunction could be written to only apply prospectively. (Mot. 20). But SFFA misses the point. West Point would have to revise its admissions criteria and apply the new policy to candidates currently (or soon to be) under review—candidates who, as a result, would then be treated differently than others already considered this same cycle.

26

defendant where late change to admissions policies would impose "undue burden" on school and students), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).

Moreover, the Supreme Court has reversed a preliminary injunction on "[a] proper consideration" of national security "alone," where, as here, the military provided evidence that the injunction would result in an "adverse impact on the public interest in national defense." *Winter v. NRDC*, 555 U.S. 7, 24 (2008); *id.* at 28 (criticizing lower courts' failure to "give sufficient weight to the views of several top Navy officers").

## CONCLUSION

SFFA's motion should be denied.

Dated:   New York, New York        Respectfully submitted,
         January 11, 2024

                                   DAMIAN WILLIAMS
                                   United States Attorney for the
                                   Southern District of New York
                                   *Attorney for Defendants-Appellees*

                          By:   /s/ *Alyssa B. O'Gallagher*
                                ELLEN BLAIN
                                ALYSSA B. O'GALLAGHER
                                BENJAMIN H. TORRANCE
                                Assistant United States Attorneys
                                86 Chambers Street, Third Floor
                                New York, NY 10007
                                Telephone: (212) 637-2743; 2822; 2703
                                Email: ellen.blain@usdoj.gov
                                       alyssa.o'gallagher@usdoj.gov
                                       benjamin.torrance@usdoj.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the above-named counsel hereby certifies that this memorandum complies with the type-volume limitation of the Federal Rules of Appellate Procedure. As measured by the word processing system used to prepare it, this memorandum contains 5,198 words.