# 24-40

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

STUDENTS FOR FAIR ADMISSIONS,

*Plaintiff-Appellant*,

v.

UNITED STATES MILITARY ACADEMY AT WEST POINT; UNITED STATES DEPARTMENT OF DEFENSE; LLOYD AUSTIN, in his official capacity as Secretary of Defense; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL STEVEN GILLAND, in his official capacity as Superintendent of the United States Military Academy; and LIEUTENANT COLONEL RANCE LEE, in his official capacity as Director of Admissions for the United States Military Academy at West Point,

*Defendants-Appellees*.

### REPLY IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL (RULING REQUESTED BY JANUARY 17, 2024)

January 31 is rapidly approaching, so SFFA will keep this reply short. Though it appreciates that the Court calendared this motion for January 23, SFFA respectfully asks this Court to rule more quickly. West Point does not deny that, if this Court grants an injunction, it will ask the Supreme Court for a stay. That third round of briefing will take time, and applicants need to know whether their skin color will matter when West

1

Point starts making general admissions decisions on February 1. This Court should enjoin West Point, pending appeal, from considering race.

## ARGUMENT

West Point misstates the legal standard. Opp.5 n.3. Though an injunction pending appeal "'demands a significantly higher justification than … a *stay*,'" *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020) (emphasis added), the standard is "similar" to the "standard for preliminary injunctions," *LaRouche v. Kezer*, 20 F.3d 68, 73 (2d Cir. 1994). SFFA satisfies all criteria for that interim relief.

**I.  SFFA will likely succeed.**

    **A.  This Court will likely reverse.**

The district court did not resolve *any* merits question, let alone in favor of West Point. It did not give West Point "'great deference'" Opp.8. It was "uncertain" about "how deference operates here." Ex.A at 21 n.11. The court didn't rule that the military academies are exempt from *Harvard* either. Opp.11. It found it "possible that *Harvard's* equal protection conclusions … apply to West Point." Ex.A at 22. And the court did not hold that SFFA is "not … likely to succeed" because West Point's use of race is constitutional. Opp.6. It dismissed that question as "impossible" in this posture. Ex.A at 22.

West Point barely defends this nondecision. It says no case required the district court to issue an injunction, Opp.22, but it cites no case suggesting that, in a constitutional case, a district court can find the movant *unlikely to succeed* without addressing the merits. SFFA cited many cases rejecting that approach. Mot.15-17. West

2

Point never responds, or even identifies what was missing from the "evidentiary record" that supposedly made a ruling improper. Opp.22. West Point, after all, created that record and has the burden under strict scrutiny. If something was missing, the district court should have ruled that *West Point* was unlikely to prevail.

West Point cannot paper over the district court's errors by saying "the issue now is whether SFFA is entitled to an injunction pending appeal." Opp.22. As West Point admits, the first factor that this Court considers on an injunction pending appeal is whether SFFA is "'likely to succeed on the merits.'" Opp.5. And the merits here means SFFA's "'appeal'" from the district court's denial of the preliminary injunction. *LaRouche*, 20 F.3d at 72. That West Point cannot defend the district court's denial speaks volumes.

### B. West Point is not exempt from *Harvard*'s principles.

West Point infers that, because *Harvard* "does not address" the military academies, the Court meant to *exclude* them from its reasoning and rules. 600 U.S. at 213 n.4; *see* Opp.11, 17 n.7. West Point reads "does not address" to mean "implicitly approves." But "does not address" can also mean "reserves the question" while giving the legal reasoning that controls the answer. *Windsor* did not address state bans on same-sex marriage, but its logic doomed them. Mot.1. *Trinity Lutheran v. Comer* "d[id] not address" anything other than "playground resurfacing," 582 U.S. 449, 465 n.3 (2017), but its "principles" doomed two different programs, *see Carson v. Makin*, 596 U.S. 767, 780 (2022); *Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246, 2254-60 (2020).

3

Lower courts must follow the *logic* of *Harvard*, not try to guess what the Justices were thinking. Perhaps *Harvard* did not address the academies because "[n]o military academy [wa]s a party" and the Court wanted to give them their day in court. 600 U.S. at 213 n.4. West Point is a party here. Perhaps *Harvard* did not address the military academies because "none of the courts below" had opined on their use of race. *Id.* That question is squarely presented here. Perhaps *Harvard* did not address the academies because it didn't know how or why they used race. *See id.* West Point submitted that evidence here. Or perhaps the Court thought that, after reading *Harvard*'s broadside against race-based admissions, the military academies would stop using race. They didn't, so now they must satisfy strict scrutiny.

*Harvard* does foreclose, however, the notion that the academies are different because they get "deference" on narrow tailoring—a plea that West Point makes at least seven times. *E.g.*, Opp.7, 8, 12, 15. The question is not whether courts should carefully consider the military's views, Opp.19, or even whether they should defer to the military on whether an interest is important, Opp.7-8. West Point cites no case suggesting the military gets deference *on narrow tailoring* when it classifies citizens based on race (or even a case involving racial classifications by the military). Opp.7-15. *Johnson* suggests—and *Korematsu* holds—that the military gets strict scrutiny when it racially classifies citizens; and *Korematsu*'s error—as *Harvard* explains—is that it *did* defer to the military. Mot.14-15. SFFA understands that Japanese internment and race-based admissions are different. *Cf.* Opp.12. But the same institutions that authorized internment should be

4

"the very *last* ones to be allowed to make race-based decisions, let alone be accorded deference." *Harvard*, 600 U.S. at 227 n.8.

### C. West Point fails strict scrutiny, badly.

Other than its failed plea for deference, West Point says it satisfies strict scrutiny because *Grutter* remains good law. Opp.13 n.4. That would be news to every civilian university, none of whom read *Harvard* as some fact-bound decision that still allows "uses of race … in admissions." Opp.17 n.7. West Point's insistence that, for the military academies, *Harvard* essentially does not exist is all that this Court needs to know about who is likely to succeed.

SFFA explained why West Point fails the five key principles from *Harvard*. Mot.8-13. Because any one of those violations would be fatal under strict scrutiny, SFFA will focus on the three that West Point essentially concedes.

West Point uses race as a negative. It concedes that, if an applicant's race is switched from black to Asian, she would lose an admissions boost at three points in its process. Opp.5. And it concedes that, if it stopped using race, West Point would "look" different. Opp.9.[1] West Point protests that, unlike in *Harvard*, the record doesn't quantify *how negative* race is for whites and Asians. Opp.16-17. But nothing in *Harvard*

---

[1] West Point suggests that, without racial preferences, the number of minority officers would plummet to "1968" levels. Opp.9-10. That claim is ludicrous; today's Army is three times further removed from 1968 than the 1968 Army was from de jure segregation. Doc.61 ¶26. But a non-hyperbolic point remains: West Point's current use of race meaningfully changes the racial composition of its classes.

5

suggests that some negative uses of race are okay, so long as they don't reach a certain threshold. An "*individual's* race may *never* be used against him in the admissions process." 600 U.S. at 218 (emphases added). West Point would also lose under its framing. If very few admissions decisions are affected by race, then West Point fails strict scrutiny because its use of race isn't necessary. *Parents Involved v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 733 (2007). Or if West Point doesn't know how much weight race gets in its process, then it fails strict scrutiny because it cannot prove any connection between its asserted interests and its use of race. *Harvard*, 600 U.S. at 224. And it would have failed to seriously study race-neutral alternatives. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).[2]

West Point uses arbitrary racial categories. West Point concedes it uses "the same race and ethnicity categories" that *Harvard* rejects. Opp.16. That the Census and Army *also* use these arbitrary categories is circular, not a defense against their arbitrariness. The point is that these categories are not grounded in cultural, anthropological, or scientific reality. *Harvard*, 600 U.S. at 216-17; *id.* at 291-94 (Gorsuch, J., concurring).

---

[2] The Coast Guard Academy's success with race-neutral alternatives is public-record, unrebutted, and detailed in SFFA's verified complaint (which counts as evidence here, *New Hope Fam. Servs. v. Poole*, 966 F.3d 145, 181 (2d Cir. 2020)). Despite the government's strange attempt to minimize the Coast Guard's importance, Opp.21, courts have long treated its academy as "comparable" to "the other Armed Services Academies" when resolving constitutional questions. *O'Neill v. Dent*, 364 F. Supp. 565, 571 (E.D.N.Y. 1973). And as the United States once stressed, "The many functions Congress has entrusted to the Coast Guard include, among others, national security, 14 U.S.C. 1, 2." U.S.-Br.16 n.10, *Lewis v. United States*, 2004 WL 2246244 (U.S.).

They were designed for rough bureaucratic bookkeeping, not military objectives. Mot.11. West Point cannot prove that people view the military as more cohesive, legitimate, and the like because it hits arbitrary targets that have nothing to do with how people see themselves. *Harvard*, 600 U.S. at 214-15.

West Point's use of race has no endpoint. West Point simply parrots the arguments that *Harvard* rejects. It admits that its racial preferences have no "'sunset date.'" *Id.* at 225. It "acknowledges that the way it thinks about the use of race" is "'the same now as it was' [decades] ago." *Id.* And it lacks a "'logical end point'" because its goal is to match the racial composition of the Army. *Id.* at 221. For example, West Point suspended part of its racial preferences for Hispanics at one point, but then reinstituted them once the numbers changed. Mot.10. Aside from promising the same "periodic review" that *Harvard* deemed insufficient, 600 U.S. at 225, West Point's only counterargument is that it doesn't need an endpoint because it's the military. Opp.16. But no military exception can be found in *Harvard*'s "critical" ruling that "*all* race-conscious admissions programs must have a termination point." 600 U.S. at 212 (emphasis added; cleaned up).

## II. Without an injunction, SFFA will suffer irreparable harm.

West Point concedes that an "'actual,'" "'imminent,'" and "'noncompensable'" violation of constitutional rights constitutes irreparable harm. Opp.23. The violation here is actual, as explained above. It is imminent, since West Point will start racially classifying thousands of applicants in less than three weeks. And it is noncompensable,

7

both because damages cannot remedy the intangible harm of unconstitutional racial discrimination and because damages are unavailable here to begin with. Mot.17-19.

This Court thus doesn't need to reach SFFA's other irreparable harms, though West Point's objections are weak there too. SFFA's members are applying to West Point now. (West Point's speculation that Members A and C might not "complete" their applications by January 31, Opp.23-24, is baseless and belied by their testimony and congressional nominations, *see* Docs.8, 25, 68-69; Mot.6.) West Point doesn't accept transfers, so asking applicants to wait another year to compete on a race-neutral playing field—for the chance to start all over as a "plebe" at West Point—is asking a lot. The costs of that lost opportunity are impossible to quantify, as West Points out, which is precisely why the harm is irreparable. Opp.24-25; *see* Mot.18-19.

West Point's confidence that "a trial could be completed, and all appeals concluded," quickly enough to benefit these members is wishful thinking. Opp.25. The district court insisted on a record as robust as *Harvard*. Ex.A at 22-23. But *Harvard* took almost *a decade* to reach final judgment. Far from "23 years old," Opp.25, SFFA's original members there were nearing their thirties when that case closed. *Harvard* has now changed the relative position of the challengers of race-based admissions vis-à-vis the defenders. Students should not have to endure waves of discrimination while the judicial process plays out here.

8

### III. The remaining factors favor an injunction.

West Point cannot argue that, *if* its racial preferences violate the Fifth Amendment, an injunction will harm the public interest. "The public interest would best be served by enjoining the defendants from infringing on the plaintiff's right to equal protection." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 807 (10th Cir. 2019). The Supreme Court has even stopped an election in its tracks, after voting had ended, to prevent an unconstitutional racial classification. *E.g.*, *Akina v. Hawaii*, 577 U.S. 1024 (2015).

West Point's claim that an injunction would come "mid-admissions cycle" cannot be reconciled with its purportedly narrow use of race. *Compare* Opp.26, *with* Opp.2. If West Point's use of race is "limited," Opp.24, then any disruption from an injunction forbidding that use should be equally "limited." Indeed, the pool of "qualified" candidates would remain the same if "the Admissions Office does not consider a candidate's race or ethnicity in determining whether a candidate is qualified." Ex.A at 8. Nor would the Academy need to change its calculations of applicants' whole candidate scores if "neither race nor ethnicity factors into the WCS." *Id.* at 7. West Point's "order of merit" candidate rankings, which are "determined by the WCS," would also be unchanged. *Id.* at 8.

And the admissions process is nowhere near the "mid[point]." Opp.26. If congressional appointees and qualified alternates are chosen based solely on their whole candidate scores, the highest-ranked candidates cannot be determined—and thus offers

9

cannot be extended—until the candidate pool is complete on January 31. Doc.53 ¶34, ¶70. Offers to additional appointees, where West Point says most of its racial preferences come into play, cannot be made until even later, because they occur only "if vacancies … remain following all the appointments otherwise authorized by law." Doc. 53 ¶70. Notably, West Point does not finish making appointment offers for this year's class until April 2024, but it claims that the process for next year's class begins in February 2024. Opp.26. So if injunctions are improper whenever West Point is "mid-admissions cycle," *id.*, the academy could never be enjoined.

West Point now concedes that a prospective injunction would not require it to rescind any letters or offers, Mot.20, so it complains instead that an injunction would cause some applicants to be "treated differently than others." Opp.26 n.9. But it is *West Point's racial preferences* that treat people differently—based on the most disfavored classification known to law. And even if applicants could "rely" on being a certain race, no applicant has a legitimate interest in being the beneficiary of unconstitutional racial discrimination. West Point cannot turn around and claim that the "balance of hardships" weighs in its favor, Opp.26, when it was the one who created those "hardships" in the first place. *See IME Watchdog v. Gelardi*, 2023 WL 6958855, at *10 (E.D.N.Y. Oct. 20) ("[T]he Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity.").

10

Finally, this Court could not rule that "national security alone" is sufficient to deny SFFA's motion without abusing its discretion. *See Singh v. Berger*, 56 F.4th 88, 92-97 (D.C. Cir. 2022). National security is *not* an overriding interest if West Point fails strict scrutiny. And West Point misreads *Winter v. NRDC*. That case said the government's interests "*outweigh*[*ed*]" the interests "advanced by the plaintiffs." 555 U.S. 7, 23-26 (2008) (emphasis added). While that was true for the *statutory* interest in "whale watching," *id.* at 25, it would not be true for the *constitutional* interest in protecting young Americans from racial discrimination.

## CONCLUSION

By January 17, 2024, this Court should grant an injunction pending appeal prohibiting West Point from considering race as a factor in admissions.

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 27(d)(2) because it contains 2,593 words, excluding the parts that can be excluded. It also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: January 12, 2024                              */s/ Cameron T. Norris*

## CERTIFICATE OF SERVICE

I e-filed this reply, which will email everyone requiring notice.

Dated: January 12, 2024                              */s/ Cameron T. Norris*

11